UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

---

| | |
|---|---|
| UNITED STATES of AMERICA | ) COURT FILE<br>) NO. 18-CR-149 (SRN/DTS) |
| vs. | ) Courtroom 9 West<br>) Friday, October 5, 2018 |
| NORRIS DESHON ANDREWS | ) Minneapolis, Minnesota<br>) 9:00 A.M. |

---

**MOTIONS HEARING**

**[ DAY 2 ]**

BEFORE THE HONORABLE DAVID T. SCHULTZ
UNITED STATES MAGISTRATE JUDGE

**A P P E A R A N C E S:**

For the Government: **OFFICE OF THE U.S. ATTORNEY**
By: JEFFREY S. PAULSEN
Assistant U.S. Attorney
600 United States Courthouse
300 South Fourth Street
Minneapolis, Minnesota 55415

For the Defendant: ***Pro Se***

**(Standby counsel)** **OFFICE OF THE FEDERAL PUBLIC DEFENDER**
By: REYNALDO A. ALIGADA, JR.
Assistant Federal Defender
107 United States Courthouse
300 South Fourth Street
Minneapolis, Minnesota 55415

Court Reporter: **TIMOTHY J. WILLETTE, RDR, CRR, CRC**
Official Court Reporter - U.S.D.C.
Warren E. Burger Federal Courthouse
316 North Robert Street - Suite 146
St. Paul, Minnesota 55101
651.848.1224

(9:00 a.m.)

**P R O C E E D I N G S**

**IN OPEN COURT**

THE COURT: All right. Good morning, everyone. We are on the record in the matter of the United States vs. Norris -- I don't have the caption in front of me.

Do you have it?

(Document handed to the Court)

THE COURT: Norris Deshon Andrews. Thank you. Case Number 18-CR-149.

Will counsel for the Government state your appearance for the record, please.

MR. PAULSEN: Good morning. Jeff Paulsen for the United States. Case Agent Dave Voth of ATF is with me.

THE COURT: Good morning.

And for the defendant?

MR. ALIGADA: For the record, Your Honor, Reggie Aligada from the Federal Defender's Office. I continue, I believe at Mr. Andrews' request, to serve as standby counsel and him representing himself *pro se*, Your Honor.

THE COURT: Very well. Good morning, Mr. Aligada and Mr. Andrews.

Mr. Andrews, I think it would be prudent for me to make a record just so that we're clear here, so -- and you can be seated.

You understand that you have the right to be represented by a lawyer from the Federal Public Defender's Office in this case, do you not?

THE DEFENDANT: Yes.

THE COURT: All right. And you understand that for today, at least, that person would be Mr. Aligada, who is an experienced counsel; you understand that, correct?

THE DEFENDANT: Yup.

THE COURT: Okay. And you understand the seriousness of this proceeding and the consequences or the potential outcomes that are riding on this hearing?

THE DEFENDANT: Yes, I do.

THE COURT: Okay. And is it your desire knowing all of those facts to go ahead and represent yourself with Mr. Aligada serving as standby counsel?

THE DEFENDANT: Yes, I do.

THE COURT: Okay. And you're doing that voluntarily, you're waiving your right to counsel in the form of Mr. Aligada today? In terms of him actually representing you, you're knowingly and voluntarily waiving that right in favor of representing yourself, correct?

THE DEFENDANT: Yes.

THE COURT: Okay. Very well. Thank you.

We may proceed, counsel.

THE DEFENDANT: Excuse me. Excuse me, Your Honor.

May I speak?

THE COURT: Oh. Yes, sir.

THE DEFENDANT: Prior to us leaving the last continuance -- I think it was the second continuance of this motion hearing, I had asked can I put other motions in, because they dumped, like, when you say so much exculpatory evidence on us two days, two days prior to the hearing that I wasn't able to challenge because it was submitted in an untimely fashion, and some of the documents are forged, so I will want to put my motions in.

Not everything that I'm putting in in these motions the Government, Jeffrey Paulsen, has. These are evidence and stuff that's from him, so I would like to put these on the docket and actually litigate these today as far as like dealing with them, because they can be dealt with readily available evidence today that doesn't need no continuances or nothing. And he has everything that I'm going to bring forth to support these allegations in these motions.

THE COURT: What is the nature of the motions? How many motions and what are they asking the Court to do?

THE DEFENDANT: Oh. Okay. Well, you want the full headings of them?

THE COURT: No, just tell me how many motions you have and basically what they are. Are they motions to

suppress certain evidence? What are they?

THE DEFENDANT: One is a motion to suppress all untimely evidence that he gave us between the 6th of September and the 12th of September.

THE COURT: Okay.

THE DEFENDANT: Another one is to dismiss this indictment for loss of exculpatory evidence and also a notice of my alibi.

THE COURT: Okay.

THE DEFENDANT: Another one is to compel the Government to disclose the identification witness that made the identification of me, the defendant, on May 15th, and to suppress the identification of this said witness for lack of grounds of actual seeing the shooting herself.

THE COURT: Okay.

THE DEFENDANT: I'm going to bring forth evidence to show that she wasn't out there and she never seen nothing, and secondly, he don't have this witness this evidence was manufactured to.

There's another motion to suppress the search warrant because it was false information in an affidavit and the officers actually searched the wrong vehicle. I mean, if you -- the transcript, you heard the officer on the stand, O'Rourke, is documented evidence of that.

And then there's another one to dismiss the

indictment for prosecutorial misconduct, and also I'm going to be putting in -- this motion is going to have an outrageous Government conduct to it for loss of exculpatory evidence, withholding exculpatory evidence and presenting false information to the grand jury.

THE COURT: Okay. Any other motions?

THE DEFENDANT: No, I believe that five or six about do it, yeah.

THE COURT: Okay.

THE DEFENDANT: One of them is a notice. One of them is just a notice to (indicating) him --

THE COURT: Okay.

THE DEFENDANT: And then the other one is all motions.

THE COURT: Right, notice of an alibi defense.

THE DEFENDANT: Yeah. But one of them -- one of these is a motion to put my alibi down, but also to dismiss the case for loss of exculpatory evidence while I'm doing my alibi, and then this one is just strictly to notify them that I'm putting in a Rule 12.1.

THE COURT: Okay. One last question for you, Mr. Andrews.

At least as I heard your recitation, there is one motion on which you would like to present testimony of a witness. Do I have that correct?

THE DEFENDANT: Yeah. In the reports -- it's actually a report document in here that this witness has made a statement, but this witness, they didn't get a name, date of birth or nothing of this person. And this is the alleged positive identification, so it's going to go to grounds of the probable cause that we're doing the search and seizure for the -- what we're actually in the middle of a hearing for now, which is the grounds that they had to pull the vehicle over and everything that followed before that.

THE COURT: Okay. All right. Let me hear from Mr. Paulsen on this issue, on these motions.

Mr. Paulsen?

MR. PAULSEN: For the record, I haven't received these motions. I'm hearing about them for the first time today.

But as far as disclosure of the witness, it's going to be the Government's position that it was a mere tipster, and this is someone who is just providing information that leads to the arrest of Mr. Andrews and is not somebody we'd be calling as a witness at trial, so I'm going to oppose disclosure of that witness.

He said something about false information in the search warrant affidavit. I don't know what he's referring to, but just like a lawyer would have to do, he's got to

make a substantial preliminary showing in order to get a ***Franks*** hearing. I don't think he's done that. I don't even know what he's claiming the false evidence is. I think it maybe has something to do with whether it's a 2002 Chevy or a 2001, which is not material.

Prosecutorial misconduct. He's alleging I withheld exculpatory evidence. I don't know what that evidence is. He's probably referring to these -- the cell site records which we gave in advance of the hearing, certainly well in advance of trial.

And something about false information to the grand jury. I can't respond to that. I don't know what he's claiming.

The other one about dismissing the indictment, wasn't clear what the grounds were, but it sounds like it's a legal matter that maybe we could brief post hearing.

THE COURT: All right. Here's what we'll do.

First of all, Mr. Andrews, you may file the motions today. I'll accept the filing of them regardless of whether they are within the time frame allowed for, okay?

THE DEFENDANT: That's the grounds for most of the motions, is that all the evidence that I'm using is because he didn't turn over Rule 16 discovery evidence and he actually lied in some of his -- his consolidated response to our motions and the judge at the arraignment hearing where

they was ordered to give it to us before the motions. He said that he gave us all this evidence and he didn't, and he came up with laboratory reports and all the other things. So I don't think he should get a break to call another continuance or nothing. I think that he should have to deal with it today, because he turned it in in an untimely manner.

And it wasn't like I didn't put it on the record at the last hearing that I wanted to bring these motions forth, because like I said, he turned this stuff over literally on the 6th and the 7th of September. I'm talking about a fingerprint. I'm talking about -- like, this is --

THE COURT: Right. I can't make that determination today. I haven't seen the motions. What we have to do is, I'm going to permit you to file the motions that will then trigger service.

Mr. Aligada, will you make sure that the U.S. Attorney's Office is served with the motions? And then I can review that and determine from there what the next steps are, but I can't do it any other way today, okay?

I'm sorry, Mr. Aligada. I asked you for a response and then I didn't let you respond.

MR. ALIGADA: The only idea, Your Honor, is, if you accept the motions and you have the Clerk's Office file them, they would be served on Mr. Paulsen.

THE COURT: All right. So I'll accept the motions. I'll deal with them when I've had a chance to look at them. I'm certainly going to preserve any rights that you have.

And if -- and I understand your concern that some of this relates to the proceedings today and that they have turned over information prejudicially late. If that is the case, then that will, of course, have an impact on what the Court considers from the evidence and what it does with the evidence.

THE DEFENDANT: But what about me wanting to challenge -- because he tried to brush over that witness person that he said gave a tip. Well, that tip that he's claiming to have is the actual identification of the defendant. This person reportedly gave not only a full government name, but a readily available picture, and they don't have a shred of evidence to support this, so I would be challenging that.

And then even in that statement that was made by the officer that this witness has made, this witness told the officer that she only heard the shooting. She never actually saw it. So all of their evidence that they're bringing before the courts and the grand jury was false. They never had a positive identification. And I have the evidence that I'm going to present today and prove that you

didn't have.

So with that issue, I still would like to bring that up today.

THE COURT: Well, and that's -- at least as I'm hearing it, first of all, okay, you'll file your motions. That's fine. Those issues will be preserved and the Court will -- your rights to challenge all that evidence and the eyewitness identification will be preserved.

Second, to the extent that what you want to present, you're suggesting you want to cross-examine some of their witnesses about, you're going to be free to do that today, but if there is a need for additional evidence or additional argument on either side, we'll deal with that down the road.

THE DEFENDANT: I just need Sgt. O'Rourke brought back.

THE COURT: I see. Well, that's not something I can order today, probably effectively, but let's do this:

Let's start with the hearing. We'll deal with that at the break, perhaps. And I understand you want to cross-examine Sgt. O'Rourke further. I'll have to hear a little bit more about that, but let's go on with the other witnesses while we have them here, okay?

THE DEFENDANT: Okay. Thank you.

THE COURT: Thank you.

Go ahead.

MR. PAULSEN: The next witness is one of the arresting officers, Sgt. Joel Pucely.

THE COURT: Would you say that last name again?

MR. PAULSEN: Pucely, P-U-C-E-L-Y.

THE COURT: Okay.

**JOEL E. PUCELY, GOVERNMENT'S WITNESS, SWORN**

THE COURT: All right. Be seated, state your full name for the record and spell your last name, please.

THE WITNESS: Joel Edward Pucely, P-U-C-E-L-Y.

**DIRECT EXAMINATION**

BY MR. PAULSEN:

Q. By whom are you employed?

A. The City of Minneapolis.

Q. As a police officer?

A. Yes, sir.

Q. And how long have you been with the Minneapolis Police Department?

A. Since January of 2007.

Q. And you're a sergeant?

A. I am.

Q. I want to take you back to May 15th of 2018. Were you involved in helping investigate a shooting incident and making an arrest?

A. Yes, sir, I was.
Q. What was your first involvement?
A. My first involvement was later in the evening. I was aware of the shooting that occurred. I had just come on duty when the shooting happened. Later in the evening, like 10:30, 11 o'clock at night, I received a call from Sgt. O'Rourke of the Assault Unit. He informed me that he had developed information that led him to believe that the suspect vehicle in that shooting was in or around the 2900 block of Girard Avenue North and asked me to go and check for it.
Q. Okay. And did you know the same of the suspect at this point?
A. I did.
Q. And what was the name?
A. Norris Andrews.
Q. Had you done anything to familiarize yourself with that person, Norris Andrews?
A. Yes. I had looked at prior booking photos.
Q. And were these recent booking photos?
A. Yes.
Q. Okay. So around 11 p.m. or so, O'Rourke tells you go to the area of -- what was it again?
A. 29th Avenue North and Girard Avenue North.
Q. All right. And we have a document in evidence,

Government Exhibit 9, which was his -- the text message alert he got from pinging the cell phone in question.

MR. PAULSEN: And just to refresh everybody's recollection, this is Pacific Daylight Time, so this alert came in at 11:41 p.m. Minnesota time, and it had attached to it --

THE DEFENDANT: Objection. Is he asking a question or is he just leading the witness? What is he -- is he testifying?

THE COURT: Sustained. Go ahead.

BY MR. PAULSEN:

Q. Page 2 of the document was a map that accompanied that alert, and if we can focus in on it, I want to ask you based on this map, where did you go to do your surveillance?

A. So initially I drove kind of -- a very small grid search around the area because I wasn't sure of the confidence rating of the ping, so I kind of drove through the alleys, maybe a block north, block south, block east, block west, just kind of in that area of 27th to 29th and Girard looking for the vehicle.

After I didn't find the suspect vehicle, I called Sgt. O'Rourke back, told him that I didn't locate the vehicle, but I wasn't doing anything else at the time, so I just told him that I would sit in the area and do surveillance for a bit. And I was sitting just north of

29th Avenue North facing southbound on Girard Avenue North.
Q. So this (indicating) is Fremont?
A. Correct.
Q. It's not marked, but the next one over is Humboldt, so would this be Girard here?
A. Yes, sir.
Q. Okay. And you were up (indicating) here?
A. Yup.
Q. 29th and Girard.
And so the suspect vehicle at that time that you'd been directed to look for was what kind of a car?
A. A blue Chevy Tahoe.
Q. And you couldn't find the blue Chevy Tahoe?
A. No, sir.
Q. All right. So then you did stationary surveillance from that location?
A. Yes, sir.
Q. And at a certain point did you see a different -- did a different vehicle attract your attention?
A. Yes, sir.
Q. Tell us about that.
A. As I was sitting there -- I can't remember the exact amount of time that I was sitting there, but a white GMC Yukon with Minnesota dealer plates on it came into my view. It was traveling westbound on 29th Avenue North, turned

southbound on Girard Avenue North, kind of drove south on the block slowly and then turned eastbound on 27th Avenue North.

Initially, I just, you know, didn't think a whole lot of it, it was a car passing down the block, but then a couple of minutes later the same vehicle came back from the opposite direction. So it came westbound on 27th, went northbound on Girard and then parked on the east side of Girard Avenue North facing northbound.

Q. Like in (indicating) here somewhere?

A. Yeah. It was where the red indicator was. It was a bit south of there, but it was that same side of the road. So yeah, it was in the first -- I would say between like a third of the way north to halfway north of 27th on the east side. It's tough, because it's a double block, so it's hard to kind of describe.

Q. And was there anything about the movements of the white Yukon that was suspicious to you?

A. Yeah, it was -- you know, the first time it -- I remember noticing that it was driving south slowly, you know, which to me kind of didn't indicate a ton at the time, but then once it came back, I was kind of thinking back and I'm like, well, maybe they're looking for somebody. Maybe they're looking to pick somebody up. You know, the car drives one direction and then within minutes it comes back

the opposite direction. And then all of a sudden -- as soon as I saw it, I remembered it because it had that dealer plate on it. And it parked and I was like, well, maybe this is going to be somebody that's coming to pick somebody up on the block.
Q. So did you focus your attention on the car?
A. Yes, sir.
Q. Let's talk about what the lighting was like here in this area.
A. Uh-huh.
Q. This was late at night. I think according to your report it's about 11:42 p.m.?
A. Yes.
Q. All right. What was the lighting like?
A. I mean, it was obviously dark, but there were streetlights that illuminated the block pretty well.
Q. Okay. And did you have anything to enhance your vision?
A. Yes. I was using binoculars.
Q. About how far away were you from your position to the white Yukon?
A. Oh, gosh. I mean, I was -- I'm not the best at estimating, like, actual distance, but I mean, it was a ways. It was far enough -- if I can just describe it, it was far enough that with the binoculars I could clearly see what was going on, but it wasn't close enough that I would

have been able to see faces in the lighting.
Q. So as you're using your binoculars, did you see any people?
A. Yes, I did.
Q. Tell us about that.
A. I saw two individuals come out of a house that was actually out of my view on the east side of the road. It was set back a little bit further. They appeared to have come out of that yard and they were kind of running, jogging-running, and they went towards the white Yukon and got inside.
Q. Could you make out their faces?
A. I couldn't make out their faces, no.
Q. How about general description, height, weight?
A. General description, the one that I had keyed in on due to the fact that he -- this person that I saw matched the general description of Mr. Andrews -- was a larger built male with what looked to be long braids or dreadlocks.
Q. And did that match the description of the person that O'Rourke was looking for that night?
A. Yes, sir.
Q. So after you saw these two people jog to this white Yukon and get in, what did you do?
A. I just sat there and waited. Within, you know, a few moments it pulled away from the curb without signaling, came

up to the -- came northbound to the stop sign that controls north/south traffic at 29th and Girard, and then made an eastbound turn onto 29th Avenue North without coming to a complete stop for the stop sign.
Q. Are those both moving traffic violations?
A. Yes, sir, they are.
Q. When -- well, there's a video in evidence, your squad video. Was your squad video operating at the time you observed these moving violations?
A. No, it wouldn't have been. The way that our squad video works is, it's a digital system, so it's constantly recording on like a 30-second loop. So when you turn your lights on the actual recording starts and it kicks back that 30 seconds. So it would -- my lights weren't on, my emergency lights weren't on, so it wasn't recording at that time, no.
Q. But you observed these moving violations yourself.
A. Yes, sir.
Q. So what did you do with respect to following this white Yukon?
A. I followed it from a short distance, kept it in sight while I used my cell phone to call another officer to help me stop it. I kind of briefed him on where I was at and what I was doing and just asked for help stopping it.
Q. Is that Officer Schroeder?

A. Yes, sir.
Q. And at a certain point did you make a decision to stop this white Yukon?
A. Yes, I did.
Q. About how far away from the original location were you?
A. Well, the traffic stop was at Lowry and Fremont, so it would have been --
Q. It might be off our map, but would it be down (indicating) here somewhere?
A. It would be north of where this is. So about three blocks north of Fremont, but we went -- Fremont's a one-way going southbound, so we went 29th to Emerson, north on Emerson to 33rd, west on 33rd and then south on Fremont and stopped it within that block. So, I mean, roughly six blocks away, or six blocks of travel.
Q. And by then was Officer Schroeder in a position to help you make the stop safely?
A. Yes, sir.
Q. That's when you turned on your lights?
A. Yes.
Q. And did the vehicle pull over right away?
A. Yes, it did.
Q. What happened then?
A. I got out of my squad. I approached the vehicle from the driver's side with the intention of making contact with

the driver. As soon as I got to the rear driver's side window, so the person seated directly behind the driver, I looked inside and I could clearly see that the person that was sitting there was Mr. Andrews.
Q. So let's set the stage for who was in the vehicle. Who was the driver?
A. It was a female. There was a female that was driving.
Q. And was there a front-seat passenger?
A. Yes, sir.
Q. Who did that turn out to be?
A. I can't remember the gentleman's name.
Q. Okay. And then the only other person was Mr. Andrews seated in back?
A. Yes, sir.
Q. Once you recognized Mr. Andrews as the person O'Rourke wanted you to take into custody, what did you do?
A. At that point, that became my priority. I asked Mr. Andrews to step out of the vehicle, which he did. He was handcuffed without incident and taken back to my squad and secured in the back seat of my squad.
Q. Did he have a cell phone with him?
A. Yes, he did.
Q. And after he was secured, are you aware of whether any weapon was found in the car?
A. Yeah. One of the officers I was assisting at scene

informed me that a handgun was found somewhere in the vicinity of where Mr. Andrews was seated.

MR. PAULSEN: No further questions.

THE COURT: Thank you, Mr. Paulsen.

Mr. Andrews?

THE DEFENDANT: Yes.

THE COURT: Do you care to cross-examine the witness?

THE DEFENDANT: Oh, yes, yes, sir.

THE COURT: Okay.

**CROSS-EXAMINATION**

BY THE DEFENDANT:

Q. So, Joel -- can I call you Joel?

A. Absolutely.

Q. You ready to tell the truth now?

A. I have told the truth the entire time so far.

Q. Oh. Well, we're going to get to the bottom of that.

Well -- okay. Now, how did you say that you received your information from Sgt. O'Rourke about this situation?

A. I think it was a phone call.

Q. You think it was a phone call.

A. Yes.

Q. That was the first contact that was made.

A. Between Sgt. O'Rourke and I?

Q. Yeah.
A. Yeah, as far as I know, a phone call or a text message.
Q. And then what other -- what other type of contact did y'all have?
A. I believe that he sent me e-mails with pings that Mr. Paulsen showed. I think he was -- if I remember right, he was forwarding me those e-mails so that I could see the same thing that Sgt. O'Rourke was seeing.
Q. He sent you a ping.
A. The cell phone pings.
Q. So he sent you that location.
A. Yes.
Q. So he sent you the precise three-foot location that he just showed you on that paper.
A. I didn't know it was a three-foot location, but --
Q. Oh, yeah. That was a direct location about -- and let Sgt. O'Rourke tell it -- it's within a three-foot radius.
A. Okay.
Q. So if he sent you that location --
MR. PAULSEN: Your Honor, I'm go to object to mischaracterizing --
Q. Why was you --
THE COURT: Hold on, hold on. As soon as he starts to raise an objection, you have to be quiet so that the court reporter can hear what the objection is and I can

hear it.

THE DEFENDANT: Okay.

THE COURT: I'll sustain --

MR. PAULSEN: I just want to --

THE COURT: -- the objection.

MR. PAULSEN: -- preserve my objection.

THE COURT: Right.

MR. PAULSEN: He can ask his questions, but I don't want my silence to be taken as agreement.

THE COURT: Understood.

Okay. Go ahead, Mr. Andrews.

BY THE DEFENDANT:

Q. You said that you were circling around this area.

A. I did drive through the area, yes.

Q. You did a six-block radius around, did you not?

A. No, it was not that far. It was -- I went like a block north and a block south and then checked the alleys on either side.

Q. You went a block north and a block south.

A. Yes.

Q. Could you tell me why you did that?

A. Because the ping wasn't for the vehicle. It was for a cell phone. So, you know, if I have my cell phone in my pocket and I park outside of this building and I walk, you know, a block away, the ping is going to show a block away,

but my vehicle is still going to be parked in front of this building. So I had an idea of where the ping was, but I didn't know if maybe the vehicle was parked a block or so away, so I drove around looking for it.
Q. Is that common practice, that people park their car a block away from where they're at?
A. I mean, it definitely could be. I've seen it before.
Q. Was this block congested, like packed with cars to the point where no car can park on this block?
A. No, it wasn't.
Q. Was there like a concert or something going on this night?
A. No, it was a residential area.
Q. So there was lots of parking spaces available, I would suggest -- I would assume, right?
A. Yes.
Q. Now, with that in mind and you had this precise location, I want to ask you again -- you're under oath, I remind you -- why would you be searching anywhere other than where that ping is at?
A. Well, I knew that the incident in question was a shooting, and in my experience people that are involved in shootings are often paranoid that they're going to get caught by the police. So if they maybe have an idea that their vehicle was seen at the scene of a shooting or leaving

the scene of a shooting and they want to go to one location, they might park their vehicle a couple of blocks away so that if the police see that vehicle, they won't associate it with the house that the person is in.
Q. Was there any indication to any of the suspects in your alleged shooting that they had warrants out for them?
A. No.
Q. Was there any location put on TV that the vehicle that you guys was looking for was wanted?
A. No.
Q. So how would the suspects have known that their vehicle was seen or wanted at a location for a shooting to park it a block away?
A. Well, I think it's just human nature that if, you know, a criminal act is committed, people assume that someone saw it happen. You know, this shooting occurred in broad daylight. I would think that the suspects would assume that someone saw it happen and might have told the police that, you know, for -- in this case that someone saw the person who did the shooting get into a blue Chevy Tahoe and drive out of the area. I mean, that's how I would think of it.
Q. You know you're reaching, right?
MR. PAULSEN: I'm going to object, Your Honor. It's argumentative.
THE COURT: Sustained.

Q. Okay. Secondly -- okay. So let's just say that this truck -- since this is the story that you're going to stick to, let's just say that this truck was two blocks away on a side block and you found it. What would you have done then?
A. I would have talked to Sgt. O'Rourke. I assume that he would have wanted me to tow the vehicle.
Q. So you would have just let the suspect go.
A. At that point I don't think it's really letting the suspect go. I would have deferred to the investigator on it.
Q. I mean, because obviously he's going to notice you just took his vehicle. So if you took his vehicle a block away because that's where you were searching for that, then the suspect would have got away at this time, wouldn't he?
A. Well, like I said, I would defer to the investigator on that.
Q. Oh, you would have deferred to the investigator. Okay. I'll move along from that. I just wanted to develop the record on that about the lies, but anyway.
Where did you say you was parked at?
A. I was parked on the -- on Girard Avenue North just north of 29th Avenue North facing southbound.
Q. And you said that you seen the suspects how?
A. What do you mean by that?
A. How did you see the suspects?

Q. With my eyes.
A. With your eyes.
A. Yes.
Q. And this was at night. This was at what time of night?
A. It was -- I got in my report. It was 11:40 something at night, I think.
Q. 11:40 --
A. Or actually a little later than that. I'm sorry.
Q. So it was dark.
A. Yes, sir.
Q. Could you tell me the -- can you describe the clothing that the suspects had on?
A. I don't recall that at this point, no. I was using binoculars. I could see -- as I explained, from the distance that I was with the binoculars that I had, I was able to see people, general descriptions, you know, general height and weight and hair style.
Q. Was you ever to see a face?
A. No.
Q. Okay. I want to slide you a picture up there. If you seen the picture of the suspect or the person that you took into custody, you would be able to recognize it, would you not?
A. If I saw their face, yeah.
MR. ALIGADA: May I approach, Your Honor?

THE COURT: You may.

BY THE DEFENDANT:

Q. Do you recognize that photo?

A. That appears to be a photo of your back.

Q. So is that the clothing -- it appears to be a photo of whose back.

A. I would assume that this is your back.

Q. You just said "your back." Who was "your back"?

A. I misspoke. This is a photo of someone's back. He appears to be a male wearing a jacket with a hood with fur on it and light blue or black pants.

Q. Okay. Do you recognize that photo?

A. I mean, I don't know exactly -- I don't think I took this photo.

Q. Do you recognize anything in that photo? Think back. Think to May 15th at 11:40 at night.

A. I guess I'm not -- I'm not really sure what you're asking me.

Q. I'm asking you to -- do you recognize that photo? Have you ever seen that set of clothes, that coat, that person there? Can you recognize and identify who that is?

A. Yeah. This was the clothing that you were wearing the night that --

Q. Who are "you"?

A. Mr. Andrews.

Q. So, can you tell me what color that coat is?
A. It appears to be black.
Q. Appears to be black.

THE DEFENDANT: One moment, please.

THE COURT: Is this marked? This copy is not. Is it in evidence?

MR. ALIGADA: No, it's not, Your Honor.

THE COURT: Do you want it?

THE DEFENDANT: I'm going to be introducing it. Yeah.

(Pause)

Huh. I seem to have misplaced my other photos I was going to use. The Government has offered these as Exhibit Number 5, but I would like to also offer these. Could you send them up there?

MR. ALIGADA: Sure. Does the Court know what exhibit number we're up to for the defense?

THE COURT: I do not.

MR. PAULSEN: I think it's Number 5.

MR. ALIGADA: I think Mr. Paulsen is right.

THE COURT: I think that's right. Let me look. I think 5 would be a safe number to use.

THE DEFENDANT: Enter both of those pictures.

MR. ALIGADA: (Indicating).

THE DEFENDANT: Yeah.

BY THE DEFENDANT:

Q. Now, those photos that you have there, do you recognize those, anybody in those photos?

A. Do I recognize anyone in the photos?

Q. Mm-hm.

A. These are photos of Mr. Andrews.

Q. When do you recognize those photos as being taken?

A. I don't -- I don't know. I don't know if I was present when these photos were taken.

Q. When did you see Mr. -- did you ever see Mr. Andrews with those clothes on?

A. Yeah, the day that this incident occurred.

Q. So that's what he was wearing the night that you seen him at night --

A. Yeah.

Q. -- that you arrested him?

A. As best I can recall, yes.

Q. As best as you can recall. Can you describe the shirt that he has on?

A. Black shirt.

Q. Can you describe the coat that he has on?

A. In this picture it appears to be a black leather jacket. It might be discolored, it might be brown. In this picture I can only see the inside of it, it appears to be brown, and then there's light-colored jeans and black-and-red shoes.

Q. Okay. Thank you.
Now, once again --
THE COURT: Let me interrupt you for one second. I assume you want this in evidence --
THE DEFENDANT: Yeah.
THE COURT: So you're offering 5.
Do you have any objection, Mr. Paulsen?
MR. PAULSEN: No, Your Honor.
THE COURT: All right. Five is received.
Sorry. We just have to keep the record clear.
BY THE DEFENDANT:
Q. I'd like to draw your attention to the TV screen there.
The photo that I'm about to show you is a nighttime photo of roughly where you would have been parked at on the exact same street that you just described to Sgt. O'Rourke facing the exact same way that you would have been facing.
That's the street you was parked on, right?
A. I have no idea. That is a street. I have no idea if that was the street I was parked on.
Q. Okay. Well, I will inform you that is 29th and Girard facing south. The stop sign that you see in the distance is 28th, roughly a quarter -- well, down the block you would have said is where you would have seen --
THE COURT: We have a problem with our screens up

here, so either we have to fix it or the officer has to move to a different screen.

THE WITNESS: Your Honor, I can look at that one quickly.

THE COURT: Why don't you go ahead and look at this screen.

There's a bar right across his screens, his and mine.

(Pause)

THE COURT: All right. Go ahead, Mr. Andrews.

BY THE DEFENDANT:

Q. I'm going to be printing this photo and I'm going to want to enter it into evidence.

THE COURT: Okay.

Q. Now, is that roughly where you was parked at?

A. No.

Q. So where were you parked at?

A. I was parked right by the stop sign. I was parked just north of the stop sign at 29th and Girard.

Q. You was parked just north, but you just told us earlier that you was less than a quarter way down the block.

A. No, I didn't.

Q. Yes -- I'm not going to debate that.

Anyway, either way, that's the block right there. Could you please tell me how if the suspect was wearing all

black and you wasn't able to see his face did you see that he had long dreads with a hoodie on.
A. The hood wasn't up.
Q. Oh, it wasn't. So what was the hood for then?
A. I don't know.
Q. When you arrested both of the suspects, were they not both wearing hoodies?
A. This is a jacket that you're showing --
Q. Did both of their coats have hoods on them?
A. I don't remember what the other person was wearing.
Q. Would you like the inventory sheet?
A. No, thank you. I mean, I don't know what the other person was wearing. I didn't have any contact with that person.
Q. You didn't?
A. No.
Q. So Montreal Tyson wasn't took of his vehicle right while you was there? You didn't go to the passenger side and escort him with officers out of the truck?
A. I don't remember doing that. If I did, I apologize.
Q. Here we go with the -- I'm asking you again. You know that you're under oath, right?
A. Yes.
Q. Now, I'm going to ask you again, how did you recognize the suspect in all black at nighttime with a hoodie, on or a

coat with a hood on?

A. I saw a larger-build black male with long dreads or braids who came out of a yard on the east side of the street, got into the vehicle. That general description, a larger-build black male with dreads or braids matched the description of Mr. Andrews.

Q. So anybody -- you would have just stopped any vehicle with anybody that night; is that safe to say?

A. No.

Q. So what made this person stand out to you? Because obviously you're not describing a suspect. You're not describing someone that you could positively identify that you should have been pulling a before, because I'm pretty sure north Minneapolis has lots of larger black guys with possibly long dreads, you know, that you can't see the face, wearing dark clothes. Because from the description that you was given, was the person wearing a black coat?

A. I didn't have a description of the person. That wasn't relevant to what was going on. Clothing description at that point wasn't relative to what I was doing in that area --

Q. So could you see his face?

THE COURT: Make sure you let him finish his answer.

Go ahead.

A. As I said, no, I could not see the person's face.

Q. So how did you make an identification?
A. I did not make a positive identification of the person at that time.
Q. Oh.
A. I saw a similar build and hair style to the person that I was looking for.
Q. Okay. And could you please tell me, could you please state for the Court how much was this person supposed to weight that you was supposed to pull over, the suspect?
A. Over 200 pounds. Like I said, a larger build.
Q. A larger-build man.
A. Yes.
Q. And you seen this at night with that heavy coat that this guy had on that he was a larger-build man.
A. You could still tell height and general size while someone's wearing a jacket.
Q. So you didn't know where this person was, what house, you didn't -- this was not the suspect's vehicle, because you was in fact looking for a blue Chevrolet Tahoe, am I correct?
A. That is correct.
Q. And the vehicle that you was miraculously watching this large black male get into, what kind of car was that?
A. That was a white GMC Yukon.
Q. A white GMC Yukon. So that in fact was not the

suspect's vehicle.
A. No.
Q. In fact, you could not see this person's face that got in this vehicle.
A. I could not, no.
Q. So you did not know who this person was other than it was just a large black male that you stereotyped that got in that vehicle, am I correct?
A. It was a large-build black male that got into the vehicle.
Q. How long have you been working for Minneapolis Police Department?
A. Since 2007.
Q. Since 2007. In your capacity, or your mindset, how many large black males is there over north?
A. I could not make that -- I couldn't even make an estimate.
Q. Is it more than five?
A. I can't -- yes.
Q. Is it more than ten?
A. I can't make an estimate.
Q. Is it more than a hundred?
A. I can't make an estimate.
Q. So it's safe to say you would have just pulled over any vehicle because you couldn't make an identification, am I

right?
A. No.
Q. You did not know who was in that vehicle, did you?
A. I had reasonable suspicion that the person that had gotten into that vehicle --
Q. You had reasonable --
A. -- was the person that I was looking for.
Q. And what was the reasonable suspicion?
A. My reasonable suspicion was that I had received the cell phone pings from Sgt. O'Rourke that told me that that cell phone that was the suspect's cell phone was in the area of the 27 to 2900 block of Girard, the 27 -- 27th to 29th on Girard on the east side of the street. I saw a person who matched the general description of the person who was responsible for the shooting come from the east side of Girard Avenue North and get into a vehicle and drive away.
Q. And you was on 29th and Girard.
A. Yes, sir.
Q. So you said the window of the blocks that you had was a two-block radius, right?
A. It's a double block. I don't think it's a full distance of two blocks, no.
Q. Well, if it's a double block, that just means it's one extremely long block, am I correct?
A. No, it's not a full two blocks. It goes from 27th to

29th. There is no 28th there, but it's not --
Q. It's not?
A. No, there's no 28th. There's no 28th there.
THE DEFENDANT: One moment, please.
(Pause)
BY THE DEFENDANT:
Q. Well, you're on 29th, obviously, and you got a 28th and a 27th block radius that you're looking for someone, right?
A. I was looking for someone --
Q. Am I correct? Just yes or no.
A. Yes.
Q. And that two-block radius, you couldn't see no faces why?
A. I wasn't close enough to see faces.
Q. So if someone was to come out, a larger black male was to come out at the corner of 27th and Girard, would you have been able to make identification of that person?
A. No, that would have been farther away than where I saw the two people come out and get into the car.
Q. But you would have still been able to tell it was a larger black male, would you not?
A. I don't know. I -- I would assume so, but that's not what happened here and I wasn't forced to make that identification from that full distance away.
Q. Okay. I'm going to move along, because I just wanted to

develop the record on what you were saying right there anyway.

So you're telling me -- and this is your story -- that Sgt. O'Rourke sent you out here to locate and do what?

A. To look for the suspect vehicle.

Q. The vehicle, or the suspect itself?

A. The suspect vehicle.

Q. And what was you to do when you found the vehicle?

A. I was going to call Sgt. O'Rourke back.

Q. So he gave you a ping to go get a vehicle.

A. He gave me the general area that the vehicle was in and he forwarded me the e-mails he was receiving from the cell phone --

Q. So what was being pinged? Was it a vehicle being pinged or the suspect's phone, cell phone?

A. The cell phone.

Q. So you were looking for the suspect.

A. I was looking -- I was looking for the vehicle.

Q. So which one was more important to the case? If you had seen the suspect and you would have seen the vehicle and the vehicle drove away, but the suspect went a different way, which one would you have apprehended?

A. I would have gone after the suspect.

Q. So that tells me you was looking for the suspect then.

A. No, not necessarily.

Q. Not necessarily. So when you drove around this area and you went through these alleys and you didn't see the vehicle, then why did you stay there if you're looking for the vehicle? Because the ping still stays there and you're only looking for the vehicle, am I correct?
A. Well, once I didn't find the vehicle --
Q. Yes or no. Was you just looking for the vehicle?
A. When Sgt. O'Rourke --
Q. Yes or no, were you looking for the vehicle, the SUV?
A. At what point?
Q. When you were sent to this location, because Sgt. O'Rourke told you to go look for the vehicle, so you were looking for the vehicle, correct?
A. When I initially got into the area I was looking for the vehicle, yes.
Q. And when you drove around this location, you could not find that vehicle, am I correct?
A. You are correct.
Q. And you decided to stay at this location, am I correct?
A. Yes.
Q. And you decided to do surveillance at this location, am I correct?
A. Yes.
Q. So at this point you're not looking for the vehicle anymore because you still have the cell site location saying

there's something here that you want, am I correct?
A. Yes.
Q. And what was that something that you wanted that was still there?
A. The cell phone.
Q. The cell phone. And who was the last to have the cell phone?
A. The suspect.
Q. So you was there to get the suspect.
A. Yes, at that point, yeah. Once I didn't find the vehicle, I figured there was -- I didn't have any other tasks or duties that I needed to do at that time, so I thought I'm going to sit here and wait to see if maybe I see the suspect.
Q. So why you would steady mislead the Court and say that you was just here for a vehicle.
A. I never said that.
Q. I'm just developing a record to show that you're lying under oath about what you was doing out there that night.
MR. PAULSEN: I'm going to object to the argumentative nature of the questions.
THE COURT: Sustained. That is argument. You can ask your questions, get your answers, and then you can argue to me if you think this is establishing that the officer is not telling the truth.

THE DEFENDANT: Okay.
BY THE DEFENDANT:
Q. I'll get down to the exact reason why.
What was the description, or should I say -- better question: Was this suspect armed and dangerous?
A. I would assume so, yes.
Q. You would assume so. What were you looking for the suspect for?
A. A shooting.
Q. A shooting.
A. Yes.
Q. So this suspect was considered armed and dangerous.
A. Yes.
Q. And how many suspects was you looking for from this shooting?
A. I was looking for one.
Q. How many suspects were you looking for from the shooting? How many suspects was at the shooting, reportedly?
A. I can't remember that for sure. I was never at the shooting.
Q. Okay. So what's the procedure when you're going to get an armed suspect? Do you take them down solo?
A. No.
Q. So what were you doing out here by yourself if you had a

ping for the cell phone? If the suspect would have came walking up to you or walking down the block, what would you have done?
A. Gotten on my police radio and aired what I was seeing and asked for another squad to assist.
Q. So why wasn't other squads there at the time if you had the suspect's location?
A. There was no reason for another squad to be there at the time.
Q. Why not? You said you had the suspect vehicle or phone pinged to this location, am I correct?
A. That's correct.
Q. So you knew that the suspect was here, right?
A. I knew the cell phone was there. I had no idea if the suspect was there for sure.
Q. So wouldn't it be more cautious to have more officers involved so if you did see the suspect and he did still have this firearm that you have some backup? Because it is midnight, am I right?
A. Yes.
Q. And this suspect is a larger black male, right?
A. Yeah, but that doesn't have anything to do with it.
Q. So you're telling me if this suspect would have came out, you would have attempted to take this suspect by yourself?

A. No.
Q. So why were you out there by yourself?
A. Because I was working by myself that night.
Q. Is it procedure to try to take into the custody or do a sting operation of a suspect that's armed and dangerous?
A. It wasn't a sting operation. It was surveillance on a block.
Q. That's what I was getting to. You were surveilling this block, you were already out there, am I correct?
A. No.
Q. You wasn't out there for the suspect, am I correct?
A. I explained why I was there multiple --
Q. Do you know the name Anthony Kanz (ph)?
A. No.
Q. You don't?
A. No.
Q. You don't know Giacomo (ph)?
A. Who?
Q. Giac Pau (ph), Giacomo?
A. No.
Q. You don't?
A. No.
Q. Huh. Interesting.

(Discussion off the record between the defendant and Mr. Aligada)

BY THE DEFENDANT:

Q. While I'm looking for this and telling him to pull up something, do you remember talking to Officer Schroeder after the suspect was taken into custody?

A. I'm sure I talked to him. I don't know what you're referring to.

Q. You did talk to Officer Schroeder, right?

A. At some point after the suspect was taken into custody, I'm sure that I talked to Officer Schroeder.

Q. And when Officer Schroeder asked you how did you locate the suspect, what did you tell him?

A. I don't know.

Q. You don't know?

A. No.

Q. I'm going to ask you again. Do you know Anthony Kanz?

A. No.

Q. Do you know Giacomo Pau?

A. No.

(Discussion off the record between the defendant and Mr. Aligada)

THE COURT: While you're doing that, Mr. Aligada, I want to -- go ahead and do that. I just want to make a record that what was displayed as a picture taken on Girard Avenue North facing south will be marked, and you said you were going to print it out. It'll be marked as Exhibit 6.

It has not been moved for admission yet. I just want the record clear.

MR. ALIGADA: I'll make sure that that's printed, Your Honor.

THE COURT: Thank you.

BY THE DEFENDANT:

Q. The phone call that you're about to hear is going to be between you and Officer Schroeder, and it's going to be very clear that Officer Schroeder is going to be talking to you, because he's going to ask you how did you locate the suspect and who were you watching, and you just testified to what, that you was -- that you was sent there by Officer O'Rourke, am I correct?

A. Yes.

Q. And that you was doing some surveillance work as a rogue officer with no backup to apprehend an armed and dangerous suspect, am I correct?

A. I was doing surveillance on that block.

Q. And you don't have no video of this surveillance.

A. No.

Q. So if the suspect would have came out and killed someone because you were looking for this armed and dangerous suspect, you would have had no surveillance of this, am I correct?

A. No, sir.

Q. If this person would have came out and strangled someone or stabbed them, you would have had no surveillance of this, am I correct?
A. No, sir.
Q. So if he'd have came up to your car and just firing reckless shots into your car, you would have had no surveillance of that, am I correct?
A. That's correct.
Q. And why is that?
A. Because it's not police procedure to videotape a surveillance incident such as this.
Q. Okay.
THE COURT: Before you play it, Mr. Aligada, for the record, this will be marked as Exhibit 7. Somehow we'll have to get a copy of it actually for the record.
THE DEFENDANT: You ain't going to need to see it. It's just a SUV being towed now.
THE COURT: I understand. We just have to keep the record clear as to what's being shown the witness.
THE DEFENDANT: This is Officer Schroeder and his partner. I don't know which car they was in, but it's Officer Schroeder and his partner. And the person you couldn't hear talking is Officer Schroeder, and after you hear it I guess the record will explain itself.
(Videotape played)

THE DEFENDANT: Could you wind it back now?
(Videotape rewound and replayed)
THE DEFENDANT: Do you want to stop it there?
BY THE DEFENDANT:
Q. Do you remember that phone call now?
A. Vaguely.
Q. In that phone call, was you not saying that you was out there just watching?
A. You can't hear my voice on that phone call. That's Officer Schroeder's voice. I don't know what I was saying.
Q. You don't know what you were saying?
A. No.
Q. But in relation to what he was saying, what would you take from that conversation what was being -- what was that conversation about? Was that not about the suspect being taken into custody and how?
A. That was -- yeah, sounds like Schroeder is asking about where the people came from.
Q. And who's the fat boy Giacomo?
A. I didn't hear anybody say Giacomo. I believe the fat boy that he's referring to is a gentleman by the name of Anthony Shannon.
Q. He said Giac (ph).
A. I didn't hear that.
Q. Do we need to replay it again?

A. He's referring to Anthony Shannon. I can hear him --
Q. He didn't say Anthony Shannon.
A. Yes, he did.
Q. No, he didn't. He said Anthony Kanz.
A. He said Anthony Shannon.
THE DEFENDANT: Could you please replay it.
Q. And he's going to call the fat guy Check.
(Videotape replayed)
Q. Anthony Kanz.
A. That's Anthony Shannon he said.
Q. So you refer to Anthony Shannon. Now, that means you were familiar with this area and this block, am I correct?
A. No. I'm familiar with Anthony Shannon.
Q. But if you know his name, then you obviously know where he stayed at if you can clearly put his name to him like that.
A. I don't know where Anthony Shannon stays. Officer Schroeder was indicating that he believed --
Q. So how did you know Anthony Kanz -- or Anthony Shannon? Was he a suspect in this?
A. No.
MR. PAULSEN: Your Honor, I'm going to object. I don't see the relevance of this --
THE DEFENDANT: You will in one second.
MR. PAULSEN: -- post-arrest, talking about things

that happened after the arrest. It doesn't go to probable cause at all.

THE DEFENDANT: It will. It's going to go to show probable cause that he was out there conducting some rogue surveillance on Anthony Kanz somehow, and he was going to pull anyone over that left that area in a vehicle. He was going to pull any vehicle over because he was on this gang task force conducting surveillance on a high-crime infested block.

THE COURT: Well, I'll tell you what. I'll give you a couple more questions in this area. I understand your point and you're free to argue that, okay?

THE DEFENDANT: Okay.

BY THE DEFENDANT:

Q. I'll move along anyway, because the record already shows that you didn't see the suspect, and just being a larger black male with -- I don't know you were able to tell -- actually, I want to ask you that for the record too.

How were you able to tell with it being that dark and this person wearing dark clothing that he had long dreads, with or without the hood being up?

A. You can see someone's general hair style with the aid of binoculars.

Q. Was these some night vision goggles?

A. They were not.

Q. So how did you -- how was it lighted enough for you to see this?
A. Streetlights.
Q. Streetlight.
A. Yes.
Q. Hmm.
THE DEFENDANT: Could you pull that picture up for that block again?
Q. These photos that's going to be showed is of the block at night in reference to the light that you would have been working with to see what you seen.
THE DEFENDANT: After this I will move along.
THE COURT: Okay.
(Pause - photos displayed)
THE DEFENDANT: All right. We'll get those printed. I want to move along.
THE COURT: Okay.
BY THE DEFENDANT:
Q. Now, at the stop, you said this vehicle had pulled over -- it did some traffic violations, am I correct?
A. Yes, sir.
Q. Can you tell me what those traffic violations were?
A. When the vehicle initially pulled away from the curb to turn northbound on Girard Avenue North after the two males got in, it did not signal that change of course. It also --

Q. How long did the vehicle sit at the curb before it pulled off?
A. A matter of minutes.
Q. A matter of minutes. Now, this is after you seen the suspect get into this vehicle that you couldn't see and identify, this unknown black male get into this vehicle that you wasn't looking for, am I correct?
A. This was after I saw the two people get into the car.
Q. You saw the two people get in the car. The car sat there for two minutes.
Now, at this time you had already in your capacity, in your mind, made up that, hmm, this is the suspect, am I correct?
A. It was around that time.
Q. That's roughly when you would have had to make your decision about was that the suspect, was it not?
A. Yes.
Q. Because that would have been the last time you seen the suspect until he was taken out of the vehicle, am I correct?
A. Yes.
Q. So, you made your decision that that was the suspect. So, at this time you should have been able to start videotaping, because you knew for sure that you had to stop this vehicle, that's your suspect, am I correct?
A. I didn't have a video camera.

Q. Don't -- ain't your squad cam equipped with video camera footage?
A. Oh, yes, yes, it is.
Q. So if you know that you're going to make a traffic stop, it's procedure to cut your squad cam on, am I correct?
A. No.
Q. It's not?
A. Our squad cameras automatically come on when we turn our emergency lights on. That's what policy says we're required to do.
Q. Okay. Pause.
This is going to show that your squad cam starts recording well before you cut your squad -- your cam on.
A. Yes, that's correct. That is correct sir.
Q. I know. I just want to --
THE DEFENDANT: The fourth one.
(Videotape played)
Q. That car comes to a complete stop and he has his lights on.
A. Yes.
Q. Following all traffic laws.
A. Yes.
Q. Your squad lights is not on.
A. No.
Q. And you're trailing this vehicle.

A. Yes.
Q. Now, this is the block that you're going to pull the vehicle over on, am I correct?
A. As soon as it makes a left-hand turn --
THE DEFENDANT: Stop the video.
Q. Now, that was roughly the last block and a half or so before you pulled the vehicle over, am I correct?
A. Yes.
Q. So, you came from 28th and Girard.
A. There is no 28th and Girard.
Q. 29th and Girard.
A. Yes.
Q. And the vehicle made a right, am I correct?
A. Yes.
Q. Now, the next block that it would travel to would be Fremont, am I correct?
A. Yes.
Q. Fremont is a one-way heading south, am I correct?
A. Yes.
Q. So the vehicle had to travel another block, which is to Emerson, am I correct?
A. Yes.
Q. Now, that's two blocks.
A. Yes. Yes.
Q. Now, the vehicle travels -- the vehicle is going to make

a left here, right?
A. Where?
Q. On 29th and Emerson.
A. Yes.
Q. And it's going to travel to 33rd and Emerson, am I correct?
A. Yes.
Q. And at 33rd and Emerson it's going to make another left, am I correct?
A. Yes.
Q. So we're looking at how many blocks now?
A. Well, it would be one, two, three, four, five, six, seven.
Q. Just to 33rd.
A. Six blocks.
Q. Six blocks, seven blocks. Okay. Let's just say six.
A. Okay.
Q. It made a left on there, then it goes to the corner there. That's seven blocks, am I correct?
A. Yes.
Q. Now, how long do you think it took that vehicle to travel them blocks? There was stop signs in here, am I correct?
A. Yes, and a stop light.
Q. And a stop light.

A. Yes.
Q. How long did it take that vehicle to get to that last turn turning off of Emerson onto 33rd?
A. I don't know, maybe a couple minutes.
Q. Couple minutes. So, you got a couple minutes of this vehicle sitting there before you pulled it over, right?
A. Yes.
Q. Then you got a couple minutes of you trailing this vehicle, am I correct?
A. Yes.
Q. And all this time you haven't called for backup and you know that this is the suspect.
A. I was on the phone with Officer Schroeder getting him in a position to assist me.
Q. Wasn't Officer Schroeder already on this call?
A. No.
Q. Oh, he wasn't.
A. No.
Q. Okay.

THE DEFENDANT: I would like to introduce this next piece into evidence. This is going to be -- well, it's going to be two pieces of evidence. One is going to be Officer Schroeder's statement, supplement, and then the other one is going to be Sgt. O'Rourke's. This one here is Officer Schroeder.

THE COURT: That will be 8. Number 7 is the video that has just been displayed to the witness.

MR. PAULSEN: Actually, Your Honor, I thought Number 7 was the phone call between --

THE COURT: You're right. Number 8 is the video that was just shown to the witness.

MR. PAULSEN: Well, Number 8 is actually a Government exhibit.

THE COURT: Yes. These are defendant's exhibits.

MR. PAULSEN: Oh, okay. I didn't know that he --

THE COURT: Defendant Exhibit Number 8 will be the video, Defendant's 9 will be Officer Schroeder's statement, and Defendant's 10 will be Officer who?

THE DEFENDANT: Kelly O'Rourke.

THE COURT: Kelly O'Rourke's statement.

BY THE DEFENDANT:

Q. Now, I remind you again, you know that you're under oath, am I correct?

A. Yes.

Q. Now, once again, you was out here -- let's bring the record up to date. You're out here trying to locate a suspect that's armed and dangerous by yourself, am I correct?

A. Yes.

Q. And you located the suspect that was armed and dangerous

by yourself. You seen someone that was heavyset with dreads get into this vehicle, but you don't know this is the suspect, correct?
A. Correct.
Q. But you're going to pull this vehicle over because you have an assumption --
A. Reasonable --
Q. -- because it's a heavyset black male with some dreads that this is the suspect, am I correct?
A. I had reasonable suspicion to believe that it was the suspect and I had probable clause to stop the vehicle based on the two moving violations that I observed.
Q. I didn't ask you about probable cause to stop the vehicle.
A. Okay.
Q. So once again I'm going to ask you, you was out there by yourself to stop an armed and dangerous suspect.
A. Yes.
Q. You had located him. You had a ping from Sgt. O'Rourke that told you that this guy was out there.
A. The phone was out there.
Q. The phone was out there.
A. Yes.
Q. Now, I'm going to ask you again, as an officer of the -- that you was the sergeant of the Gang Interactive Task

Force, Gang Task Force, or whatever, am I correct?
A. Yes.
Q. So you know law and procedure, am I correct?
A. I do.
Q. Would you ever tell one of your fellow officers to go take down an armed and dangerous suspect that shot multiple people in one day, multiple different shootings in one day, because that's surely what the suspect was being accused of, am I correct?
A. I know of one shooting.
Q. You only knew of one? How many people were shot in that one shooting?
A. I can't remember. I think there was at least two.
Q. You said you familiarized yourself with this case, did you not?
A. I did. I know where it happened. I knew there was a shooting. I knew there was a blue Tahoe that was involved.
Q. So you don't know how many people were shot? Do you even know if someone was shot?
A. I do know that someone was shot, yes.
Q. So how many people were shot?
A. I don't know.
Q. So you know the suspect's name. You familiarized yourself with that. You're familiarized yourself with a vehicle that was just leaving the scene. Like, did this

vehicle hit someone?
A. No.
Q. So what made this vehicle stand out more than the human? Who's more important here, the human or the vehicle, a human life or a vehicle?
A. I don't -- I don't know what you're asking me.
Q. I'm asking you which one is more important. Which one -- which one, if you had to think about something, that you would value more to think about, the human life or a vehicle?
A. What do I personally -- my feelings? What do I personally value more, a vehicle or a human?
Q. Yeah.
A. A human.
Q. So you would care about more what happened to a human life than a vehicle, am I correct?
A. Yes.
Q. So you should have known that -- let's just move it along, move it along.
Anyway -- and I'll take you to -- let's start with Sgt. O'Rourke. Do you have his report up there?
A. I do, yes.
Q. Could you please read the sixth paragraph down where it says: "Approximately at 23:36 hours." Could you please read that full paragraph.

THE COURT: Any objection, Mr. Paulsen?
MR. PAULSEN: No, Your Honor. He's already testified to this, O'Rourke, I mean.
THE COURT: Yes, understood. I just want the record clear that you're reading from Exhibit 10, correct?
THE WITNESS: Yes.
THE COURT: Go ahead.
Q. "At approximately 2336 hours, I received information that Andrews was in the area of 2810 Girard Avenue North. I contacted Sgts. Pucely and Peltz along with Officer Schroeder and advised them of Andrews' location. All three were aware of the suspect description."
Q. Could you please read the last officer that he said he made aware?
A. Officer Schroeder.
Q. So this officer would have already known and he was sent to this location, am I correct?
A. I don't know if he was sent to that location.
Q. Oh, you don't. Well, could you please go to Officer Schroeder's statement. Can you please tell me what supplement you're looking at?
A. Supplement number 25.
Q. Supplement 25. And who was that supplement by?
A. Officer Schroeder.
Q. Officer Schroeder. Okay. I would like to point you to

the second paragraph. Could you please read the paragraph "At around 2350 hours."

THE COURT: Any objection, Mr. Paulsen?

MR. PAULSEN: No, Your Honor, Mr. Schroeder will testify.

THE COURT: Exhibit 9 for the record.

THE DEFENDANT: This is Officer Schroeder's statement.

THE COURT: Correct.

A. "Around 23:50 hours, I was directed to the area of 28th Avenue North and Girard Avenue North, as I received information from Sgt. O'Rourke that the possible suspects of the shooting were in the area. The suspect was ID'd from a witness on the shooting A1/Norris Andrews."

Q. Okay. Now, you said that -- now, you just said right here in Schroeder's statement that he was already made aware of the situation, am I correct?

A. Yes.

Q. So he would already been at this location, am I correct? He should've already -- you wouldn't have had to fill him in. He should have known what was going on, because as you said, Sgt. O'Rourke told you he told Schroeder and he told another officer that didn't write a report somehow in this whole thing, but you two guys is going to testify y'all was made aware, am I correct?

A. What's the question?
Q. Was you guys made aware of this situation? Did the Officer Schroeder statement just say that he was told to go to 28th and Girard?
A. His statement says that, yes. The statement said he was directed to the area. It doesn't say that he went there.
Q. So if you had to read that statement, what would you take from that? Do you think he just ignored it?
MR. PAULSEN: Your Honor, Officer Schroeder is going to testify next. This question should be put to him, not to somebody --
THE COURT: Sustained as to foundation.
A. I'm sorry. Did you ask a question?
Q. Yes.
A. Okay.
Q. With this paragraph being listed, could you please tell us -- because I assume you've worked with Sgt. -- this Schroeder, right?
A. He's never worked for me, no. I've worked with him.
Q. But he's from the Minneapolis Police Department, am I correct?
A. Yes.
Q. And this officer knows the law and procedures that goes with this type of thing, does he not? He's an officer, am I correct?

A. I can't speak to anything he that he knows or doesn't know.
Q. If an officer is given this type of location -- if you was given this type of location -- let's take Officer Schroeder out of here.
Let's just say you was told that. What would you have done if you was called and given this information that the suspect from the shooting was on 28th and Girard and that was the possible suspect that was over there in that location?
A. We talked about it. I did receive this information --
Q. No, if you were Officer Schroeder, this exact statement, would you have went to this location?
A. I'm sorry. I can't speak to anything that Officer Schroeder would have done. I can only tell you what I do.
Q. Okay. So when you talk to Officer Schroeder -- because obviously you're going to talk in circles -- when you were talking to Officer Schroeder and you had to fill him in and make him so much aware of this situation, that it took you what, you said a few minutes with the car sitting there and a couple more, so we're talking about five to ten minutes to get him to back you up on a situation that he already knew about, am I correct?
A. It wasn't -- it was less than five minutes total.
Q. You did just testify that the car sat there for a few

minutes, am I correct?
A. I said a matter of minutes.
Q. A matter of minutes.
A. I don't know if that's -- I don't remember -- this was five months ago. I don't remember specifically if the car -- I wasn't being looking at my watch. I don't know if the car sat there for a minute, few minutes --
Q. Oh. But you do know how long it took that car to drive there, because you labeled stop signs and you went as far as saying a stop light.
A. You asked me --
Q. So how long did it take the car to get up there to 33rd?
A. I said a couple of minutes.
Q. A couple of minutes.
A. Yes.
Q. So we're talking at least five minutes.
A. No, to me a couple means two.
Q. A couple means two. So we're talking a couple minutes at the curb, a couple minutes to drive seven, eight blocks, and then make some more turns and drive some more, and you still don't have no backup from a sergeant that was directed to the same neighborhood, the same block that you was already on after you, because you got your information at what time?
A. I would have to reference my report. I have it in front

of me if you want me to reference my report. I have the exact time in there.
Q. Yeah, I would like you to. Here, I'm going to give it to you.
A. I have it right here in front of me.
Q. Could you reference your report if it would help your recollection.
A. Yes. At 23:42 hours, I received information from Sgt. O'Rourke, so 23:42 hours was the exact time.
Q. Okay. Could you tell me what time you stopped the vehicle.
A. 00:07 hours, seven minutes after midnight.
Q. Seven minutes hours after midnight. Hmm. So at 12:07, I mean, at 12 o'clock midnight, you would have still been on 28th and Girard, am I correct?
A. Yes. 29th and Girard.
Q. 29th and Girard. Could you please tell me again what time Sgt. O'Rourke said that he was told to go to that location.
A. Sgt. O'Rourke was the one that was telling people about the incident.
Q. I'm saying what time did he start filling you guys in to go to that location.
A. I received information from him at 23 --
Q. I said on his paper. What time did he state on his?

A. Whose paper are you referring to?
Q. Sgt. O'Rourke. The paragraph that you read.
A. 23:36 hours.
Q. 23:36. That's approximately what time, Officer?
A. 11:36.
Q. 11:36. Could you please tell me what time Officer Schroeder said that he was sent over there.
A. Around 23:50 hours.
Q. Around 23:50 hours. So that means you would have still been over there, wouldn't you?
A. Yes, I was probably there at --
Q. Did you see Officer Schroeder's car come through there?
A. I can't remember if I did or not. I think I might have, actually, now that you say that. I think that I might have seen his car come through the area.
THE COURT: Everybody's got to slow down, okay?
THE DEFENDANT: Okay.
THE WITNESS: I'm sorry.
THE COURT: This poor gentleman has to take it all down.
You ask your question slowly, wait till he's done --
THE WITNESS: I'm sorry, Your Honor.
THE COURT: -- give your answer slowly.
Let me stop for one second. Mr. Aligada, I know

you have a court appearance upstairs. I understand that you need to leave here at 10:45, is that correct?

MR. ALIGADA: That's correct, Your Honor.

THE COURT: Okay. Just so you know, we have to take a break at 10:45 for Mr. Aligada to be up in front of Judge Ericksen.

Go ahead.

BY THE DEFENDANT:

Q. Okay. So now the record is fully developed that there's multiple people that should have been in this area and that knew about this situation, because as Officer Kelly O'Rourke put in his report, he was making multiple people aware because this suspect was armed and dangerous, am I correct?

A. He made multiple people aware.

Q. He made multiple people aware. And you testified to the fact that you would never tell no one, or you wouldn't try to take an armed and dangerous suspect down by yourself, did you not?

A. I would not.

Q. Okay. Moving along, that being said.

At what point would you say that Officer Schroeder made it to your location?

A. I believe Officer Schroeder, as I was making the northbound turn -- or I'm sorry -- the southbound turn onto Fremont from 33rd, I think that's when he pulled in behind

me.
Q. He pulled in behind you.
A. Mm-hm.
Q. So was he on 28th and Girard with you?
A. No.
Q. How long before he was with you would you say -- after you talked to him?
A. I called Officer Schroeder as soon as I pulled away from 29th and Girard.
Q. As soon as you pulled away from 29th and Girard. So at this point in time, you already knew that you wanted to stop this suspect, am I correct?
A. Yes.
Q. And you can cut your cameras on for your car, am I correct?
A. I can, yeah.
Q. So if you knew that the suspect was in that car that sat there for multiple minutes, wouldn't that have been police procedure to cut it on to start recording?
A. It's not procedure, no.
Q. So if the suspects would've just seen your car and got to shooting again -- because you seen them, so obviously they could have seen you, right?
A. I have no idea what they would have seen.
Q. I said they could have seen you. By you seeing them

with your eyeballs, they could have seen you, am I correct?
A. I was sitting in a dark vehicle, you know, a distance away from them and they didn't have binoculars that I could see, so I'm guessing that they probably couldn't see me --
Q. I didn't ask you could they see. I said they could have. You was out there. You wasn't invisible, am I correct? Your vehicle wasn't invisible, am I correct?
A. No, but it's unmarked.
Q. It's unmarked, but it's still a vehicle, am I correct?
A. That's correct.
Q. You have a laptop in there, don't you?
A. I had a squad computer, yeah.
Q. And you have a dome light on your truck. You have lights and sirens on this truck, don't you?
A. Not on the exterior of the vehicle. They're all interior.
Q. But these is known undercover police cars in Minneapolis.
A. I don't know if they knew my vehicle. It was dark.
Q. Okay. Moving along anyway, while you were out here, you pulled the car over and you said that -- how did you approach this vehicle?
A. I walked up to the vehicle on the driver's side.
Q. And at that point you said you immediately recognized the suspect?

A. Yes.
Q. So you seen through the window.
A. Yes.
Q. And you seen the suspect.
A. Yes.
(Discussion off the record between the defendant and Mr. Aligada)
(Videotape played)
BY THE DEFENDANT:
Q. That's Officer Schroeder, by the way. That's when his car came on. He was going down Lowry.
Now, at this point that officer who's bending over giving you his rear, that's Officer Schroeder. You're the officer who body cam'd this, am I correct?
A. I don't know if that's my body camera or not. I haven't heard my voice.
Q. Oh, you eventually will.
In the next clip you're going to hear -- Officer Schroeder's going to try to get you to say that you seen this person moving around, and you're going to state -- and I quote -- "No, I couldn't see anything inside. The tint was too dark."
THE DEFENDANT: Could you please play it.
(Videotape played)
BY THE DEFENDANT:

Q. That's Officer Schroeder, right?
A. Yes, sir.
Q. Now, I ask you again, you just testified that you clearly seen through the window again and recognized the suspect.
A. Yes.
Q. So why did you just say it was too tinted, you couldn't see nothing inside?
A. Officer Schroeder was referring to as the vehicle was coming to a stop when I would have been looking through the back window of the vehicle --
Q. He asked you when you walked up to the vehicle.
A. Can I -- no, he didn't. He said, "Did you see him moving around inside?" and I said, "No."
THE DEFENDANT: Well, could you please replay it.
Q. If the window was too tinted --
THE COURT: Hold on, hold on.
Did you finish your answer?
THE WITNESS: No, Your Honor.
THE COURT: Finish your answer.
A. The reference that I was making when I said no, I couldn't see was as the vehicle was coming to a stop. I would have been looking through the back window of the Yukon, which is tinted very dark, almost black.
I could see in the rear driver's side window when

I walked up because I'm much closer to it. There were lights on. I wasn't referring -- if Officer Schroeder -- I don't know -- I'm just telling you what my thought process was from the question that he directed towards me. And if it wasn't specific, I was referring to as the vehicle was coming to a stop. I could not see any movement inside of the vehicle due to the tint level of the window, which my reference was to the back window because that's the only thing I could see when the vehicle was coming to a stop.

BY THE DEFENDANT:

Q. That was a nice recovery, but I'm going to ask you this now:

Before we go back to the video, this is a large SUV, am I correct?

A. Yes.

Q. All of the windows in the back is privacy tinted the same tint, am I correct?

A. I have no idea.

Q. So if you couldn't see through the back far window and the back window is the same tint as the back window on the back door, then how did you see in that window? If you couldn't see in the back windows, how did you see in the other back window?

A. I was further away. My reference was being made to when I was still inside of my squad car --

THE DEFENDANT: Could you please replay the thing again.

THE COURT: Hang on. Finish your answer.

A. My reference was made to as I was looking at the vehicle when I was still inside of my vehicle. If I got out of my vehicle and walked up to the exact same window, that back window, and looked through it, I would be able to see through it from that distance away. It's the same idea as the side windows, the ones that you're referencing.

THE DEFENDANT: Could you please replay it again, starting at five?

THE COURT: And then ask your next question and then we'll take a break.

(Videotape played)

THE DEFENDANT: Stop it.

BY THE DEFENDANT:

Q. Now, the comment that, "I could not see anything, it's too tinted," could you please tell me the definition of that in your mind, in your words? That -- just the part of you stating, just this one statement: "I could not see anything, it was too tinted."

Could you please tell me without -- in your car, out your car, trying to make justifications, could you please tell me the definition of "It's too tinted." If I was to tell you that something was too tinted and I couldn't

see anything, what would I be saying to you?
A. I can't answer that question without giving context to the question. The windows weren't too tinted for me to see through if I was close to them and using a light. They were too tinted to see through if I was a distance behind them in my squad car looking through the windshield at the window.
Q. But the officer was asking you -- was he not asking you, "Did you see this person move?" and you said, "No," because what?
A. Because the windows were too tinted.
Q. So if the windows was too tinted for you to walk up and see this person move, then the windows would have been too tinted for you to see this person's description, am I correct?
A. No.
THE COURT: All right. It's 10:44. We have to break so that Mr. Aligada can be up in Judge Ericksen's chambers.
For planning purposes, how long will it take you?
MR. ALIGADA: This is an uncontested final revocation hearing, Your Honor. I expect it to be completed within 30 minutes.
THE COURT: Okay. So shall we reconvene here at 11:15 and then go on till noon?
MR. ALIGADA: The hearing starts at 11:00, so I

anticipate we'd be done by 11:30.

THE COURT: 11:30. What does everybody prefer to do? Do you want to come back here at 11:30 and go for a little bit before we break for lunch.

MR. PAULSEN: Yes, Your Honor.

MR. ALIGADA: Yes, Your Honor.

THE COURT: Mr. Andrews, good with you?

THE DEFENDANT: Yes.

THE COURT: Okay. We're in recess. We'll reconvene at 11:30.

(Recess taken at 10:45 a.m.)

* * * *

(11:44 a.m.)

IN OPEN COURT

(Defendant present)

THE COURT: I apologize, everyone. I do not like to make people wait. I'm sorry.

Come on back, Officer.

THE COURT: For planning purposes, Mr. Andrews, how long do you think you will go with this witness?

THE DEFENDANT: If I can get straight answers, pretty quickly.

THE COURT: Okay. Please be seated, Officer. You understand you're still under oath.

THE WITNESS: I do, Your Honor.

THE COURT: All right. Proceed, Mr. Andrews.
BY THE DEFENDANT:
Q. Before we went on break, we was discussing the matter of the tinted windows and the definition of: "I can't see through the tint, it was too dark."
Could you please tell us what that meant?
A. That meant from my position seated in my squad car looking through the back window, I could not see inside of the car.
Q. So when Officer Schroeder said, "Did you see him moving around," he would have been referencing to you a car and a half back inside of your vehicle with a passenger that's in the full-size, or should I say extra large, edition of a Yukon Denali with tinted windows. Am I hearing you correctly, that's what he was asking you?
A. Yes.
Q. So he wasn't asking you what a logical person would ask Did you see this person moving at all"?
A. What I took his statement to mean was that as the car was coming to a stop, did I see any movement inside, and I was unable to see inside of the vehicle from my position as the vehicle was coming to a stop.
Q. Did he ask you that? Did he say, "when the vehicle stopped"?
A. No, he didn't say that. I'm saying that that was what

my inference was by his question.
Q. Do you remember what his question was?
A. His questions was, "Did you see" -- I can't remember what it was verbatim.
Q. Do you want to hear it?
A. I think I have the gist of it.
Q. You have the gist of it or would you like to hear it? Because there's a very big difference than what you're trying to reference to and get around to and what's the issue at stake here, which is that you couldn't see in the window, is that correct?
A. I could not see in the back window.
Q. Could you see in the side window?
A. From my position inside of my squad car, I could not --
Q. So when you -- sorry about that. When you walked up to the vehicle, at that point you can see in the vehicle.
A. Yes, I could.
Q. And what did you see?
A. I saw the suspect seated behind the driver.
Q. You saw the suspect. Was he moving?
A. He was sitting there.
Q. Was he bending down?
A. No.
Q. Was he kicking things?
A. No.

Q. Did you see a firearm in his hand?
A. I did not.
Q. But you seen his face clearly.
A. I did.
Q. I'm going to ask you under oath again, that's your final statement about that, you seen through that tinted window?
A. I could see through the back driver's side window. I could see that the suspect was seated in the seat directly behind the driver, yes.
Q. And at that time what did you do?
A. I asked the male to step out of the car and I handcuffed him.
Q. Okay.
THE DEFENDANT: Could you please play that.
Q. This is your body camera, number one.
(Videotape played)
Q. Could you please tell the Court why did you tell him to roll down his window?
A. Force of habit.
Q. Force of habit or because you couldn't see through the window?
A. No, I could clearly see through the window there.
Q. So why did you tell him, "Roll the window down"?
A. It's a force of habit.
Q. Force of habit. But you just told the Court that you

seen through the window and just told him, "Get out the car" and arrested him.
A. Well, I left out one statement.
Q. You left out a lot of statements.
A. I -- okay.
THE COURT: You've got to ask a question.
Q. So at this point you told him, "Roll the window down," and as we can see, he's being taken out of the vehicle, am I correct?
A. Yes.
Q. Okay. Now we're going to move a little bit further, as to how and why -- who okayed it for this car to be searched?
A. At that point no one needs to okay the car to be searched.
Q. Why?
A. Because the car is going to be impounded.
Q. Why?
A. Because we're arresting someone --
Q. Who was under arrest?
A. The male that's about to be -- Mr. Andrews is.
Q. He wasn't under arrest.
A. Yes, he is.
Q. He was being taken down for questioning.
A. No, he was under arrest at this point. I had probable cause to arrest him for second degree assault.

Q. You had probable cause to arrest him for second degree assault.
A. Yes.
Q. So that's your story you're going to stick to again.
A. Yes.
THE DEFENDANT: Could you please roll the footage again. You know what? Let's just start with that one. Just play it from where it's at right now.
(Videotape played)
THE DEFENDANT: Could you stop it.
BY THE DEFENDANT:
Q. You said you was going to be making some phone calls. Could you tell me what that was.
A. Yeah. I was going to call Sgt. O'Rourke.
Q. So at this point the suspect is under arrest.
A. Yes.
Q. You read him his rights.
A. No.
Q. That's what you do when you put someone under arrest, don't you?
A. No.
Q. You don't?
A. No.
Q. So is this suspect just being detained for questioning or is he under arrest?

A. This suspect is under arrest.
Q. Okay.
(Discussion between the defendant and Mr. Aligada)
(Videotape played)
THE DEFENDANT: Okay. Go forward. Right here.
(Videotape continues)
THE DEFENDANT: Go back when he first opens that up.
(Videotape continues)
THE DEFENDANT: Just go back to where he gets in the car. Right there.
(Videotape continues)
BY THE DEFENDANT:
Q. The suspect just asked you, "Am I under arrest?" and what did you state? "No, you're not. You're just being detained"?
A. I said, "You're being taken down to talk to an investigator."
Q. So he wasn't under arrest, am I correct?
A. By the letter of the law, at this point you are technically under arrest.
Q. By the letter of the law, when you arrest someone, they're supposed to be read their rights, am I right?
A. In a sense, yes, but in this situation, no.
Q. So what makes one situation different from the other is

because it's going to make all of this illegal if I'm under arrest and I'm not read my rights.

MR. PAULSEN: Objection. Legal conclusion.

THE DEFENDANT: It is.

MR. PAULSEN: Well beyond the probable cause for the arrest. Now he's talking about things that happened after the arrest and there's been no motion in that regard.

THE COURT: Well, it doesn't relate to probable cause.

THE DEFENDANT: It does, because I asked him this is on the lines of what grounds did he have to search the vehicle. We're going for suppression of everything in the vehicle.

THE COURT: Okay. I'm going to overrule the objection, allow the officer to answer the question, but I understand your objection, Mr. Paulsen.

Go ahead.

THE WITNESS: What was your question, exactly?

BY THE DEFENDANT:

Q. Simply, don't when you arrest someone, you read him his rights, do you not?

A. No, not under this circumstance.

Q. And what is this circumstance?

A. This circumstance is that I make the arrest as an officer on the street, but I'm not questioning you. At no

point did I question you regarding the incident that you were under arrest for. You have to be read your rights per the ***Miranda*** decision prior to being questioned regarding the incident that you're under arrest for, and that would be something that Sgt. O'Rourke would do once we got down to 108 and he got you into an interview room.

Q. So no one was under arrest.

A. You were under arrest. You had not yet been read your rights.

Q. So I wasn't under arrest.

MR. PAULSEN: Your Honor, we seem to be going and forth on this.

THE COURT: Yes. Sustained. Asked and answered.

BY THE DEFENDANT:

Q. Okay. Well, how about the female passenger?

A. The driver?

Q. I mean the driver, yes, the female driver.

A. About what?

Q. Well, surely she was the driver of the vehicle, am I correct?

A. Yes.

Q. Was she wanted from your shooting?

A. No, not that I knew of.

Q. So what probable cause, I ask you again, did you have to search this vehicle?

A. Well, we arrested Mr. Andrews for second degree assault, the shooting. We searched the area immediately around him for any weapons due to the fact that the shooting had happened, you know, roughly eight hours prior.

THE DEFENDANT: Objection, Your Honor. He's --

THE COURT: No, no.

THE DEFENDANT: That's not what I asked him.

THE COURT: You asked the question. He is responding to it.

You go ahead and finish the answer.

A. So the gun used in the shooting had not yet been recovered. We knew that going in. You were taken into custody in this vehicle less than eight -- approximately eight hours prior -- after the shooting had happened. I'm sorry.

We searched the area immediately around where you were taken into custody, which is where the handgun was located. Once the handgun was located, then a full search of the vehicle ensued from there and then the vehicle was towed.

Q. So when we just watched you -- since you wanted to put all that on the record, we're going to deal with that now.

What were you searching -- wasn't that the immediate area that you were searching when you looked in the back of the car that we just watched was not where

Mr. Andrews, the defendant, was sitting?
A. In the back of what car?
Q. In the back of that SUV.
Q. Are you talking about with the backpack?
A. Yes, the backpack. Looking under the seat, looking all around, feeling that whole area is not the area that the suspect was sitting.
A. Yes, it was.
Q. You searched it, right?
A. I started to search it and then there was enough officers on scene --
Q. Did you search the area?
THE COURT: You got to quit cutting him off, okay? He was mid-sentence when you cut him off.
THE DEFENDANT: Well, tell him to stop lying.
THE COURT: Pardon me?
THE DEFENDANT: Tell him to stop lying. This is perjury.
THE COURT: No, no. Mr. Andrews, you asked a question. He gets to answer it. I understand that you believe him to be lying, not telling the truth. That's an argument, okay? You can make that argument to me. You asked the question, he answers it, you think he's lying, then you tell me that later in whatever form we're going to do.

But finish your answer.
A. I began searching the area around where Mr. Andrews was seated in the car. I then deferred to allow the other officers that were on scene to finish that search.
Q. So answering yes or no, you searched the backpack that was seated where the suspect was seated, am I correct?
A. I began to search that backpack, yes.
Q. You searched under the seat, am I correct?
A. Right. I looked underneath the seat, yes.
Q. And you moved things in the immediate vicinity where the suspect was sitting, am I correct?
A. Yes.
Q. So it's safe to say that you searched the area that the suspect was in, am I correct?
A. I never completed the search.
Q. You completed the search where the suspect was sitting, am I correct?
A. No.
Q. Did Officer Schroeder tell you that the suspect kicked the backpack?
A. I don't remember. I don't know.
Q. You don't remember, you don't know.
A. I don't know. I --
THE DEFENDANT: Could you please go back to the beginning of his, same video, skip straight to the front.

Play it from the beginning.

(Videotape played)

THE DEFENDANT: Pause it for one second.

I want the record to reflect that this is directly after Joel, the witness on the stand, is getting off the phone with Sgt. O'Rourke after he cut his body cam off for whatever reason, to make this call. He made this call and he's coming back to the vehicle where he's now giving them the okay to just ram -- just to search the vehicle, whatever, and everything else you'll be able to tell. I just want the record to show that this is --

THE COURT: I can't make that determination. The record can't reflect anything other than --

THE DEFENDANT: All the video.

THE COURT: -- what the testimony is or what the video is. The video is what it is.

THE DEFENDANT: Well, could you start the video? Thank you.

(Videotape played)

THE DEFENDANT: Could you stop it.

BY THE DEFENDANT:

Q. Now, at that point you guys are discussing what?

A. The impound lot.

Q. That the vehicle is going to be impound. Under what grounds?

A. I can't remember the phone conversation I had with Sgt. O'Rourke, but I would assume that Sgt. O'Rourke told me to have the vehicle towed.
Q. This is before the gun was found, am I correct?
A. Yes.
Q. And you're talking about that this vehicle from what he just said is going down for Assault, Safe Streets, or a weapon, am I correct?
A. That's not exactly what we were talking about, but --
Q. Could you please --
A. -- we're talking --
THE WITNESS: I'm sorry, Your Honor.
A. We're discussing a procedural matter of where vehicles get towed to when they're being held for one of the units in the City. This vehicle was being held for the Assault Unit for Sgt. O'Rourke. That's what that discussion is about.
Q. Okay. Is that the vehicle from the assault?
A. No.
Q. So you were going to tow this vehicle and seize it, saying that this was the vehicle from the assault. Could you please tell the courts what was the description of the vehicle that you was looking for for the assault?
A. This wasn't the same vehicle. It was a blue Tahoe.
Q. Okay. So this is not that vehicle, so why would this vehicle be being towed down to the impound lot and seized

under assault --

THE DEFENDANT: Well, could you please replay it so I can hear all the things he named this vehicle was going in under?

(Videotape played)

BY THE DEFENDANT:

Q. All of those things he named sound like this vehicle's going down for the crime itself, that it was involved in the crime, am I correct?

A. No.

Q. So it's not?

A. No.

Q. Could you please tell us what he just made reference to this vehicle going in for?

A. Vehicles that are towed off of the street that are involved in investigations are often held for units, such as Safe Streets, the Weapons Unit or Assault. He was just making reference to individual units in the Minneapolis Police Department.

This vehicle was being towed for the Assault Unit. The Weapons and Safe Streets portion of that had nothing to do with this vehicle. He was making a reference, telling me that -- he was telling me that the vehicle would be put into the fenced-in part of the impound lot if it was being held for the Assault Unit or if it would have been held for any

other unit. This unit -- this car was being held for the Assault Unit.
Q. Could you please tell the courts why would this vehicle if it wasn't in an assault be held for the Assault Unit?
A. Because Sgt. O'Rourke works -- he is a member of the Assault Unit.
Q. And could you please tell the courts why would Sgt. O'Rourke think or have -- because you work with Gang Task Force stuff. Why would this vehicle that didn't have nothing to do with the assault be going in for the Assault Unit?
A. Because Sgt. O'Rourke works for the Assault Unit. He requested, I can only assume based on how this is transpiring -- like I said, I don't remember -- that he wanted the car towed and held for him. I don't know if he was going to execute a search warrant on it. I don't know what his plan was.
Q. Okay. So this vehicle right now from what you said is that this vehicle didn't have nothing to do with nothing and Sgt. O'Rourke was just randomly taking this vehicle -- holding it for Assault, right?
A. No.
Q. For the Assault Unit, right? He wanted it for investigation, am I correct?
A. Yes, he wanted it as part of his investigation.

Q. He wanted it as part of his investigation.
Now, the gun wasn't found yet, was it?
A. No.
Q. Was anything to indicate that this vehicle was in any shape, form, size and way tied to the crime itself at this point in time?
A. Yes.
Q. What?
A. Mr. Andrews was the person who was implicated in the assault as the suspect. Mr. Andrews was arrested while seated in that car after the car had transported him from one location to another. Therefore, that vehicle is now tied to that assault.
Q. So any vehicle that a suspect is in whether the person who's driving has a license, insurance, or anything, if you arrest someone -- let's just say Grandma's driving and her -- you pulled it over and do a warrant check and her grandson is wanted for murder.
A. Different circumstance.
Q. What makes that circum -- every circumstance seems to be different in this situation. What makes the average circumstance different, because what I see -- what this is sizing up to be -- and correct me if I'm wrong -- is illegal search and seizure. You had no reason to search or seize this vehicle and you guys did.

A. You're wrong.
Q. Oh, I am?
A. Yes.
Q. So at this point is when you got your okay to search this vehicle.
A. As I explained earlier --
THE DEFENDANT: Your Honor, could you please ask him to answer the questions? I didn't ask him what he said earlier. I asked him in reference to what I just asked him.
Q. Is this the point in time where you got your probable cause or you got your okay to search this vehicle?
THE COURT: Go ahead.
A. Prior to any vehicle being impounded we will do an inventory search of the vehicle. Now, additionally, as I said earlier, in this circumstance Mr. Andrews is being arrested for a second degree assault in which the gun hadn't been recovered. That gives us a secondary reason to search the immediate area around him.
Now, procedurally, prior to impounding any vehicle unless there's a forensic reason not to do so, we do a search of that vehicle to make sure that there isn't anything of outstanding value or whatever so that we can document it.
Q. Okay. So until this point right here, the vehicle was not supposed to be searched, so at this time you're going

to -- you got your okay that you're going to tow the vehicle, so now you guys can begin to inventory this vehicle, right?

A. The vehicle still -- the vehicle still would have been searched, the area around where Mr. Andrews was seated, regardless if the car was going to be towed or not. Once I talked to Sgt. O'Rourke and he said he wanted the vehicle towed and held for him --

Q. Mm-hm.

A. -- then a full inventory search of the vehicle was completed.

Q. Okay. And Mr. Andrews is in the back seat, right?

A. Yes.

Q. And he was under arrest, right?

A. Yes.

Q. That's the story you're sticking to.

A. Yes.

THE DEFENDANT: Could you please go to his dash cam, number 4. Leave that open. Just open the other one, actually the car cams this time.

It's dark again. You got to make it lighten itself up.

(Discussion off the record between the defendant and Mr. Aligada)

THE DEFENDANT: I think you got to minus them

other screens.

(Videotape played)

THE DEFENDANT: Now, Your Honor, if the courts will allow, can I describe what we're seeing?

THE COURT: This video is part of the court record, so it speaks for itself. You can ask him if --

BY THE DEFENDANT:

Q. Okay. What are we witnessing now?

A. This is me searching you, Mr. Andrews.

Q. Okay.

THE DEFENDANT: Your Honor, can you all see that good?

THE COURT: I can see it.

(Videotape continues)

BY THE DEFENDANT:

Q. Could you tell the Court what's happening now?

A. The female driver is being removed from the vehicle.

Q. Okay.

THE DEFENDANT: Pause. Just go back a split couple seconds. Right there. Play.

(Videotape continues)

THE DEFENDANT: Pause.

BY THE DEFENDANT:

Q. Now, at this time, do you have the okay to search that vehicle? Have you talked to O'Rourke yet?

A. No.
Q. So no one should be going in and out of that vehicle searching, am I correct?
A. I mean, we still had to -- we still needed to search the area where Mr. Andrews was seated.
Q. And that's the back, correct?
A. Yes.
THE DEFENDANT: I would like to draw the Court's attention to the officer that's standing by the driver's side door. Notice how he's reaching into his vest.
Could you please play the footage now. Pay close attention to this officer --
(Videotape continues)
THE DEFENDANT: -- as he plants evidence in the door. There. He's going to go in the car and move some evidence around too.
Then he's going to go in the door and plant some more, move some more stuff around while this officer tries to cover for him, all before you had the okay to search this vehicle.
Now he's going to try to play it off and act like he's looking in the vehicle and not touching things. He has no gloves on. He wasn't searching this vehicle.
Could you stop this for one moment. Now, could you please pull up the second video of him again.

MR. PAULSEN: For the record, I object to the narration. Mr. Andrews is not under oath and he's just characterizing a video.

THE COURT: The objection is sustained. The Court will treat Mr. Andrews' narrative as argument.

THE DEFENDANT: Could you go back. Well, as a matter of fact, right here, right here. That's good.

Go back a little bit. Go back a little further. Keep going. Keep going.

That's the officer right there. At this point in time, you're going to notice after you give him the okay he's going to start putting on his gloves now after you talk to O'Rourke, and now he's going to start his legal search of this vehicle.

Could you please play the footage.

(Videotape played)

THE DEFENDANT: As you see, he's putting on gloves which he never had on when he was tampering and putting evidence in the door.

BY THE DEFENDANT:

Q. You care to explain to the courts the sequence of things that we just witnessed? Because if I'm not correct, that's the illegal search right there. That was illegal planting of evidence which by the law I would think taints the evidence.

But could you just please tell us what grounds did he have to plant stuff in that door?

THE COURT: Hold on. I'm not going to allow that question. You can rephrase it to ask him the justification for what's on the video, but you can't ask him a question that assumes facts -- assumes an argument and treats them as facts.

Q. Okay. Well, can you please justify the officers seen putting things into the door and moving things inside the vehicle with no gloves on before you gave the okay to search this vehicle?

THE COURT: Go ahead and answer the question.

A. There's no evidence that I've seen that anyone put anything in the door. There's also no evidence that anything was moved around inside of the car. We saw a video that was taken from a squad car that was parked to the rear of the suspect vehicle. We --

Q. And what did you see that that officer was doing from that squad cam in that video?

A. I saw on officer standing near the open driver's side door --

Q. Doing what?

THE WITNESS: Can I finish, Your Honor?

THE COURT: Go ahead.

A. I don't know what he was doing. He was standing near

the open driver's side door. At one point he leans into vehicle. I have no idea what he was doing. I wasn't standing there. You can't tell from the video what he's doing other than standing next to the door, looking into the map pocket and leaning into the car.

Q. So you don't see him tampering with things and moving things around and pulling something out of his vest?

A. No.

Q. Do we need to watch it again?

A. No.

Q. I think we do.

A. I didn't see it the first time --

Q. Okay.

THE DEFENDANT: Okay. Well, could you please replay it. I think the officer needs to see it again.

THE COURT: Hold on a second.

Okay. Mr. Andrews, I'll let you play it again, but here's the deal. A lot of this is getting repetitive. I understand your argument, I understand where you're going. You've asked a question, he's answered it.

THE DEFENDANT: But you're not --

THE COURT: No, hold on. You can have it replayed, you can ask it again, but at a certain point he's not going to change his answer, okay?

THE DEFENDANT: Okay. Well, Your Honor, at a

certain point, like -- ain't it like some type of contempt to the Court that he's just blatantly lying?

THE COURT: That a determination that the Court makes when all the evidence is in and you've had an opportunity to argue to me and convince me that you're right, that he's lying, okay?

THE DEFENDANT: But you see what you see, right?

THE COURT: I am not going to comment on the evidence at this point. I see the video. We'll deal with what it shows and doesn't show at the appropriate time. Right now all you're doing is putting this into the record.

THE DEFENDANT: Could you -- okay. Well, I would like to have the video played again.

THE COURT: Okay.

BY THE DEFENDANT:

Q. Now, before -- as he's queueing this video, the search that you say was authorized now because the suspect was under arrest, am I correct?

A. Yes.

Q. So the driver of this vehicle, was she under arrest?

A. At that point, no, I don't believe so.

Q. And she was the licensed driver of this vehicle, she's the one that was in control of this vehicle, am I correct?

A. I don't know if she had a driver's license or not, but yes, she was driving the vehicle.

Q. Oh. So you don't know if this person had a license and insurance. So whose vehicle is it?
A. I have no idea.
Q. You have no idea. So you was just going to take someone's random property without forfeit paperwork or nothing. You was just --
A. There would have been a tow sheet completed.
Q. There would have been a tow sheet completed. And what would that tow sheet have told, entailed?
A. The facts of the vehicle tow.
Q. Which is what?
A. The identifying information from the vehicle.
Q. Whose vehicle it was?
A. That may or may not have been on the tow sheet. That didn't have anything to do with any of this, whose vehicle it was.
Q. When you run a vehicle VIN number or license plate, it tells you whose vehicle it is, does it not?
A. Yes. I think -- if I remember correctly, this vehicle had a dealer plate on it, so it wouldn't have had a person associated with it regardless if it was run or not.
Q. Okay. We'll address that in a minute, because that's going to bring me to another topic.
But anyway, this female driver is not under arrest. I just want to make sure that I got the sequence of

what's going on here.

This car was pulled over and this sketchy situation about did you know it was the suspect or didn't you. For just argument's sake, you got your man out of the truck, he's secured, he's in handcuffs, am I correct?

A. Yes.

Q. The passenger is in handcuffs, am I correct?

A. Yes.

Q. And the driver's secured inside of another officer's squad car, am I correct?

A. Yes.

Q. So at this time all the suspects or occupants of this vehicle is secured, am I correct?

A. Yes.

Q. So at this time you could have legally got a search warrant or something to search this car if needed, right?

A. Yeah, I think that was the plan.

Q. That was the plan, to get a search warrant.

A. Yes.

Q. So could you tell me what went wrong and why this vehicle was searched before the search warrant?

A. We have to do an inventory search prior to the vehicle being towed. Also, as I said, the area immediately surrounding where the suspect was seated in the car --

Q. Mm-hm.

A. -- can be searched for any evidence of the crime.
Q. Only if the suspect is what, able to still reach into the immediate area --
A. No.
Q. -- am I correct?
A. No.
Q. He's not?
A. No.
Q. Okay. Well, that's on the record.
Well, anyway, you say that at this point in time right here you haven't talked to Sgt. O'Rourke, right?
A. I don't think so, no.
Q. So the vehicle was not authorized to be towed or searched at this point, am I correct?
A. Not by Sgt. O'Rourke.
Q. By anyone. Is anyone on the scene gave the okay or found probable cause to tow and search this vehicle yet?
A. The area where the suspect was seated could have been searched under a different exception.
Q. And could you please tell us what that exception is, because I thought you just told the courts that it was for the car being towed, the inventory search.
A. Additionally, as I stated, the area immediately surrounding where you were, or where Mr. Andrews was seated, could have been searched for evidence of the crime.

Q. Only after it was said it was going to be towed, am I correct?
A. No, that's not necessarily true.
Q. Could you please tell the Court the necessities of it, because I'm law illiterate, so I need the record to fully state what your reasoning was so we can understand this.
A. If that area would have been searched and nothing would have been found and Sgt. O'Rourke didn't want to have a search warrant done on the vehicle or requested that I tow the vehicle or that I have the vehicle towed, then we could have let the vehicle go, but both of those things -- there was a handgun located and Sgt. O'Rourke wanted the vehicle towed for investigatory purposes.
Q. Was the gun located before or after Sgt. O'Rourke wanted the vehicle towed?
A. After.
Q. So he didn't know that there was a gun in that vehicle.
A. No, he didn't.
Q. So he didn't know there was a gun in that vehicle. I just want -- just yes or no.
A. Not at that time, no.
Q. Okay. Now, at this point in time you say that -- the immediate area of the suspect. Was the suspect in the driver's seat?
A. No.

Q. Was he in the driver's side door?
A. No.
Q. Okay.
THE DEFENDANT: Okay. Could you please play this video.
THE COURT: And before you press "Play," for the record, has this video been marked and introduced?
THE DEFENDANT: We got it from Jeffrey Paulsen.
THE COURT: No, I understand that. I'm just trying to make sure that when somebody has to read the transcript of this we know what we're talking about that you are cross-examining the witness on. If it hasn't been marked, I believe we are on Defendant's 12.
MR. PAULSEN: This would be a part of Government 4, I think it is, because all the squad videos are on Government 4.
THE COURT: Okay. Fair enough. Go ahead.
(Videotape played)
THE DEFENDANT: Could you stop it.
BY THE DEFENDANT:
Q. At that point in time, you kind of pointed at the officer. Could you tell me why you pointed at him.
A. I have no idea.
Q. You don't know why you pointed at him?
A. I have no idea.

Q. And this is the officer that's going to go inside this driver's side door.

A. I didn't even see myself point at anyone, but I don't know why I would have pointed at somebody.

THE DEFENDANT: Could you take it back like two seconds, please. Now just go frame by frame. Right here. There you go. Press "Play."

(Videotape continues)

THE DEFENDANT: Stop it. Now, the button in front of the "Stop." Over. The other way. Over, over. Right there. Go. Click, click. Keep going frame by frame. I'm going to tell you when to stop. Keep going. Right there. Back one. Go back one frame. No. Right there. That one.

BY THE DEFENDANT:

Q. Could you tell us what you're doing there.

A. Moving my arms.

Q. You're not pointing at that officer?

A. No.

Q. You're moving your arms. Could you tell us why would you just be randomly picking your arm up?

A. No, I can't tell you why I'd randomly pick my arm up.

Q. So we don't see you pointing there.

A. No.

Q. Okay.

A. One hundred percent, unequivocally, no, I am not

pointing at anyone right there.

THE DEFENDANT: Could you go another frame back. Down, a little bit more.

Q. Your arm's not up there.

A. You're correct.

Q. Now, the female is being escorted away from the car, am I correct?

A. Yes.

Q. And you're just going to turn around to walk away from the situation?

THE COURT: Before you go on, answer that question, but I just want the record to reflect that on the video, the current time is marked at 00:09:52. Again, I'm just trying to keep your record clear.

Go ahead and answer the question, please.

A. I'm sorry, sir. What was your question again?

THE COURT: Read it back.

Q. Are your -- is your arm up as the female is walking away?

A. No.

Q. So as you go to turn away --

THE DEFENDANT: Could you go one split second ahead again. One more.

Q. Your arm's still not up as you're turning away, correct?

A. That's correct.

Q. You're still looking back, though, right?
A. Yes.
THE DEFENDANT: One more. One more.
Q. Could you tell us what you're doing there?
A. I don't know. If the sequence continued, maybe I could see what the follow-through of that motion is and I would --
THE DEFENDANT: Take it a couple more times.
A. -- have a better idea of what I was doing.
THE DEFENDANT: Keep going. Keep going.
A. I can tell you what I'm doing now.
Q. Please do.
A. I'm keying my (indicating) microphone. In that uniform I wear right here, I'm keying that microphone to radio to dispatch to say that the scene is under control, or code four.
Q. Okay. So you need to stick your arm out from your body to do that, or would you lift your arm straight up and key your microphone?
A. I don't think I got my arm away from my body. I was turning and my arm came up and keyed the mike and that's how it happened.
THE DEFENDANT: Could you please go back to the second the judge had told us, 09 or whatever. Right there. Go back one. Go more. Go forward, forward, forward. Right there. No, back, back one more. Right there.

Q. You're reaching to key your mike there?
A. Yes.
Q. So putting your arm out to the left of your body in the direction that this girl is away from your body, is your microphone outside of your body to that side?
A. My arm is not extended out like that. My arm is bent at the elbow back towards the middle of my body at that point right there.
Q. That's not what this video is showing.
A. Yes, it is. That's absolutely 100 percent what that video is showing. My harm is bent --
Q. Okay. Well --
A. Can I finish, please?
Q. Yes.
A. My arm is extended out and my elbow is bent, and my -- that would be my left hand, just like I sit here today, is reaching towards the middle of my chest.
Q. It is?
A. Yes.
THE DEFENDANT: Could you please go another split second forward.
Q. It looks like your arm's coming back -- now it looks like it's bent forward. It looks like it's coming forward.
THE DEFENDANT: A little bit more.
Q. It looks like it's still coming forward.

THE DEFENDANT: A little bit more.

Q. Looks like it's still coming forward and now has reached your body. Now you're reaching into your body close to where your microphone's at. So when your arm was extended before, you was pointing. Your arm was extended. It was not facing your body.

MR. PAULSEN: Objection. Argument. This can all be briefed later.

THE COURT: It is argument. Objection sustained.

THE DEFENDANT: Well, could you please go ahead and finish playing it. I'll tell you when to stop again. Stop.

BY THE DEFENDANT:

Q. The officer by the driver's side door, is he not reaching towards his vest?

A. I can only see one officer right now. I can see the officer who's standing directly by the door. I can se what I believe to be his right arm. There's an officer who's in full uniform that's completely blocking his view with the exception of his right arm.

THE DEFENDANT: Could you back a split second.

A. Oh, I'm sorry. I apologize. There's another officer who is standing to the left --

THE DEFENDANT: A little bit more. A little bit more. A little bit more. A little bit more. A little bit

more. A little bit more. A little bit more.

I want his arm to be down. Keep going to that officer with the flashlight right there where the arm is down. Right when the girl gets past him. A little bit more. There.

Q. Do you see his arm is on his gun, am I correct?

A. I don't know what his arm is on. His arm is near his gun.

Q. His arm is near his gun. So he's holding his flashlight in his left hand.

A. I don't know what he's holding in his left hand.

Q. But he doesn't have nothing in his right hand, am I correct?

A. It doesn't look like it, no.

Q. Okay. And his right arm is where?

A. His right arm is near his gun.

Q. Is near his gun.

THE DEFENDANT: Could you go a few split seconds ahead. Stop.

Q. Could you tell me what his right arm is doing now?

A. No, I can't.

Q. Is it still by his gun?

A. It's near his gun.

Q. Did it move?

A. Yes.

Q. Did it move up or down?
A. It moved up.
THE DEFENDANT: Could you go a couple more split seconds.
Q. Did it move again?
A. Yes.
Q. Where did it go?
A. It went up farther.
Q. Okay. And there was nothing in that hand, right?
A. I didn't -- this is far away and it's green. I don't know if there's anything in his hand. It does not look like there's anything in his hand from this point of view, but I cannot say that with 100 percent certainty.
THE DEFENDANT: Could you please give a few more seconds. Stop.
Q. Could you please tell us what it looks like his hand is doing right now?
A. I don't know. I can't tell.
Q. Is his arm crossed over his body?
A. It looks like it, yes.
Q. Like it's reaching towards his vest, inside of his vest?
A. It could be.
THE DEFENDANT: A couple more seconds ahead.
Q. The officer is now looking at the door, is he not?
A. It looks like he's looking into the car.

Q. Okay.
THE DEFENDANT: Keep going.
Q. And he's still reaching into his vest, am I correct?
A. I have no idea what he's doing right now.
Q. Is his elbow still bent at the shoulder going towards his vest?
A. Yes. Yes.
Q. Okay.
THE DEFENDANT: Keep going.
Q. Now, at this point, where is all the other officers?
A. Not near the car.
Q. They've miraculously -- they just disappeared all at once, am I right? They're all just starting to leave. Even this officer is turning around, the last one, is he not?
A. I don't know what he's doing.
THE DEFENDANT: Go a couple more seconds.
Q. Is he turning away?
A. Yes.
Q. So he's leaving too.
A. Yes.
Q. Can you explain why everyone at this split second has decided to leave this area of this vehicle?
A. Maybe because they had other things that they needed to do.
Q. So the vehicle where the gun is possibly still in there

needs to be searched because you say you need to search this area, and everyone just dispersed from this car like spontaneous combustion.

THE COURT: You got to ask a question, Mr. Andrews.

Q. Did everybody leave that vehicle at one time?

A. I mean, generally the same time, yeah.

Q. Okay.

THE DEFENDANT: Could you go a little bit further now. Just play it. I'll just tell you when to stop it. Stop it.

Q. That officer that was seen reaching into his vest, could you tell me what it looks like he's doing now?

A. I can't tell what he's doing, and I also want to make it clear that I don't know if he was reaching into his vest. He was reaching towards his vest. I don't know if he was adjusting the strap on his vest. I don't know what he was doing.

Q. Is he still in the same spot in the video?

A. He took a step forward.

Q. And which way is he facing now?

A. It looks like he is kind of parallel to the door.

Q. Like he's turning in to the door?

THE DEFENDANT: Go frame by frame. Right there. A little bit more. Stop.

Q. His arm is still bent, isn't it?
A. His right arm is bent, yes.
Q. And it looks like he's looking into this door, isn't he, facing the door, looking down into the door?
A. Yeah.
THE DEFENDANT: Go a couple more frames.
Q. Is his arm coming down now?
A. His head is coming down. I don't know if his arm is coming down.
THE DEFENDANT: A little bit more.
Q. Do you see his hand now?
A. Yes.
Q. Is it coming down to the door?
A. Yes.
THE DEFENDANT: Keep going.
Q. Now, what he is placing in the door?
A. I don't know if he is placing anything in the door.
Q. Is he touching something in the door?
A. I can't tell. I can only see his back.
Q. From the looks -- as an intelligent officer of the court, does it look like this officer is touching this door?
A. I don't want to make any inferences. I can't see anything but his elbow and his upper arm.
THE DEFENDANT: Okay. Go a little bit further.
Q. What is he doing now? Is he bending into this door?

A. I have no idea what he's doing. He appears to be looking down at something that may or may not be in the map pocket of the door. I don't know what his arms are doing.
Q. Okay.
THE DEFENDANT: Go a little bit further. Just play it. I'll tell you when to stop. Because we all can clearly see what's going on here. Stop.
Q. From your recollection, was that not meth said to be found in that door?
A. I have no idea what was found in that door.
Q. You don't?
A. No.
Q. So the officer didn't come to you and tell you that they found some Ecstasy and methamphetamines?
A. I knew that there was Ecstasy located. I don't even know where it was found inside of the car.
Q. So you never heard them say nothing about no meth.
A. No, I don't -- I don't recall anything about any meth. I remember Ecstasy.
Q. You remember Ecstasy.
A. Yes.
Q. And that's your -- you're going to testify to that.
A. Yes.
THE DEFENDANT: All right. Just play this part. Just finish this off so we can see what the rest is he's

doing to this door. Beside the door, moving something into the car, back in the door again. Now he's going to play it off. Nothing's going on.

All right. You can stop that footage. Now, go back to his body cam too. Back it up. Not too far. Right there. Play it.

(Videotape played)

Stop. Go back a split second.

Q. And I want you to listen to the background. This officer is going to tell you guys that it's suspected methamphetamine in this door, the officer in the background.

THE DEFENDANT: Stop.

Q. Did you hear it?

A. I think I heard something about meth.

Q. So you're the control -- you what we would call the OIC, like the officer in charge, am I correct, of the scene?

A. Yes. Yes.

Q. So when something of that magnitude is found in the door, wouldn't you be made aware of that?

A. I mean, in this situation, a small amount of methamphetamine, if that's in fact what was located, wouldn't really have a whole lot of consequence on the entire thing.

Q. What makes you say it was a small amount of meth?

A. I don't know. I don't remember -- I don't even remember

meth being recovered. I said I remember Ecstasy being recovered.
Q. So why did you just make reference to a small amount of meth if you don't remember any meth being found?
A. Because if it was, for example, a pound of meth, I probably would have remembered.
Q. So if an officer finds one gram of meth, it's the same as finding a pound of meth? He wouldn't inform you? Wouldn't it still be the same thing to inform the officer in charge that he's found a gram or a pound of meth?
A. Well, someone mentioned something about meth on the video.
Q. But you just mentioned a small amount of meth and I asked you earlier did you know the meth was there.
A. You just directed me to the video that you can hear someone saying something about meth, so I was acknowledging the fact that someone said that there was meth in the car. I don't have an independent recollection of that minus my body camera footage that we just watched.
Q. Well, I'm going to help enlighten you, because the officer in fact said the same thing you just said, that it was a small amount of meth, and just miraculously you chose those exact words, a small amount of meth. That's Officer Joel -- what's his name? One second, please.
THE DEFENDANT: And I won't -- I'll tell the Court

relevance is still on the illegalness of this whole search.

THE COURT: Understood.

THE DEFENDANT: That's what this is going towards so the courts understand.

What exhibit is the defense on?

THE COURT: I believe you have entered through 11.

Is that correct, Officer?

THE WITNESS: Oh, I'm sorry.

THE COURT: Through 11, correct, or 10?

THE WITNESS: The highest number I have is 10, Your Honor.

THE COURT: Okay. The next exhibit number is 11.

BY THE DEFENDANT:

Q. His name is John Owen. Does that sound about right?

A. Yes.

Q. Was that the officer that you just seen that that video that we was just looking at and making reference, another member of your gang intervention unit or team, your Gang Unit?

A. Yes, Officer Owen is a member of the Gang Unit.

Q. So the other officers in blue, the ones that's not seen planting evidence in a door, are regular Minneapolis police officers, am I correct?

A. They are patrol officers, yes.

Q. And the Gang Task Force guy that you was pointing at or

you wasn't pointing at at the time he went to put this in the door, he's with the Gang Task Force, am I correct?
A. He is a Gang Unit officer, yes.
Q. So that means he's under your control, am I correct?
A. Yes.
Q. Thank you. Now, did you get a chance to read his inventory report?
A. No.
Q. Would you like to read it, or would you like me to just read it to you?
THE COURT: No, you have to have a reason to question the witness about the inventory.
THE DEFENDANT: Oh. I'll --
THE COURT: Hold on. Ask him if he's aware that something, whatever it is you want to establish, was found in the car.
THE DEFENDANT: I already did that.
BY THE DEFENDANT:
Q. But I will ask it again for the record because the judge said.
Now, I want to ask you again, you said that you was unaware that anything was found in this car.
A. I said I didn't have an independent recollection prior to reviewing my body camera footage just now.
Q. So you didn't know about this meth, because that's what

I asked you under oath and you said you're testifying that no one never mentioned or said nothing about any meth, am I correct?

A. I had no recollection of any methamphetamine being recovered from that vehicle prior to watching my body camera here today.

Q. Okay. Now, when you just referenced that it was a small amount of Ecs -- I mean, of meth, where did you come up with that? Where did you get that from?

A. I was making an example that if a small amount of narcotics are recovered on a stop, any stop, it probably isn't going to be burned into my memory and something that I would remember, because over the course of my career I've had a lot of stops that have resulted in the recovery of a small amount of narcotics.

Q. Okay. I want --

A. When a larger amount of narcotics is recovered, I usually have a memory of it because it's a more memorable instance. That's why I said that if a small amount of methamphetamine was recovered, I probably wouldn't have remembered. I do remember that there were somewhere in the neighborhood of 90-some pills of Ecstasy that were recovered. That would be a larger amount.

Q. So in a stop like this where you're trying to find you some probable cause and you've got guns and everything, one

drug doesn't stick out to your memory more than another?
A. Yeah, the Ecstasy sticks out more because there was more -- it was a larger amount. I didn't remember any methamphetamine.
Q. Which one is a seriouser (sic) drug, methamphetamine or Ecstasy?
A. In the eyes of the law they're roughly the same.
Q. No, they're -- well, I pass on that.
I want to read you an answer of Joel Owen and I'm going to ask you a question.
This is the third paragraph of Supplement 30, John Owen Supplement, with the case that's in question:
"Once all parties were removed from the vehicle, Sgt. Pucely advised that an inventory search should be conducted. I started to search at the driver's side door and observed a clear containment container in the side door" -- "in the side panel of the door. Inside the clear containment container was a small crystal-like substance that I believed to be crystal meth."
That sounds like the same thing you said, it was a small amount of meth, doesn't it?
A. Yes, it does.
Q. Is that just a coincidence?
A. No, I explained this already. When I referenced a small amount of methamphetamine, it wasn't because I had an

independent recollection that there was a small amount of methamphetamine recovered from that vehicle. Why I said a small amount of methamphetamine is -- was using it as an example, that if a small amount of narcotics is recovered on a stop, I probably won't remember that stop, or I won't remember that portion of the stop, because there were a lot of other things going on here.
Q. But you remembered the Ecstasy because it was a large amount, right?
A. It was a larger amount, yeah.
Q. Because you would charge somebody with a larger amount, right?
A. Well, someone could -- technically, someone could be charged with a small amount of methamphetamine as well.
Q. But the larger amount sticks out because you can charge someone more with it, right?
A. I don't know -- I honestly don't know what the charging limits are for Ecstasy. I don't know -- I would assume that a small amount of methamphetamine is a lesser charge than 90-some pills of Ecstasy, but I don't have the charts in front of me. I don't have those numbers memorized.
Q. No, I'm asking that to ask about why it stuck out to you, because I want to get to the fact that why wasn't no one charged with these drugs. I want to understand --
MR. PAULSEN: Objection on relevance grounds.

THE COURT: Sustained. What's the relevance?

THE DEFENDANT: Huh?

THE COURT: What's the relevance of your question why no one was charged with a drug offense? Assume that to be true.

THE DEFENDANT: Oh, it's true. It's fact.

THE COURT: Okay. Why is it relevant here?

THE DEFENDANT: Because I'm still trying to impeach this officer about his lies and that he just told this officer -- he pointed to him. I'm trying to develop the record to show that he was -- that he knew about this.

THE COURT: That's argument and you can argue that. All you can do today is establish the facts, meaning whether you believe them or not, whether they're true or not, you can get this officer's answers to questions that you ask.

THE DEFENDANT: Okay. Well, listen. I want to introduce this into evidence under the grounds that -- with the video in that it shows that this officer clearly got the tampering and putting evidence in there, because this goes to show, like, who knows how that gun got in there. I think they put it in there now.

THE COURT: I understand that is your argument and we will entertain your argument and rule on it, but that's not what you're doing here.

Mr. Aligada, what's the exhibit number?

MR. ALIGADA: 11, Your Honor.

THE COURT: Defendant's Exhibit 11. Any objection, Mr. Paulsen?

MR. PAULSEN: No, Your Honor. That would be John Owen's statement.

THE COURT: It's received.

BY THE DEFENDANT:

Q. And before we leave this subject, I want to make it clear that the area that that officer was searching inside the door and inside that driver's seat, that's not where the suspect was located, am I correct, the defendant?

A. No. Yeah. Mr. Andrews was located behind the driver's seat.

Q. So when that officer went to search through that door, he wasn't in fact searching the immediate area of the defendant, am I correct?

A. He was not.

Q. Thank you.

Moving along from that. Now, let me see here.

I want to ask you as far as procedure. When pulling over a vehicle for a traffic stop, as you said, in this situation, am I correct? --

A. Yes.

Q. -- what's the procedure of approaching the car when

you're making a traffic stop for a traffic violation?
A. Getting out of the squad car and walking up to the driver's side of the car.
Q. And who do you approach first?
A. I approach whoever I come into contact with first. I look in all portions of the car as I'm approaching. I don't pass by windows. If there's someone seated in a spot -- like in this example there was someone seated behind the driver. I wouldn't have walked past that person regardless of who it was. I would have had that person roll their window down and talk to the driver beyond them.
Q. So if it was four old ladies in the back seat of a car with no tint and you're pulling this car over because it had a busted taillight, you're telling me that you're going to stop at the back door and get the -- question the passengers in the back, because they surely would be who you pass first, the little old ladies in the back seat.
A. In that circumstance, no, I would walk up to the driver.
Q. So what makes that circumstance different from this one if you're conducting a traffic stop?
A. Because I had reasonable suspicion to believe that a person who had committed a shooting less than eight hours prior to this stop was inside of that vehicle.
Q. So when you try to throw the little facts about this being a traffic stop, that wasn't in fact what it really

was. You were going to stop this car regardless of what happened, regardless if this car had low lights on, or regardless if this car and did every traffic stop to the T, you were still going to stop this vehicle anyway, were you not?
A. I don't think that's relevant, because there were two moving violations that were committed within the first 30 seconds of the car moving. I had a legal reason -- two legal reasons to stop this car. Yes, I had other ideas about what I might find once the vehicle gets stopped, but I had two legal reasons, two citable offenses, that I could have written to the driver prior to making this stop.
Q. So why didn't you go stop -- why you didn't step to the driver about the traffic violations then?
A. Because when I walked up to the rear passenger side window, I observed Mr. Andrews, who I knew to have been the suspect in a shooting that happened less than eight hours prior, sitting behind the driver. It would have been incredibly unsafe to walk past Mr. Andrews and talk to the driver when I knew that the firearm in the shooting had not yet been recovered and I did not know if he was armed. In my experience, in my training in 12 years as a cop, I would never ever walk past someone who I knew to be a suspect in a shooting without taking them out of the car, handcuffing them, pat frisking them for weapons, and moving them away

from the vehicle.
Q. You're just contradicting yourself here. You state that, one, it's a traffic stop, or two, it's a takedown. Which one is it? Are you trying to just arrest someone, or you're looking for a traffic stop here?
A. I had a -- two legal reasons to stop that car. I had --
Q. Okay. Could you stop right there? Could you stop right there, please. I asked the question. I received my answer.
THE COURT: Hold on. That's fine. This record is established on that point. Here's what I need you to do, Mr. Andrews. I'm giving you a lot of latitude, you're representing yourself, but here's the deal.
A lot of this you've asked and he's answered and you've asked again and he's answered. You need to get to whatever other points you want to make with this officer, okay?
THE DEFENDANT: I'm trying to --
THE COURT: No, I understand you're trying and I'm giving you a lot of latitude, but --
THE DEFENDANT: But you're not -- Your Honor, listen. This is your court. Like I said, I don't know no legal -- I don't have no law degrees or stuff, right? So I can only the questions how they need to be asked, but you're letting him give me the runaround and he's not answering the question correctly. He's talking around the questioning.

He's taking two, three, to five minutes with each answer that I'm not asking him and you're not stopping him and you're not having him answer the question how I'm telling him to answer, because clearly he's not telling the truth in what he's saying.

THE COURT: I will acknowledge that the witness has given several narrative answers. If you don't want a narrative answer, the best way to accomplish that is to ask a question that doesn't call for a narrative answer.

So, for example: "Officer, did you or did you not do X? Officer, what was -- where was the passenger seated," et cetera, things that don't call for a narrative. But if you ask a question: "Why did you stop?" or: "What was your justification?" he's entitled to give a narrative answer, okay?

BY THE DEFENDANT:

Q. Officer Joel, these next questions I want you to answer all yes or no; do you understand that?

A. Yes.

Q. When the suspect -- well, the suspects came out of this house, you seen them get into a vehicle, am I correct?

A. Yes.

Q. At that point the vehicle sat there for at least two minutes, am I correct?

A. Roughly, yes.

Q. At that two minutes, you knew already that you thought this was your suspect, am I correct?
A. I had reasonable suspicion to believe --
Q. Yes or no.
A. I don't know.
Q. You didn't know if that was the suspect or not?
A. Not with 100 percent certainty, no.
Q. Okay. Now we're getting somewhere.
Second, with the thought in mind that maybe this was the suspect, at that point you could have cut on your recorder to your car, am I correct?
A. Yes.
Q. And if you'd have cut your recorder on to the car, it would record these, quote-unquote, traffic violations, am I correct?
A. Yes.
Q. So when the car pulled off, you have no proof whatsoever that there was a traffic violation, am I correct?
A. I had my observations.
Q. I ask you again, yes or no, other than your statement or your observation or your story line, do you have a shred of proof that there was a traffic violation committed?
A. No.
Q. Once the car pulled off and then made it to the next block, you at that point could have still cut your camera on

to this vehicle, could you not?
A. Yes.
Q. And you would have still in fact caught the vehicle if it committed another traffic violation, am I correct?
A. After the first --
Q. Excuse me. Am I correct?
A. I can't answer that question as a yes or no.
Q. Before the vehicle made the turn that you said it made without coming to a complete stop, you could have cut your camera on to caught that traffic violation, am I correct?
A. I can't answer that question with a yes or no. It needs explanation.
Q. It doesn't. It's a yes or no. Could you physically took your finger and pressed the record button?
A. Yes, I could have.
Q. And you chose not to lift your finger and press the record button, am I correct?
A. I did not. I did not turn the recorder on.
Q. So when you didn't cut the recorder on, you don't have a shred of proof that this car committed a traffic violation, am I correct?
A. My answer is the same. No, I don't.
Q. And also, when you say you had binoculars out, did you cut your camcorder on inside your car or your body cam to record that?

A. No.
Q. So you don't have a shred of evidence that you had a camcorder or the binoculars out surveilling these suspects, yes or no?
A. No.
Q. So once these suspects got in the vehicle and the car got on its way and it traveled a mile, roughly, you still did not choose to cut on your body cam, yes or no?
A. No.
Q. Is it not in your police procedure, yes or no, when you're going out to a scene or going to possibly make an arrest of something of this magnitude where it's a suspect from a shooting that's armed and dangerous and you have information from a T-Mobile ping that places this suspect stationary on a specific block at a specific time that you know where this suspect is at that's armed and dangerous, is it not in your procedure to have your body cam on?
A. No.
Q. Thank you. Second, is it not in your procedure when you know you're going to pull a vehicle over for a traffic violation to start recording?
A. No.
Q. Thank you. I'll move on from that. That's what I have for that.
And you say that you wasn't out there for other

purposes, am I correct?
A. What do you mean by "other purposes"?
Q. Exactly what the question asked. Were you out there for other purposes?
A. I don't know what "other purposes" you're referring to. I don't know what the main purpose that you're referring to is, so I wouldn't know what "other purposes" are.
Q. Did you have any other agendas out there? You were out there to locate the suspect or the suspect vehicle. That was your purpose, am I correct?
A. Yes.
Q. So that's the only purpose you was out there, is that correct?
A. Yes.
Q. So that would be the only purpose in this situation that I'm talking about, am I correct?
A. Yes.
Q. Okay. Thank you.
So you wasn't out there surveilling Anthony Kanz.
A. There is no one that I know of named Anthony Kanz.
Q. So the conversation that you and Sgt. -- I mean, Officer Schroeder --
MR. PAULSEN: I object to going over the same thing again.
THE COURT: Asked and answered.

Q. Okay. Well, it's on the record. I just -- you know.
Oh, that's what I wanted to ask you.
Okay. Now, back before all of this, you said that Sgt. O'Rourke contacted you by phone?
A. Yes.
Q. And he sent you to this location by phone.
A. Yes.
Q. And that was your first and only communication with Sgt. O'Rourke?
A. To the best of my recollection, yeah, that was the first time I had talked to him that day.
Q. What would make something significant stand out? Would it have to be sent somewhere else?
A. What?
Q. If Sgt. O'Rourke sent you somewhere else, you would remember that, would you not?
A. I might.
Q. Did Sgt. O'Rourke send you to St. Paul to check on 646 Thomas Avenue West for the suspect in his vehicle?
A. I did not go to St. Paul that night.
Q. Did you get told to go to St. Paul that night?
A. No.
Q. You didn't?
A. No.
THE DEFENDANT: I would like to enter into

evidence -- for the record, Your Honor, I want to make somewhat of an objection, even though I'm going to use it. I want to make an objection to the grounds that the Government -- and this is going for the outrageous Government conduct. He's (indicating) clearly going to introduce evidence that he wouldn't have been able to had we not took a two-week pause. He went and manufactured some e-mails and stuff that he's going to bring other officers back to try to clean up impeachment that I did on Sgt. O'Rourke on the stand about some of his statements, and had we not had to take a two-week pause, this wouldn't have been available. It's forged anyway, but --

THE COURT: You want to enter that exhibit, is that correct, for the purposes of impeaching this witness?

THE DEFENDANT: Yes.

THE COURT: For that limited purpose?

THE DEFENDANT: Yes. Just the email part, just to show the relevance that this document is not real. This is a phony document.

THE COURT: Okay. Offered for that limited purpose, Mr. Paulsen, do you have an objection to that exhibit which has not yet been marked?

MR. PAULSEN: No. I provided that to the defense.

THE COURT: All right. Let's mark it. It will be received for the limited purpose you've offered it.

MR. PAULSEN: That's Number 12, I believe.
THE COURT: I believe that's right.
BY THE DEFENDANT:
Q. This document that I hold in front of me is an email correspondence going back and forth between you and Sgt. O'Rourke. And in this email, you're the one who contacted O'Rourke and told him that my kid's mother was the owner of a 2002 Chevrolet Tahoe with a 21-day sticker, is that correct?
A. I don't know what document you're referring to. I would need to see that.
Q. But you would remember something that significant, am I right, because you said that the first contact you had with O'Rourke was when he told you to go to 28th and Girard, am I correct?
A. I don't have a recollection of what you're referring to.
Q. Well, this email from you was at 11 p.m. on that night in this 40 STS for tonight's shooting.
A. Okay.
THE COURT: He can't say anything about the email if you don't show it to him.
THE DEFENDANT: This is my only copy. I need copies of it, because if I give this to him, I won't be able to make reference to it.
MR. PAULSEN: I have an extra.

THE COURT: Do you have an extra? Thank you, Mr. Paulsen.

(Document handed to the witness by Mr. Paulsen)

BY THE DEFENDANT:

Q. Could you please read the time and date of that email, the top one, and who it's from?

A. It was sent from me to Sgt. O'Rourke at 11:03 p.m. on Tuesday, May 15th.

Q. 11:03. In your statement that you wrote in the supplement, and in your report -- I mean, and in your testimony on the stand, and to every other statement or document that I see thus far, did not you say that Sgt. O'Rourke called you at 11:42 and sent you to the area over there on 28th and Girard -- 29th and Girard, should I say?

A. Yes.

Q. And I just asked you under oath, yes-or-no -- answer this question yes or no -- was that the first contact that you and Sgt. O'Rourke had?

A. It was the first contact --

Q. Excuse me. I said yes or no.

A. I can't answer that question yes or no.

Q. Is this document -- yes or no, is this document stamped and dated before the time that's in your report saying that Sgt. O'Rourke sent you to 29th and Girard?

A. Yes.
Q. Did you not just testify when I asked you how did Sgt. O'Rourke get in touch with you, you said by phone, am I correct?
A. Yes.
Q. You said that that was the first time he talked to you and y'all made contact is when you told him to go over there -- I mean, when he told you to go to 29th and Girard, is that correct?
A. I can't answer that yes or no.
Q. Did you not just testify to that when I asked you the same question less than five minutes ago, did you or did you not -- was it not the first time he talked to you he told you to go over there on 29th and Girard?
A. That was my testimony, yes.
Q. So this document that I have here, yes or no, is this not a contradiction, or should I say impeachment, of that statement?
A. It's a contradiction.
Q. So which one is the truth? Is your statement the truth that you wrote in your supplement, or is this the truth?
A. Now that I've been provided with this email, I still don't really have an independent recollection of it, but this email clearly shows that I did have contact with Sgt. O'Rourke prior to the phone call that I received from

him.
Q. So it's safe to say that you're just willing to just testify and say anything that you need to say to develop the record or get your point across, is that not correct, yes or no?
A. No.
THE COURT: Hold on. It's not a proper question.
THE DEFENDANT: It's not?
THE COURT: No. It's argumentative.
BY THE DEFENDANT:
Q. Okay. Well, let's just say, yes or no, you have your own way of determining things of importance to remember, is that not correct?
A. No.
Q. You don't determine what's important and what's not to you?
A. I don't make a conscious determination to forget something.
Q. So if Sgt. O'Rourke told you to go on 29th and Girard and apprehend the suspect from a shooting and you decided to go over there by yourself, no backup, no squad cams, no nothing, you just went over there -- I mean, like you said, this is an armed and dangerous person that you would never approach without securing and putting in handcuffs because he's so dangerous. You just testified to that, am I

correct?
A. Yes.
Q. And this is the person that you went over here on 29th and Girard to get with Sgt. O'Rourke telling you, you remember that, right?
A. Yes.
Q. But you don't remember that you and Sgt. O'Rourke had a conversation back and forth and he told you to go and check 646 Thomas in St. Paul for Mr. Andrews and his vehicle? And this was at 8:30 p.m. This was well before 11:30 at night.
A. I don't remember this. I did not remember this exchange until it was provided to me today.
Q. Hmm.
A. I'm not denying that it happened.
Q. So when this thing makes reference for "tonight's shooting," what shooting was it tonight? Could you please tell us what shooting it's talking about that's in the nighttime, not the one from 4:00 o'clock in the afternoon?
A. I think -- I didn't write that.
Q. Oh, you did. It's at the bottom of yours.
A. I did not write that subject line.
Q. But you left it on there as a forwarded subject line. It's what y'all was talking about. You're both making references back and forth, telling each other that this is

the subject, this "tonight's shooting."

So was there another shooting that you was out on 29th and Girard to investigate and you was going to pull that white Tahoe over no matter what and who answered it?

A. No.

Q. Is it more believable to the Court -- if it's more believable to you to tell the courts that you was out there to get an armed and dangerous suspect, or you was doing some surveillance on some gang activity because you're the Gang Task Force and you thought you seen some gang activity get into this vehicle, which one is more believable? Let's just -- now, you sit back, you think, and I want you to give me a narration of this. This is one where I'm going to allow you to use your own judgment because I just want your answer for the record, and I'm going to ask this question:

Is it more believable to you that an officer in your capacity of magnitude would be out at 12:00 o'clock midnight going to pick an armed and dangerous suspect up that was involved in reportedly two shootings today that you had the exact location for by yourself, or is it more believable that you would have been out there surveillancing some gang activity, watching the house of Anthony Kanz or the fat guy, because it was another fat guy out there in this area, and you seen this vehicle because this vehicle was a white Tahoe -- I mean, a white Yukon Denali, am I

correct?
A. Yes.
Q. And you was looking for a blue Tahoe, am I correct?
A. Yes.
Q. So these was not the same vehicles, am I correct?
A. You are correct.
Q. But this vehicle stood out. This vehicle made you -- even though you couldn't identify the suspect getting into this vehicle, something stood out, am I correct?
A. Yes.
Q. And that something made you want to investigate and stop that vehicle, am I correct?
A. Yes.
Q. So please tell the Court which one makes sense out of those two scenarios.
A. I have recounted the truth from the beginning to end of this entire scenario multiple occasions.
I was in that area initially looking for the suspect vehicle in the shooting at the direction of Sgt. O'Rourke. Once I did not find that vehicle, I didn't have any other tasks or duty that I needed to do at that moment and I knew that cell phone was in that block.
I made the decision on my own to sit on that block and do surveillance and see if I could catch a glimpse of the suspect or something that possibly led me to know that

the suspect was in a vehicle nearby, and that's what happened and everything progressed along from there and we've talked about it.

Q. Okay. Now, thank you, because that's what I was going to get to.

You mentioned that you had that cell phone. That cell phone, was that a ping?

A. Yes.

Q. How does Sgt. O'Rourke tell you that location?

A. He called me initially over the phone where the location was and I think forwarded a couple updated pings to your cell phone.

Q. He forwarded a couple updated pings?

A. Yes. I --

Q. That was a yes or no. You answered.

THE COURT: He answered it, "Yes."

THE DEFENDANT: Yes.

Q. Now, with those e-mails being sent to your cell phone, right --

A. Yes.

Q. -- you knew that the suspect was at this location, right, because you had T-Mobile pings, yes or no?

A. I knew the cell --

Q. Excuse me?

A. I can't answer that.

Q. Okay. Well, listen, why is that in none of your reports? You never mentioned that T-Mobile pings being sent to your cell phone.
A. Because it wasn't relevant to this case.
Q. It wasn't?
A. No.
Q. Could you please read your statement about how you came across the evidence that you found out that the suspect was at this location?
A. Yes. In my supplement it says that at approximately 23:42 hours I received information from Sgt. O'Rourke that he had determined that the suspect may be in the area of 29th Avenue North and Girard Avenue North.
Q. Okay. Now, you said that he had determined. Now, if he has sent you a realtime location to your email, it wouldn't have been him determining, it wouldn't been his information. You would have had direct knowledge that this email was sent to your location, because this email seems to have miraculously came up after some T-Mobile phone call records that we put in that we got came up on September 7th.
THE COURT: I'm sorry, Mr. Andrews. I don't understand the question. You're going to have to rephrase it.
THE DEFENDANT: I'm going to the relevance to show that -- once again, this is the same objection I had about

him having time to talk and reach these officers and tell them what to say about a T-Mobile ping every -- it's in no one's report. Their whole narration used the 11:00 o'clock hour which I'm going to introduce into evidence. It's already in evidence from Sgt. Voth and that Jeffrey Paulsen gave it to us as to how they developed the suspect's location. And then this information that -- how they developed they used between the 11:00 o'clock hour to get a cell site, and that site recommended to 29th and Fremont Avenue.

Now, from that cell site information, all they can determine is what direction this cell phone was pinging from, and it could be a mile in that direction, two. Them coming up with this new T-Mobile emergency ping is the direct contradiction.

And another reason why I put in to have this thing dismissed is because they're changing (indicating) their evidence, because if we use the same T-Mobile record that he used to say that they got the suspect's location at 11:00, it gives the defendant an airtight alibi and that we'll show the Court right now with the same phone records.

THE COURT: So what's the question that you're asking this witness?

BY THE DEFENDANT:

Q. Why is this the first time you are now bringing up this emergency ping that everyone keeps referencing to?
A. I never referenced an emergency ping. It's not the first time I brought this up. I believe we talked about it on direct.
Sgt. O'Rourke called me and told me that he had the ping in the area of 29th and Girard. That's what led me to that area. Subsequently, after I was already there, he sent me at least one updated ping showing me that it was still in the same area. I had nothing to do with the ping itself. I did not write a ping order, did not do any of that. The only thing that I had was that he forwarded at least one email that I can remember --
Q. Same one he showed you, am I correct?
A. I believe so, yeah.
Q. Okay. Now, impeaching evidence, in that same ping he showed you did show that phone registered on 28th and Girard?
A. This is -- there is no 28th and Girard.
Q. Oh, it didn't? Could you please read Sgt. O'Rourke's statement about what was the address that that phone was pinged in, because he testified to it on the stand too.
A. I don't see an address in Sgt. O'Rourke's report that you gave me.
THE COURT: Okay. What's the supplement number?

THE WITNESS: I have Supplement Number 33 from Sgt. O'Rourke, and I don't see an address other than 1711 Plymouth.

BY THE DEFENDANT:

Q. It's the sixth paragraph.

A. 2810 Girard.

Q. I thought you said you didn't see the reference. How can you reference that that's the --

A. You told me which paragraph to go to.

Q. But you already knew it.

A. And the paragraph is only three lines long.

Q. But it was the first --

THE COURT: All right. Read the first line of the paragraph.

A. "At approximately 23:36 hours, I received information that Andrews was in the area of 2810 Girard Avenue North."

Q. Thank you. That's the first lines in that paragraph. As soon as I said the sixth paragraph, you told me 2810 Girard, but you were just telling the courts and me that you didn't see it in there. You're willing to just say anything on the stand, is that correct?

A. No.

THE COURT: You don't have to answer that.

That's not a proper question and I told you that.

THE DEFENDANT: That's the thing about it. I

don't know this court shit.

THE COURT: I understand. I'm trying to help you with that.

Here's the deal. It seems to me that we've -- you established the facts you want to establish. Now we're just arguing with the witness. Is there anything else to ask this officer that isn't already in the record?

And what I mean by that is, for example, you wanted to establish that he said he was directed to the location because he received that phone call from Officer O'Rourke, who also sent him a ping, but that that reference to a ping was nowhere in his report. You wanted to establish that.

THE DEFENDANT: I wanted to establish that --

THE COURT: That's been established.

THE DEFENDANT: I wanted to establish it again.

BY THE DEFENDANT:

Q. Yes or no, you were on the block of 29th of Girard?

A. I was at 29th and Girard.

Q. And you was -- that ping was referenced in the block between 27th and 28th and Girard, am I correct?

A. 27th to 29th, yes.

Q. Long narration. In your report, that directed you to 29th and Girard, the area of 29th and Girard?

A. Yes.

Q. So that means that he never sent you a ping, because that ping would have given you the 2810 address, am I correct?
A. No.
Q. It wouldn't? Could you please look at the email again?
A. The ping would have given me 2810 Girard. When he initially called me, he did not tell me a specific address. He told me the area of 29th of Girard, which is very nearby to 2810 Girard. So what the line in my report that you're referencing, that is based on the phone call that I had with Sgt. O'Rourke, who directed me to 29th and Girard. It was after that that I received the pings and the exact address.
Q. You wrote your report after all this, am I correct?
A. I did.
Q. So in your report you could have easily put in there that he gave you the direct ping and you went over to 28th and Girard, am I correct, because that would have been easier for the court -- would have been the correct answer in this situation, that I got an email from Sgt. O'Rourke and he sent me to 2810 Girard. I sat out there, seen the suspects get in the vehicle, I watched the vehicle pull off, knew it was him and I stopped him.
Would that not have been way easier, would that not, simple truth, if this was the truth that you want the courts to believe about this ping?

A. No.
Q. It wouldn't?
A. No.
Q. It's not easy to see that I had a direct ping on 28th and Girard?
A. No.
Q. So it's easier that you were sent to the area of 29th and Girard and I rode around looking for the vehicle and I couldn't find it, so I just decided to stay and conduct surveillance? So it's more convincing that I had a realtime location on the address and I saw this address and waited till the suspect came out, realtime address of this suspect, did you not?
A. At some point I did.
Q. So in that ping that you say that you had at some point, it shows that the suspect was a quarter way of the block into the 28, 27 block, am I correct?
A. The ping was centered around 2810.
Q. So why did you look around the area of 29th and Girard?
A. Because we're talking about a distance of 200 feet here. I didn't think that I needed to be that specific to a certain address that I didn't even know where the ping was centered around. I was told to go to the area of 29th and Girard. That's what I did. That's what I wrote in my report. Everything was sequential.

Q. If that's what happened, that's what you wrote. So that ping that you're talking about that was sent to you that you knew about, that's fictitious, is it not?
A. No.
Q. Well, could you please show us somewhere where you told someone or you wrote it down about this ping?
A. No.
Q. You can't, can you?
A. No.
Q. Because it doesn't exist, right?
A. It exists.
Q. I'm sure the paper exists now. We have it in evidence. It doesn't exist you telling someone or writing it down. Who can you reference to the courts --
THE COURT: Finish your question.
Q. In the courts paperwork, can you point to the courts that would support that you had this realtime location? Because everything else just does not make sense.
THE COURT: Objection?
MR. PAULSEN: No, I'll just let him answer the question.
A. I'm operating under my recollection of this incident. I do not have a physical copy of the ping. That wouldn't have been my place. In this call -- Sgt. O'Rourke was the case agent on this case. If he was relaying his information to

me, it would have been his responsibility to provide that information for the case file, not mine.

Q. Could you please read his report and tell us, does it say it in any his report that you have up there, his supplement?

A. What do you want me to read?

Q. Just scan through and tell me if you see anything, T-Mobile, anything, realtime location, anything from Sgt. O'Rourke.

MR. PAULSEN: I think we went through that with Mr. O'Rourke. I think he conceded he didn't put that in there.

THE COURT: That is my recollection as well. In addition, the document will speak for itself.

We've been going for an hour and 45 minutes. Mr. Willette, if not the rest of us, needs a break and so we're going to take a brief recess. But here's the deal. Here's what I want you to do, Mr. Andrews:

I appreciate what you're doing. I think you're doing a good job, okay, particularly for somebody who's not schooled in the law, but we're repeating things, okay?

THE DEFENDANT: I want to make sure --

THE COURT: You want to make sure that the Court understands where you're going, make sure you have the evidence in the record to make the arguments that you want

to make. I am telling you that I do understand where you're going. I do believe you have the evidence firmly in the record from which to make an argument.

Now, if there's something not already dealt with, by all means you have the right to question him, but it's -- your cross-examination has gone probably three times longer than the direct, which is fine, but we're repeating things.

THE DEFENDANT: One or two more just quick questions.

THE COURT: If you're going two questions and then he's done, I'll give them to you, but two questions turns into --

THE DEFENDANT: After two questions, if he doesn't give me the right answers, I reserve after the break --

THE COURT: Well, you ask your two questions and we'll see where you are. You got two.

THE DEFENDANT: Okay.

BY THE DEFENDANT:

Q. In this case, you was made aware of the situation and how the evidence was developed. I want to know was you informed of how the suspect's identity was determined?

Wait. Better question. With that question, did you get or see or know -- did you physically see that somebody forwarded it to you, made aware in any form and size how the suspect's name was brought up and given?

A. No.

THE DEFENDANT: No further questions.

MR. PAULSEN: No redirect, Your Honor.

THE COURT: Okay. Officer, you are excused.

THE WITNESS: Thank you, Your Honor.

THE COURT: Leave the exhibits there.

We're in recess until quarter to 2:00. Thank you.

* * * *

(1:50 p.m.)

IN OPEN COURT

(Defendant present)

THE COURT: All right. We're back on the record in the matter of the United States vs. Norris Deshon Andrews, Criminal Number 18-149.

Mr. Andrews, before the Government calls its next witness, I just want to let you know the Court has a hard stop today that cannot be avoided at 3:30, okay? It's my hope that you'll be able to finish your questioning of the next witness by then. I think you should be able to do it.

Let me also extend a compliment to you. With the last witness when you were using the yes-no format, those were some pretty good questions, but it also moves the hearing along, so it's my hope you'll finish with this witness. We will find out.

All right. Mr. Paulsen, if the Government wants

to call its next witness.

MR. PAULSEN: Officer Andrew Schroeder.

**ANDREW W. SCHROEDER, GOVERNMENT'S WITNESS, SWORN**

THE COURT: Please be seated.

State your full name for the record and spell your last name.

THE WITNESS: My name is Andrew William Schroeder. My last name is S-C-H-R-O-E-D-E-R.

**DIRECT EXAMINATION**

BY MR. PAULSEN:

Q. And you work for the Minneapolis Police Department?

A. I do, sir.

Q. How long have you been an officer there?

A. Roughly four years.

Q. I want to take you back to May 15th of 2018. Were you on duty that day?

A. I was, sir.

Q. Uniform and everything?

A. Yes, sir.

Q. Did you get some information about a shooting that occurred late afternoon?

A. Yes, sir.

Q. And were you eventually provided with the name of a suspect?

A. Yes, sir.
Q. Which was what?
A. Norris Andrews.
Q. And did you do anything to familiarize yourself with the appearance of Mr. Andrews?
A. I looked at his photos.
Q. Which photos now?
A. I believe it was a booking photo, might have been a driver's license photo, and I had also seen surveillance photos of the shooting scene.
Q. Okay. So you'd seen some still images from the actual shooting scene itself?
A. Correct.
Q. So now I want to jump ahead to late that night. Did you get a call from a fellow officer about going to a particular location?
A. Sergeant, yes, sir.
Q. Sergeant who?
A. O'Rourke.
Q. Okay. And what time did you get that call?
A. Close to midnight.
Q. And where did Sgt. O'Rourke tell you to go?
A. To the area surrounding 28th and Girard Avenue North.
Q. Just so we're clear on the times, your report says 23:50, or 11:50 p.m., does that sound right?

A. Yes, sir.
Q. And did you then go to 28th and Girard North?
A. Yes, sir.
Q. What happened when you got there?
A. I drove around the area. I looked for a suspect vehicle.
Q. Which at that time was what?
A. A blue Tahoe, or something similar.
Q. Did you find the blue Tahoe?
A. No, sir.
Q. Okay. Then what did you do?
A. I drove around the area, I bumped into Sgt. Pucely, who was sitting in the area, and I told him my primary responsibility is to take 911 calls, so I had to go take a 911 call and he said he was going to stay in the area, so I said, you know, "Call me if you need anything."
Q. All right. Did you get a call from Sgt. Pucely a short time later?
A. I did.
Q. And what was the call about?
A. He said he wanted to stop a vehicle he believed was related and potentially had the suspect inside.
Q. What did you do in response to that request?
A. Drove to the area he directed me to and eventually we stopped a vehicle.

Q. And did this turn out to be a white Yukon or something like that?
A. Yeah, Yukon or Suburban. I'm not sure of the exact.
Q. It would be reflected on the squad videos, though.
A. Correct.
Q. And what was your role during the stop?
A. I was a backup cover officer to Sgt. Pucely. I positioned my squad next to his.
Q. As the stop was being made, where was your attention trained?
A. To the driver's side of the vehicle.
Q. And did you see anything that caught your attention as the stop was being made?
A. I did.
Q. What did you see?
A. I saw a person sitting in the back seat behind the driver lean over out of my view. The person would have been leaning towards the I guess passenger side of the vehicle, if that makes sense.
Q. All right. And how were you able to see this? What was your vantage point?
A. Well, I was parked next to Sgt. Pucely kind of at an angle. I believe my tires might have even been up on the curb, so I was looking kind of directly in the (indicating) I guess it would be driver's side of the

vehicle. I was looking in the rear two windows.
Q. So if we were to envision the driver's side, we've got the front door window and the backseat door window.
A. Yes, sir. So I was looking in the backseat passenger window and then the window behind that, which would be the window to like -- I guess you call it the trunk or the cargo area.
Q. And after you observed these movements, what did you do?
A. Sgt. Pucely and I went up to the car.
Q. What happened then?
A. I believe it was Sgt. Pucely opened the door and I immediately recognized Mr. Andrews.
Q. And was there anybody else in the vehicle?
A. Yes, sir.
Q. How many people?
A. Two.
Q. Who was the driver?
A. A female that I never learned her name.
Q. What was her condition during the stop?
A. Nervous, shaking, crying.
Q. Any other person?
A. The person in the front passenger seat was Montrel Tyson.
Q. Did you run him for any felony warrants?
A. I had previously in the evening and I was aware that he

had several.
Q. So Montrel Tyson, the front-seat passenger, had felony warrants?
A. Yes, sir.
Q. Are you aware that a gun was found, a handgun was found in the vehicle?
A. I was.
Q. And did you learn where it was found?
A. I did.
Q. Where was that?
A. Underneath the back seat on the passenger side of the vehicle.
Q. And where is that in location to where you saw this person who was moving? Where was that in relation to the movement?
A. Right where he -- right where I saw him lean to.
Q. And this person that you saw moving turned out to be whom?
A. Mr. Andrews.
Q. One last thing. No, never mind. That's all I have.
A. Yes, sir.
THE COURT: Thank you, Mr. Paulsen.
Mr. Andrews, your witness.

**CROSS-EXAMINATION**

BY THE DEFENDANT:
Q. I want to draw your attention to the beginning of your story. You said you made -- somehow had contact with Sgt. O'Rourke, right?
A. Correct.
Q. Could you tell me in that conversation what was said or how you was related some information?
A. On the phone.
Q. Over the phone?
A. Yes, sir.
Q. Did you get any realtime location, e-mails, texts, anything?
A. No, sir.
Q. So you were just sent to the general area of what?
A. 28th and Girard.
Q. You were sent to the general area of 28th and Girard to do what?
A. To look for a potential suspect.
Q. So you were sent there to look for a suspect.
A. Yes.
Q. What did he tell you? How did he get this information?
A. I believe it was through a phone.
Q. You believe it was through a phone, or was it?
A. You would have to ask Sgt. O'Rourke. That's what I believe.

Q. You believe it was through a phone. And when did you just believably get this new information that it was through a phone?
A. I'm sorry. I don't understand your question.
Q. When did you get the information that you believed that it was through a phone?
A. Around midnight.
Q. Around midnight? What did he say?
A. I don't recall the specifics.
Q. But you can recall specifically who was moving and where the car was and specific suspects' names and stuff, but you can't remember some specifics about how Sgt. O'Rourke would tell you he got a suspect's location, because you are obviously -- was an investigative officer that he trusted to go to this situation, am I correct?
A. You're going to have to repeat the question.
Q. Did Sgt. O'Rourke put his faith and trust in you to go handle this situation, to go look for this suspect?
A. Yes.
Q. So he sent you into this situation. Did he equip you with the correct knowledge and what information he developed and how he got that information?
A. Yes.
Q. And could you please tell the courts what it was.
A. It was he was tracking a phone he believed to be the

suspect's in the area of 28th and Girard.
Q. So he didn't send you no email.
A. Correct.
Q. No text messages.
A. I don't recall that.
Q. Did he give you an address?
A. No.
Q. So he just said, "Just ride around and look for him."
A. Basically.
Q. But if there was a realtime location, that would give you a direct location, would it not?
A. I'm not familiar with how phone pings work, so I can't answer that question.
Q. But I'm saying with your knowledge, the knowledge that you do have as an officer -- how long have you been on the force?
A. With Minneapolis, four years.
Q. How?
A. Four.
Q. How long have you been on the force, period?
A. Twelve, roughly.
Q. And in your 12 years cell phones has evolved, huh?
A. Yes, they have.
Q. And you've been able to keep track of how the location magnitude of this has been going on, like the developments

of new technology on how to get cell phone locations and stuff, have you not, over time you've learned more and more and more, right?
A. Yes, I have.
Q. And how far has our technology come? What's the furthest and closest you've heard in your 12 years that cell phones have developed you tracking a location?
A. So from my basic understanding of cell phone pings, if that's what you're asking, depends on several different things which I don't know. Cell phone pings, I have seen 5,000 meters. I have seen cell phone pings within two meters. I don't know the specifics of what Sgt. O'Rourke got, but he sent me to the general area of 28th and Girard.
Q. To do what? What was his specific thing that you was to go there for?
A. To look for a suspect.
Q. You was looking for a person or was you looking for a vehicle?
A. Both.
Q. You were looking for both now. So since you know it was both, can you tell us what he said you was looking for?
A. Well, I knew what he was looking for.
Q. What was he looking for?
A. Norris Andrews in a blue SUV, Tahoe or something similar.

Q. So you remember Norris Andrews, but you don't remember the girl's name that was crying, like the girl that you said was visibly shaken, traumatized?
A. I never identified her.
Q. And why is that?
A. Wasn't my job at that situation.
Q. Oh, it wasn't. But you identified everybody else.
A. No, I knew who everyone else was.
Q. So if you knew who the other two suspects was and an officer of your years and experience, wouldn't it have been in your best interests to find out who this other person was?
A. No.
Q. No? So this person didn't matter.
A. No, sir. It just wasn't my job at the time.
Q. So why was this person arrested?
A. I don't know that they were.
Q. Didn't you take the person out? You said she was visibly crying, right?
A. Yes.
Q. Didn't you pat this person down?
A. Yes.
Q. You didn't ask this person their name as you patted them down?
A. I don't believe I did.

Q. You asked the sus -- you asked Norris Andrews his name, though, didn't you?
A. I did.
Q. But you already knew his name, though, didn't you?
A. True.
Q. So why wouldn't you ask the person that you physically took out of a police car their government name and figure out who they are and what they have to do with this crime?
A. It was another officer-on-scene's job, not mine.
Q. Did you take this person out of the car?
A. And placed them in another officer's car.
Q. Was you at the driver's side door with your gun drawn?
A. Likely.
Q. So you was leaning on this driver, right, in the doorway of this driver -- this car?
A. I guess I'm not sure what "leaning on" means.
Q. You was in the doorway. If this person was to try to step out of the car, you would have to move.
A. The driver?
Q. Yes.
A. Correct.
Q. So when you was in that doorway, you didn't think to get this person -- because this was a traffic stop, was it not?
A. Yes, sir, it was.
Q. And you didn't think to ask this driver for a license

and registration?

A. We don't ask people for registration and I'm sure that someone did ask her her name and eventually she did get identified. Again --

Q. Before you pulled this person out of a vehicle, is it not police procedure to identify this person by license and registration of the vehicle?

A. No.

Q. You don't ask the person for their license or ID?

A. Sometimes.

Q. And what would make these times different? Because this was a traffic stop you just said, correct?

MR. PAULSEN: Your Honor, I think this is getting irrelevant at this point, whether or not he ID'd the driver.

THE COURT: Go ahead and answer that question.

A. I'm sorry. You're going to have to repeat the question, sir.

Q. When you stop a vehicle for a traffic violation, which is what you was on, right?

A. In this situation it's a little bit different, because on a normal traffic stop the person does not come out of the vehicle. We ask them for all the information we need to conduct our police procedures. We return to our vehicle and come back and the car leaves.

This situation was a little bit different, as

everyone in the car was coming out of the vehicle, so at some point that everyone's out of the vehicle, everyone in the vehicle would get ID'd.
Q. And this person wasn't relevant enough for you to know their name?
A. Correct.
Q. Okay. Moving along. I just wanted to ask you just to see if we can get some honest, truthful answers out of you. You seem pretty honest.
A. Thank you.
Q. You're welcome.
Like I said, on the 28th, you mentioned that -- you just testified that you stopped and spoke to Sgt. -- I mean, Joel Pucely.
A. Sgt. Pucely. Yes, sir.
Q. Yes. Where was he parked when you spoke to him?
A. 29th and Girard.
Q. 29th and Girard. You stopped and got out of the vehicle. Was you driving?
A. I did not stop and get out of the vehicle.
Q. So how did you speak to him when you got over there?
A. I pulled up window to window.
Q. And you was driving?
A. Yes, sir.
Q. So you was driving. You pulled up to him and you spoke

to him.
A. Yes, sir.
Q. Why is that not in your report?
A. It's not relevant.
Q. How isn't it? This was supposed to be a coordinated takedown between you, him -- you -- I mean, it's Sgt. Pucely. Sgt. O'Rourke gave you all the information to go over there and apprehend this suspect. Wasn't Sgt. Pucely by his hisself?
A. Sgt. Pucely was by himself, that's correct.
Q. So you left, or you decided to leave an officer --
A. Sergeant.
Q. -- with two known armed suspects from a shooting earlier on location by hisself; is that what you're telling the courts?
A. Yes.
Q. Wow. In your 12 years, that's the training you got, to leave an officer to take down two armed suspects by hisself?
A. I don't know how to answer that. I mean --
Q. Yes or no, yes or no. Is that the training you have? If you're a trained officer, your supervisor was in here right now and you had to answer a survey question, would the correct answer be that if you were sent on a stakeout takedown to get two suspects that's armed and dangerous from this location, to leave one officer by hisself to take down

these suspects or try to apprehend them while you go off on another call?
A. So the problem is, I was sent to the area to check. I wasn't sent on a stakeout. I wasn't sent -- I was sent to look. Once I saw Sgt. Pucely, he was looking, so I left the area.
Q. I thought you said that Sgt. O'Rourke told you that it was information from a phone tracking that the suspect was there.
A. So like I explained to you earlier, my knowledge of phone pings, some can say that the phone is within one or two meters of an address. In this situation I was sent to an area. For me, an area means just that, several blocks. So while Sgt. Pucely took "area" to mean he was sitting stationary at 29th and Girard, my area was much greater than that.
Q. But this suspect was on -- in the general area right there because you had Sgt. O'Rourke tell you from phone tracking location that the suspect was there, right?
A. Incorrect.
Q. He didn't tell you that the suspect was at that location?
A. He told me that a cell phone was there.
Q. And who had the cell phone?
A. Believed to be the suspect, but not proven, hence the

reason why I would leave an able sergeant by himself, because we didn't know who was there.

Q. So you would leave a sergeant with a phone that your superior officer, a sergeant that's an investigator that does the investigation for these type of things, that looked up and somehow figured out that a suspect was at this location. Are you telling me that you left one officer with two armed and dangerous suspects -- I'm going to ask you this one time, then I'm going to move along.

A. Yes, I left him there alone.

Q. Okay. Moving further, when you went to arrest the suspect, when you got the suspect out of the vehicle, you made a call for backup, did you not?

A. Likely.

Q. Likely or did you? Did you call for extra cars?

A. I believe we did.

Q. No, I said did you. Not we, you.

A. I don't recall.

Q. So you don't recall when y'all was taking a suspect out of the vehicle if you needed extra assistance here?

A. I don't recall.

Q. You don't recall?

A. It would be on somebody's camera.

Q. Would you like it played for your recollection or would you just like to take that we've heard and seen it in this

courtroom?
A. I would take your word for it. If I called for backup and you saw it on video, I believe that.
Q. Okay. You called for backup. That's firmly stated. It's on the record.
A. Okay.
Q. Now, what would make you call for additional cars if it's same the officer, the one officer you left behind and the suspects here on location now? Now that you're here to help him, you and your partner, what would make you call for backup?
A. So the situation changed a little bit from having just a cell phone pinging in the area to now we have two -- your words -- potentially armed and dangerous suspects, so now the situation has changed from more of surveillance to an arrest.
Q. So when Joe Pucely called you, what did he state?
A. Something to the effect of: "I just saw two guys get in a vehicle on the block. I'd like to stop this car."
Q. You saw two guys get into a vehicle on what block?
A. Girard.
Q. Why would he just say "the block"? Was this a known drug block, a gang-infested block? Is there something about this block?
A. I don't remember his exact words, but I remember that he

said he saw two people get into a vehicle, that he wanted to stop the vehicle.
Q. Are you familiar with the block of 28th and Girard?
A. It's a double block. Yes, I am.
Q. Do you know people who live on that block?
A. I can't say for sure.
Q. You can't say for sure?
A. Correct.
Q. So you don't know no one's government name or alias or things like that that live on that block.
A. I know several people who frequent the block, but I don't know for certain if they live there.
Q. Okay. So if you know that them people frequent that block, why would you know this? How would you know this if you don't know if they live there, but you know that they frequent that block? What is that type of activity called?
A. Whose activity?
Q. The activity that you would have been monitoring to know that these people that could live there or don't live there that would be on that block?
A. Oh. It's called community policing. It's when you -- police drive through the area, they speak to members of the community on a professional level, say hello, that type of thing, give stickers to kids. So I get to know people on a lot of blocks. I don't know if they live there or if

they're hanging out or if they're visiting friends, but that's my job.

(Discussion off the record between the defendant and Mr. Aligada)

(Videotape played)

MR. PAULSEN: Not to interrupt, but I don't think we've seen this one before.

THE DEFENDANT: Oh, this is one where he's going to get the name of the people on the block. He's going to get the given government names and aliases of the people on the block.

THE COURT: Is this video admitted, anybody know?

MR. ALIGADA: Yes. This is Government's Exhibit 4, I believe.

MR. PAULSEN: Oh, okay. It's on the Government exhibit. All right, fine.

THE COURT: This is part of Government's Exhibit 4. I'll note for the record --

THE DEFENDANT: Oh, no. This ain't a Government exhibit. I introduced this. The first time that this was played in court was by me.

THE COURT: Well, be that as it may, then it has two exhibit numbers, because I do remember the Government Exhibit 4.

THE DEFENDANT: He put the one in from the

shooting. This ain't the shooting. This is the squad cam video.

THE COURT: Do you know, Mr. Aligada, the defense exhibit number on this one? Is this 10?

MR. ALIGADA: Your Honor, I don't believe that we have put into evidence the entire video. Mr. Paulsen referenced this. This is a single disc or file that has multiple squad car videos on it and I wasn't clear on whether the Government introduced it or not, but we certainly can produce a copy of it and introduce it.

THE COURT: That's fine. For the record, this is a squad video showing. It is following a -- the Denali. It's a white Denali.

THE DEFENDANT: This is Officer Andrew Schroeder's squad video, part two. He has two parts to his. For some reason he stopped his cameras and restarted them.

THE COURT: Go ahead. I'm just trying to keep the record clear.

(Videotape played)

THE DEFENDANT: Go a little bit further to the end. A little bit more. Right here. Stop.

BY THE DEFENDANT:

Q. Now, I want to ask you again under oath on the stand, did you know people, government names and who lived on that block that y'all was out there surveillancing?

A. Again, I know several people on that block.
Q. That live there.
A. That frequent there. I don't know if they spend the night there.
Q. Okay.
THE DEFENDANT: Start the video.
BY THE DEFENDANT:
Q. This is Officer Schroeder talking in his squad car to Joel Pucely on the phone.
A. Schroeder.
Q. Schroeder.
A. Thank you.
(Videotape continues)
THE DEFENDANT: Stop.
BY THE DEFENDANT:
Q. That's one guy, the fat boy. Who's the fat boy, the fat boy's house? He obviously lives there. That's his house.
A. There's several obese people that live on that block, if that's what you're asking.
Q. Does this fat boy have dreads?
A. Negative.
Q. Do any of these fat people have dreads?
A. One person that I know frequents that block has very short dreads.
Q. So you know -- by you saying that that fat person

doesn't have dreads, you know who that fat person is you're talking about, right?
A. I do.
Q. Who is it?
A. His real name?
Q. Yes.
A. Dari Evans.
Q. Dari Evans. That's one person that you know that lives on that block.
A. Well, I know he frequents there.
Q. You just said that's fat boy's house.
A. It's a house he frequents.
Q. You just said it's his house. If it's his house, he either lives there or doesn't he? When you say it's someone house, is it their residence or is it just a place they frequent, because I need to -- the courts need to know this for the record.
A. Sure. For the record, the north side community is very unique in the fact that several times people will say that it's their house when they don't actually reside there. Several times people will say, "No, I don't live here," although they have clothes there, they spend the night there. So I don't know if it's actually his house. It's definitely not the address on Dari Evans' ID.
Q. So why would you say it's fat boy's house? "I bet that

was fat boy's house," as in like he owns it or it's a possession of his. You state it as it is a possession, like nine-tenths of the law, like it was his, his house. Why did you say that?
A. Those would be your interpretations of my words. Like I already answered, because he frequents the house.
Q. Well, just a minute ago you said you didn't know no one that lived there, they just frequent that area, but that showed you knew someone and you knew his name. So now we notice that this officer was out there doing something else and you knew about it.
THE DEFENDANT: Could you please start the video again.
MR. ALIGADA: From the same spot?
THE DEFENDANT: Yes, from the same spot.
(Videotape continues)
THE DEFENDANT: Stop.
BY THE DEFENDANT:
Q. That don't sound like "Gary." That sounds like "Anthony Kanz." That's somebody else who lived there on that block. How many people do you know whose houses are there, man? You just said you didn't know nobody.
A. I'm sorry. I couldn't hear that and I have no clue what you're talking about.
Q. Oh, you want to hear it again?

THE DEFENDANT: Take it back a couple seconds. Thank you. That's enough.

(Videotape played)

THE DEFENDANT: Stop.

BY THE DEFENDANT:

Q. You bet it's Anthony Kanz' house.

A. Same house.

Q. You just said -- in the video you said it was different. You said it was fat boy's house, he described another house, and then you said you bet it was Anthony Kanz' house. You're giving out government names to people whose houses that you know on this block.

So as I asked you before, is this a block that you guys watched, the Gang Task Force would be watching because you know people by their aliases and you call them fat boys, because I'm pretty sure that's not his government name. His name is not Fat Boy, is it? Is it?

A. His government name is not Fat Boy.

Q. Okay. And Gary -- because I know who this is. He's an African-American, is he not?

A. His name is not Gary.

Q. What is it?

A. Dari. It starts with a "D."

Q. I know he's a Pau. He's goes by Giacomo. But he's an African-American, is he not?

A. He is.
Q. Isn't calling an African-American "boy" a racist slang or term?
MR. PAULSEN: Your Honor, I think we're getting a little far afield here. This has nothing to do with probable cause for the arrest.
THE DEFENDANT: No. I'll move along.
THE COURT: Sustained. The objection is sustained. The question is not relevant to the issues here.
BY THE DEFENDANT:
Q. Okay. Well, the relevance of the matter is that you knew that people was out there and you knew that this sergeant was out there for a different purpose, and I think that this video both ways shows that and your testimony and the other officer's testimony shows that.
So would you like to please tell the Court the truth now of what was going on that night and how you guys came to be out there on that block or how that officer got out there on that block?
THE COURT: You can answer it again.
A. We were directed to the area of 28th and Girard by Sgt. O'Rourke to look for a possible suspect or suspects and a vehicle that was involved in a shooting earlier in the evening. That is the only reason we were there.
Q. Were you still in the area when Sgt. Pucely called you

to tell you to come help him make this traffic stop?
A. Yes, sir.
Q. Where were you at?
A. I believe I had just cleared a call near 34th and Girard or 35th and Girard maybe.
Q. So when he gave you that call, that's when your video camera started?
A. I don't know when my video camera started.
Q. You said you cleared a call. After he called you and told you that he seen some suspects or somebody he wanted make to make a traffic stop on, at that point you would cut your squad cam on because you guys is going to make a stop, am I correct?
A. You're incorrect.
Q. So when would you cut your camera on?
A. My camera turns on when my lights turned on, and I assume that's when it turned on in this case.
Q. Okay.

THE DEFENDANT: Could you go to video two and just start it from the beginning, but I'm going to need you to stop it very, very quickly, because I want to catch the street he's on as he makes this U-turn. It's going to be Lowry Avenue going east.

(Videotape played)

THE DEFENDANT: Stop.

BY THE DEFENDANT:

Q. That vehicle just made a U-turn. You're on Lowry and Emerson right now.

A. Correct.

Q. You said you was on 34th and Girard. Girard would be another three blocks ahead of where you're at and another three blocks to the right. Why were you heading in the other direction?

A. So if I could just explain the start of this video.

Q. Please. Please do.

A. So when a squad video activates, I'm assuming it activated 30 seconds prior from the start, which means when I turn my lights on, the squad camera backs up 30 seconds.

So, when I got the call from Sgt. Pucely, I was near 34th and Girard, several blocks away from this screen photo, you're correct. I got in the area, was on the phone with Sgt. Pucely. He was directing me on where he was.

At this point you see me make a U-turn and then I'm assuming I go down and around the block and activate my lights, which activates my audio, which backs up the video 30 seconds of what you're seeing now.

Q. So that's the story you want the courts to believe after you just said you was on 34th and Girard.

A. I guess you could GPS my car if you really need to find out --

Q. We see where you're at. Is not this Lowry and Emerson? Yes or no.
A. This is Lowry and Emerson, yes, sir.
Q. And the way you was facing is east, is that not correct?
A. Yes. So if I was coming --
Q. Is that not away from Girard, yes or no, the way you was facing before you made this U-turn? Is Girard the opposite direction?
A. Correct.
Q. No, it's not. It's straight ahead of you.
THE COURT: Your question actually asked what he was facing before he turned around.
Q. Which way is you facing now?
A. Right now I'm facing west. Girard would be two blocks in front of me.
Q. So the way you was facing when this video started was the opposite direction, am I correct?
A. Correct.
Q. And Lowry is what number block?
A. 32.
Q. 32nd. So you're four blocks away from where you said you would have been when you got this call, right?
A. Correct.
Q. How far is this location from 28th or 29th and Girard, four blocks, correct? Wouldn't it be a straight shot if you

turned around and came straight down the blocks. You would go straight from 34th to 29th and Girard?
A. If you want me to answer the questions, you got to ask one at a time, because I just can't keep it straight. I'm sorry.
Q. Okay. Sgt. Pucely was on 29th and Girard, correct?
A. Correct.
Q. So when you got the call that he determined it was some suspects in this vehicle, because he testified that the vehicle sat there for awhile while he called you, he would have still been on 29th and Girard, is that correct?
A. That's Sgt. Pucely. That's not --
Q. Okay. Well, where did he start at? Where did you know him to last be at?
A. I believe he followed the vehicle. When he first talked to me he was on Emerson approaching Lowry.
Q. Where was he at when you said you seen him?
A. Which time?
Q. When you seen him on Girard. You said you stopped and talked to him, did you not?
A. Yes, I did. I think I've answered that a couple times, 29th and Girard.
Q. So he was an 29th and Girard, and when he was on 29th and Girard, he told you that he just seen some suspects enter this vehicle, am I correct?

A. Incorrect.
Q. Oh, he didn't? So you know precisely where he was at?
A. No, I don't. That's why I said you'd have to ask him that. I know where I was when he called me.
Q. And where were you?
A. For the third time, I think I said 34th and Girard, roughly.
Q. Okay, roughly, 34th and Girard. But the two directions, they would cross each other, they would come into each other, would they not?
A. I'm not sure what you're asking.
Q. If you took Girard and went straight backwards, what would be the numbers that you would be going to? Would you go down in numbers?
A. You're going to have to clarify what "backwards" means.
Q. Either way you was facing on Girard. If you was going up or whether you was going down Girard. If you was going up, you would be going towards 35th and Girard, correct?
A. So northbound.
Q. Northbound. That would be that (indicating) way, correct?
A. Northbound the numbers get higher. If you go southbound, the numbers get smaller.
Q. Correct. So you need to go southbound, which is where he would have been at with the suspects if he was trailing

them, right?
A. No.
Q. You wouldn't? So he's higher in the numbers?
A. When Sgt. Pucely called me, the car was no longer on Girard.
Q. So what did he tell you? Where did he tell you he was at?
A. Again, he told me he was following the vehicle on 29th, I believe, and the vehicle was turning onto Emerson Avenue North, turning northbound.
Q. Okay. So if it was turning northbound on 29th and Emerson and you're on 34th and Girard, that means you'd have came down to Lowry or even just took Girard over and started coming down Emerson, because where you're at Emerson is still a two-way, am I correct?
A. So if you're asking me about how I got there --
Q. Yeah. How did you get facing east past Emerson going towards the Lowry Bridge?
A. So from my recollection, from roughly 34, 3500 Girard, I drove over one block east to Fremont. I drove south on Fremont to Lowry. On Lowry I turned east. I proceeded east on Lowry till I realized I had passed Sgt. Pucely, thus making a U-turn which is captured on my squad video.
Does that clarify everything for you?
Q. When he first called you, it told you where he was at

and the suspect. You just said he said the suspect turned north on Emerson, did you not?
A. Yes.
Q. So why would you pass Emerson if you know that the suspects are coming your way on Emerson, because surely you just said Lowry is 32nd, so if 32nd is before 29th, why would you cross Lowry going that way?
A. I don't know.
Q. Because you wasn't on that call. You didn't know nothing about it. Let's just be real. Let's just keep it real for the courts. Because you went past it. You was not there.
THE COURT: You do need to ask one question.
THE DEFENDANT: I just wish I would make them tell the truth.
THE COURT: Well, if your question is: Isn't it true you were never on the call --
BY THE DEFENDANT:
Q. Yeah. Isn't it true you was never on the call?
A. What call?
Q. This call to this location. You cut your cameras on the moment you got the call to this location.
A. My cameras were on before we made a traffic stop. I wasn't on an assigned call.
Q. Okay.

THE DEFENDANT: Could you play this so we could see how far his damn car goes with the cameras off.

Q. Because the current time that it has on your dash cam that your car has been recording is six minutes. This video started at six minutes. Where is the other six minutes?

A. So I think you're confused. That's zero, zero -- that would be like six minutes after midnight.

Q. Oh, is it?

A. I think so.

Q. You think so.

THE DEFENDANT: Okay. Play it.

(Videotape played)

A. Yes, that's six minutes after midnight.

Q. That's Sgt. Pucely and the suspect that just turned that corner, is that not?

A. Yes.

(Videotape continues)

THE DEFENDANT: Stop.

BY THE DEFENDANT:

Q. Now, you want the courts to believe that that's where you was going, he told you to meet him there? Because you surely would have seen them if you was on that call. You surely -- because you just passed each other. Because as you would have been making that U-turn and going past Lowry and going past Emerson, that car would have been right there

to your right. It would have passed you, surely. You wasn't on the call. He called you on the fly once he decided he wanted to just stop the vehicle and you cut your cameras on and you helped him stop it.

THE COURT: Do you understand the question?

THE WITNESS: Not at all. I'm sorry.

Q. I'm going to move along, man. The record shows -- the camera footage shows you was not -- you was going down Lowry the opposite direction when the footage started. I'm going to move along for time's sake, because I got other things we need to get to.

Okay. When you guys stopped the vehicle, right, you stated that you seen what?

A. Saw the vehicle stop. I saw a person later identified as Mr. Andrews sitting behind the driver lean over out of my view, leaning towards the passenger side of the vehicle.

Q. You seen him lean over. When did you convey this to other officers?

A. I believe as we were walking up.

Q. As you was walking up?

A. I think so.

Q. You think so. So could you see the suspect's legs?

A. No, sir.

Q. You couldn't see them?

A. No.

THE DEFENDANT: Could you please go start the body cam, part two, from the beginning in this video.

(Videotape played)

THE DEFENDANT: That was it. That was perfect. Just stop it right there, right here. Stop.

BY THE DEFENDANT:

Q. In this video that's going to start, that's you standing there, am I correct?

A. I believe so, yes.

Q. You said you can't see the suspect's legs. Why are you going to tell Sgt. O'Rourke -- I mean, Sgt. Pucely -- that you seen the suspect kick a backpack?

A. So you asked me --

Q. Why are you going to say that? You just testified that you couldn't see the suspect's legs, right?

A. You asked me when we stopped the vehicle.

Q. I asked could you see the suspect's legs, period, and you said no.

A. Once the door was open on the vehicle.

Q. So you want us to go back and look at the door being open on the vehicle so you can see if you see his legs, because we see his legs, or would you like to just tell the Court the truth?

THE COURT: That's argumentative.

Q. Okay.

THE DEFENDANT: Play the footage.

(Videotape continues)

THE DEFENDANT: Stop.

BY THE DEFENDANT:

Q. You said there's a backup he was trying to kick. Why didn't you tell officers that you seen him leaning over and bending over? Why would you say he was trying to kick a backpack?

A. I didn't say that.

Q. You did just say that.

A. I believe if you listen to it closely, like he was trying to kick.

Q. How would he like be trying to kick a backpack? Can you tell me like how you seen that through that door with that tinted window?

A. I believe I was referring to, once the door was open, I could see Mr. Andrews' full body. The backpack was right next to Mr. Andrews' right foot, like --

Q. So why is that not in your report?

A. I didn't think it was relevant.

Q. You didn't think it was relevant. So if they'd have found that gun in that backpack, it would have been relevant then, huh?

A. Correct.

Q. Because that's what you seen, right?

A. Correct.
Q. So now you seen him just doing the Holy Ghost in there. He kicked the backpack, then he bent over. Which one did he do?
A. So like my report says, I saw Mr. Andrews lean over. I did not see him kick a backpack.
THE DEFENDANT: Could you please start it over. No, don't start it over, just a second before. I want to make sure I heard it correct.
(Videotape played)
BY THE DEFENDANT:
Q. Now, you didn't say that backpack next to where he was sitting he tried to kick?
A. I believe I said like he was trying to kick. Like, I didn't see you do it, but that's what I thought was happening.
Q. So you're willing to just about say anything to get the record developed that where that gun was at, it was the suspect's, is that not correct? Is that not safe to say?
THE COURT: Go ahead and answer.
A. That would be very incorrect.
THE DEFENDANT: Okay. Could you please skip ahead to five minutes. As a matter of fact, that's it. Perfect.
(Videotape played)
THE DEFENDANT: Stop.

BY THE DEFENDANT:

Q. Who's "He's in trouble" that you just made reference to? Who's "He's in trouble"?

A. Are you asking about the person?

Q. Yeah. Who's "He's in trouble"?

A. Mr. Andrews.

Q. Why would Mr. Andrews be in trouble?

A. Because Mr. Andrews had been identified in the back seat as a suspect in a double shooting, where now we pulled him over and Mr. Andrews was seen leaning into the area where a gun was recovered.

Q. But just four or five minutes ago on this video, you say he kicked the backpack, so I'm confused. Did he lean over and kick the backpack or did kick the backpack and then lean over and put the gun over there? Which one? Was he trying to stash the gun in the backpack, or was he stashing it under the seat, because it seems like you're saying two different things here. It's not matching. Was he stashing it in the backpack, because it's just obvious you were trying to lead the officers to believe that it was in the backpack. That's what you -- that was going to be your probable cause if the gun was found in the backpack, that you see him leaning the backpack -- he was kicking a backpack, right?

THE COURT: What question do you want him to

answer?
Q. I want you to answer yes or no. If the gun was found in the backpack, would you have said that that was your probable cause for what you seem like you said, he leaned over in the back seat which you put in your report? That wouldn't have been in the report. It would have just been he kicked the backpack, would it not?
A. You're going to have to --
Q. Okay. Listen, had the gun been found in the backpack, what would your report have said? Would it have said that: When I pressed the stop light, he leaned over -- would it still have said that? -- and then left the backpack being kicked out?
A. My report would speak to the truth of what happened and what I observed.
Q. So you would have still not said he kicked the backpack. You wouldn't have said he was kicking the backpack next to him, he was trying to kick that backpack. You would have just said -- you still would have said that, right? If the gun was found in the backpack, you still would have said he was seen bending over where the gun was at.
A. Sir, you're just speaking way too fast for me to understand multiple questions at a time.
Q. Yes or no. Your report -- had the gun been found in the backpack, right? Are you following me?

A. Yes, sir.

Q. Yes or no. If the gun was found in that backpack, would your report still only have stated what it states now?

A. Yes, sir.

Q. So you would have left out that he was trying to kick the backpack.

A. Yes, because I did not see Mr. Andrews kick a backpack.

Q. So you didn't lead the officer to that car and insist that he look in that backpack because he was trying to kick it?

A. I suggested he look in it based on the fact that it was, again, at the right foot of Mr. Andrews when he was removed from the car. And if you watch my video, it was like he was trying to kick it. So maybe that meant to me at that time that Mr. Andrews' foot was touching the backpack.

Q. We're going to play the video for that part too, but can you tell me how you seen him lean over? You seen that through the tinted windows?

A. Yes, sir.

THE DEFENDANT: Could you take it two seconds back and then play it again.

You're going to ask Sgt. Pucely a question.

(Videotape played)

THE DEFENDANT: Stop.

BY THE DEFENDANT:

Q. Now, when you asked Sgt. Pucely did he see him moving around, what did he state?
A. No.
Q. Why did he state no?
A. I'm guessing because he didn't see anyone moving around.
Q. Was he in front of him or back of him when you approached the vehicle?
A. I don't recall. His car --
Q. Was he in front of you or back of you when you approached that door?
A. I believe he was in front of me.
Q. So he would have had a better view into this car than you, because, one, he was behind the vehicle, and, two, surely he approached the vehicle before you, so he would have seen into this vehicle before you, would he not?
A. Walking, yes. But when I saw the movement from Mr. Andrews, it was before I had exited the vehicle when I was parked parallel to the -- not parallel, but at an angle to the vehicle. So where Sgt. Pucely was looking in the rear window, the jet black tinted window, I was looking in the side windows where there's less tint and could see the shadow of a very large-build Mr. Andrews duck out of view.
Q. So when a vehicle is made -- you own newer model vehicles, don't you?
A. (No response).

Q. You own vehicles, don't you? Do you own an SUV or something? Have you ever seen an SUV or owned one?
A. I've seen an SUV.
Q. Standard. When they put the privacy tint on the back windows, do they standardly make the tint different?
A. I have no idea.
Q. You have no idea. So they just pick certain windows to make darker than other ones when they make their standard vehicles with the tint?
A. I have no idea.
Q. So you're telling me the side back window on this vehicle, which is also a rear compartment to this vehicle because it's the trunk space, would be darker than the rear window itself?
A. That's what I believe.
Q. That's what you believe. So you believe that you looking from an angle and Sgt. O'Rourke looking straight through this vehicle --
A. Sgt. O'Rourke was not --
Q. Not O'Rourke. I meant to say Pucely, Sgt. Pucely of the Gang Unit. He wouldn't have seen into this vehicle better than you or before you?
A. Obviously not, because I asked him and he said he didn't see it.
Q. So why was you so shocked? You expected him to say,

"Yeah" and go along with you, did you not?
A. No, I didn't.
THE DEFENDANT: Could you please just play it again, because it sounded shocked to me. If I asked somebody a question and I don't get the right answer, and I say, "What? What?"
(Videotape played)
Q. What did you say, "What" for?
A. I'm not sure.
Q. You were shocked, huh?
A. I don't think so.
Q. It's pretty clear what's going on here, man. I just have one question, man: Why? Why did you choose to tell these stories to make up your probable cause?
MR. PAULSEN: I'm going to object as argumentative, Your Honor, assumes facts not in evidence.
THE COURT: Sustained.
Q. Well, how else can I ask it? Why did you choose to make Mr. Andrews the target of your accusation about where this gun was found?
A. I guess I'm not clear what the accusation is.
Q. Was Mr. Andrews sitting where that gun was found?
A. Yes.
Q. He was sitting where that gun was at.
A. Yes.

Q. So he wasn't pulled out the driver's side behind the driver's seat.
A. He was.
Q. And that gun was pulled out from under the seat on the passenger side, is that correct?
A. Within reach of Mr. Andrews.
Q. I didn't ask you within reach. I asked you was he sitting there.
A. And my answer to that will be yes.
Q. Yes, he was sitting in the seat where the gun was at.
A. The back seat, yes.
Q. So you're under oath and you're just going to continue to sit here and lie to the courts.
MR. PAULSEN: Argumentative.
THE COURT: Sustained. You can't ask that question.
THE DEFENDANT: Well, I'd like the record to reflect that the officer has once again impeached himself. The defendant got out the back seat behind the driver.
Could you please run that footage? Play the first one, the first body cam.
(Videotape played)
THE DEFENDANT: Could you stop it.

BY THE DEFENDANT:

Q. Officer Schroeder, could you please tell the courts what you see on the video now.
A. The suspect vehicle.
Q. The suspect's vehicle?
A. The vehicle the suspect was in.
Q. Okay. Which is what?
A. A white Suburban Denali, whatever it is. I don't know.
Q. And what is this scene picturing?
A. The suspect's vehicle.
Q. What's going on in this scene?
A. Well, this is Sgt. Pucely's body cam, so it would be Sgt. Pucely walking up to the car.
Q. And where are you at in relation to Sgt. Pucely?
A. I would be from this screen to the left.
Q. And they're going to approach this vehicle, am I correct? You and Sgt. Pucely and the officer that's off to the right in this screen is going to approach this vehicle, am I correct?
A. Correct.
THE DEFENDANT: Could you please play it.
(Videotape played)
THE DEFENDANT: All right.
BY THE DEFENDANT:
Q. Could you please tell us, what's the video showing now?
A. Well, just prior to the video stopping you could see

kind of the silhouette of the headrest and Mr. Andrews' large build. It's the same view that I had from the side window and this back window of Mr. Andrews leaning down out of my view, looking at it from that same angle.

What this still picture is showing right now is the back door prior to Sgt. Pucely opening the door and arresting Mr. Andrews.

Q. Can you see something through that window?
A. Right now?
Q. Yeah.
A. I believe so.
Q. What do you see?
A. I believe this is a silhouette. My screen's a little blurry.
Q. You see a silhouette of what?
A. A body.
Q. A body. Is that body moving?
A. The video is stopped, so no, it's not.

THE DEFENDANT: Could you take it back a couple seconds, approximately.

(Videotape played)

THE DEFENDANT: Stop.

Q. Can you see that silhouette still?
A. I can't see it on the video.
Q. Can you see a white thing on that door? Can you see

something touching that door?
A. Yes.
Q. Is it moving? When this video starts to play, can you tell me if that thing moves from that door.
THE DEFENDANT: Play it.
(Videotape continues)
THE DEFENDANT: Stop.
Q. Did that thing move?
A. Not in the two seconds from the last time you stopped the video.
Q. So can you please tell us why did you tell the sergeant that, oh, he was doing so much movement that -- what was all this movement? Because we just watched multiple seconds of that silhouette stuck to that door, and now that the door's open, can you please tell us what that white thing was that was touching the door?
A. The white thing I believe would be the hood, or the collar.
Q. The collar to the hood. So that means this person was up against the door, right?
A. At the time that we walked up to the vehicle, the hood was up against the door.
Q. So if this person was doing all this movement and leaned out of view, that hood would have left that door, is it correct?

A. You're absolutely correct and it did leave the door prior to us walking up to the vehicle.
Q. Okay. Anyway. Now, this is the picture of the door being opened, am I correct?
A. Correct.
Q. You can visibly see the suspect's legs, can't you?
A. Yes.
Q. Could you please tell us where the suspect is seen trying to kick a backpack.
A. I never saw the suspect kick a backpack.
Q. Well, could you please show us the suspect trying to kick the backpack. This is a perfect picture of the suspect's legs and his body. Could you show the suspect leaning and trying to kick a backpack, please.
A. In this still photo from Sgt. Pucely's body camera?
Q. Yes.
A. I don't know that you could see it. This also isn't my body camera, and I don't --
Q. Was your body camera activated, by the way?
A. At this point, it was not.
Q. It wasn't. That's illegal, is it not, to not have your body cam on when you're arresting or taking into custody an armed and dangerous suspect? Ain't it illegal to have your body cam off?
A. I think that is incorrect.

Q. So why did you make reference to that's Sgt. Pucely's body cam as if your body cam's going to see something different?
A. It could had my body camera been on.
Q. So why is Sgt. Pucely's body cam on and yours not?
A. I -- so a body camera is manually activated.
Q. Right.
A. I believe I manually activated it. Clearly I did not. Once I realized that, I activated it.
Q. So your body cam was supposed to be on. When you go out to a call, the body-worn cams that's now standard issue for all Minneapolis police officers that's actively out in the field, do not they supposed to be activated?
A. Per our police department policy, they are supposed to be activated.
Q. So you are in direct violation of your police policy right now by having your body cam off that you just made reference to, am I correct?
A. You are not correct.
Q. How not? You just said it's policy that it's supposed to be on.
A. It is, and our MPD policy, if you look at it, equates for human error.
Q. It equates for human error, but it's supposed to be on minus the human error, so you just decided not to cut it on.

A. Incorrect.
Q. So why is it not on? Was it broken?
A. Like I explained to you --
Q. Was it broken?
A. No.
Q. So it was functioning.
A. Correct.
Q. It could have been cut on.
A. It could have been turned on had I done it correctly.
Q. Okay. Now, why did you just make reference that on Sgt. Pucely's body cam it's not seen?
A. I have no idea. I've never watched this video before.
Q. No, you just said on his body cam it's not seen like on your body cam it would have been seen. Once again, you're just willing to say anything, are you not?
THE COURT: You don't have to answer it.
You can't ask that question. It's an argumentative question.
THE DEFENDANT: Well, anyway, could you please finish playing the footage so we can see if we can see it on anybody's cam this suspect trying to kick a backpack.
(Videotape played)
THE DEFENDANT: Stop.

BY THE DEFENDANT:

Q. Could you please show us any movement that would have gave an indication that that individual that you could have seen in that tight little space right there -- because you see into the car, right? Could you please look at the camera. Can you see into the car?
A. This camera, you can see into the car, yes, you can.
Q. And how far is the space, you would say, from the front seat to the seat that the passenger was sitting in in the back?
A. A foot?
Q. A foot. Not a lot of room for you to see into if someone's sitting, there, huh, a larger male, huh?
A. Well, as you can see from where Sgt. Pucely's body camera was, I was standing -- you can't see me in the video.
Q. You're behind him.
A. Or on the side of him.
Q. You want to get the video? You want to put up the dash cam, or would you like to take our word that you're behind him?
A. Okay.
Q. So how did you see it from behind him, or would you like us --
A. See what?
Q. -- to play the video? How did you see through Sgt. Pucely if he's in front of you when this door opened

the suspect kicking the backpack?
A. I never saw a suspect kick a backpack --
Q. Well, you saw --
THE COURT: Hold on, hold on. Finish your answer.
A. I never saw a suspect kick a backpack. That's why it's not in my report, because I didn't see that.
Q. So why did you tell the sergeant that the suspect was trying to kick the backpack?
A. I believe, again, I said it was like he was trying to kick it, which I think what that means in my mind is it was right next to his foot.
Q. So if I'm sitting stationary and the backpack is just sitting stationary next to me and I don't make no movement towards this backpack, I'm just sitting here, that means I'm trying to kick that backpack?
A. If you make no movement, I would say no.
Q. So by you saying that this suspect was trying to kick that backpack, it had to be movement, correct?
A. Correct.
Q. And what movement was it that led you to tell this officer that he tried to kick that backpack?
A. Like I explained, when we first pulled up I saw Mr. Andrews lean completely over. I saw a lot of movement. I couldn't see legs at that time. Once the door was open I could see a backpack with Mr. Andrews' legs right next to

it.
Q. So the way that he leaned over, that you said he bent over his body, which you said his whole upper body leaned to the right, am I correct?
A. Correct.
Q. So he leaned into the -- how did he kick the backpack leaning over? That's his arms, wouldn't it be? Wouldn't that be his arms where the backpack's at now?
A. So again, I never saw anyone kick a backpack. I'll just say it again so we don't have to -- I never saw anyone kick a backpack.
Q. So please tell the courts why did you tell that officer that?
MR. PAULSEN: Your Honor, I think we've beaten this to death. We've been on it for about --
THE DEFENDANT: He's not answering the question.
THE COURT: No, he answered it. It's asked and answered.
THE DEFENDANT: I still ain't satisfied with the answer.
THE COURT: I understand that.
THE DEFENDANT: I'm not satisfied with the answer and the Court shouldn't be. That's not a good enough answer. He said -- he's clearly on the video saying he kicked the backpack.

THE COURT: Here's the deal, okay? I'll let you ask it one more time. You've asked it about five. He's answered it however many times you've asked it. I understand you're not satisfied with the answer. I understand what your question is and his answer is.

Reask the question and answer it one more time.

THE WITNESS: Yes, Your Honor.

BY THE DEFENDANT:

Q. Okay. The question is: When you put your spot cam on, what movement did you see?

A. I saw Mr. Andrews disappear out of my view, appeared to be leaning towards the right of the vehicle passenger side.

Q. Would that gave you a notion that he kicked the backpack? Would that movement, him leaning to the side, as you would say, roughly where this gun was at, would that gave you the notion that someone kicked the backpack?

A. No.

Q. Okay. When this door was open, could you please tell the courts what would give you the notion there that he kicked the backpack.

A. I did not see anyone kick a backpack. The notion like he was trying to kick a backpack I said because the backpack was very close to Mr. Andrews' right foot.

Q. Okay. Since the backpack was very close to Mr. Andrews' right foot, that's what you said. Now, if the gun would

have been found in his backpack that had what in it? What was in the backpack?

MR. PAULSEN: Your Honor, I think we're -- you gave him a little leeway. I think we exhausted the leeway.

THE DEFENDANT: I asked him what was in the backpack.

THE COURT: That's a different question. I don't know that it's relevant, but answer it.

A. I have no idea.

THE DEFENDANT: All right. Play the second one, the second video, please -- yeah, the body cam, so he can go in the backpack. I want to show the -- this is going to show the relevance of where the backpack was and what's in the backpack, what was found in there.

Skip forward.

(Videotape played)

THE DEFENDANT: Stop.

BY THE DEFENDANT:

Q. Could you tell us what you see and the sergeant's going to touch in his backpack?

A. I have no idea and I'm not going to testify to anything the sergeant did.

Q. So what do you see him doing -- what's in the backpack?

A. I have no idea.

THE DEFENDANT: Play it.

(Videotape played)

THE DEFENDANT: Stop.

BY THE DEFENDANT:

Q. Could you tell us what the sergeant just pulled out the backpack and threw in?

A. It looked like a purse or something.

Q. A female's purse, huh?

A. Purses are not gender-specific.

Q. Could you tell us what color the purse was.

A. Pink.

Q. Did it have any identifiable marks on it? What did it look like?

A. A pink glittery purse.

Q. Is that something like a male purse or a female purse?

A. Again, in today's age, I will not gender-specify an item of color.

Q. But you was willing to call somebody a fat boy, wasn't you?

A. Yes, I was.

Q. But you don't want to gender name a purse to an individuals sex, but you will call somebody a fat boy?

THE COURT: Go ahead.

A. Again, yes, I said that clearly. It's on the video.

Q. And you don't think nothing's wrong with that.

A. Well, it's actually -- his nickname, he goes by it, you

can check out his Facebook page. He goes by Fat Boy.
Q. So you've been on his Facebook page more to show that you knew he lived on that block and more about him. You've been on his Facebook page, you know his alias, and he goes by Fat Boy. I thought he went by Check. Ain't that his nickname, Check, Giacomo? He's a Pau?
A. He's not a Pau. His last name is Evans.
Q. You know he's a Pau. But it's okay.
A. Okay.
Q. That's here nor there.
THE DEFENDANT: Could you please finish playing the video.
(Videotape continues)
THE DEFENDANT: Stop.
BY THE DEFENDANT:
Q. What are you seeing now in the bag?
A. I don't know what that is. Hair product or some type of bottle.
Q. More feminine shit, right?
A. Again --
Q. Is this something that would be in a backpack that you would have as a male? Would it be some hair products and a pink purse?
A. I can't answer that.
Q. You can't answer that. Hmm. Look on the passenger seat

across from there, right? What do you see there?
A. Looks like an open bag with something pink.
Q. Something pink again, another feminine type of item, correct?
A. Your words, not mine.
Q. But it's pink. Do you wear pink?
A. Yes.
Q. Oh, okay. Feminine male. Good to know.
THE DEFENDANT: You can finish playing it. Finish playing it.
(Videotape continues)
THE DEFENDANT: Stop.
Q. Did the sergeant just not reach across that seat and actually flash a light by that seat and under that seat too?
A. I'm sorry. You're asking me a bunch of questions to testify what a sergeant did.
Q. Do you need us to replay it?
A. No, because I'm not testifying to what a sergeant --
Q. I'm going to ask you what did you see. Did you see the sergeant reach across to that other seat? Did you see a light flash under that seat?
MR. PAULSEN: Your Honor, the video speaks for itself. I think the officer doesn't need to characterize somebody else's video.
THE COURT: Sustained.

Q. Okay. Well, where was the gun located?
A. I later learned the gun was located under the back seat.
Q. Which seat?
A. Well, it's a bench seat, but on what side would be roughly behind the front passenger seat.
Q. Man, you just can't tell the truth for nothing, can you?
Could you please point in this video where a bench seat's at? Please. Please show us in this video a bench seat.
THE DEFENDANT: Take it back a little bit.
Q. Please show us the bench --
A. So let me just clarify here.
Q. Please.
THE COURT: Hold on. Go ahead.
A. I never searched the vehicle. I never went into the vehicle. I assisted in removing Mr. Andrews from the vehicle. I assisted in removing the driver from the vehicle. I later learned a gun was located in the vehicle. And as you already saw in the video, from outside the vehicle I looked underneath to what I thought was a bench seat. Maybe it's not, but the gun was underneath the seat behind the front passenger seat.
THE DEFENDANT: Take it back a little bit. Play it.
(Videotape played)

THE DEFENDANT: Stop.

BY THE DEFENDANT:

Q. What type of seat does that look like?

A. It looks like a bucket seat.

Q. So there's a space in between, am I correct?

A. Correct.

Q. Did the sergeant not just look under the bucket seat that his hand's on now?

A. I believe he did.

Q. Is that not the same seat that you just took the defendant out of?

A. Yes.

Q. So why would you testify to the courts that the gun was under his seat?

A. I didn't.

Q. You did.

A. I said it was under his seat because I believed it to be a bucket -- or a bench seat.

Q. But you put in your report the same thing. You just --

THE DEFENDANT: Anyway, man, I'm done with this witness, man. This shit's just getting ridiculous, man.

THE COURT: Any further questions, Mr. Andrews, or are you done?

THE DEFENDANT: Man, I'm --

THE COURT: I understand your points.

THE DEFENDANT: I'm done with him. I'm done with him, man. He's --

THE COURT: All right. Very well.

Mr. Paulsen?

MR. PAULSEN: No redirect, Your Honor.

THE COURT: Officer, you may step down. Thank you.

THE WITNESS: Thank you very much, sir.

THE COURT: All right. Mr. Paulsen.

MR. PAULSEN: Yes. I'd like to offer a couple of documents in rebuttal to some --

THE DEFENDANT: Is this allowed?

THE COURT: We'll find out.

What are you going to offer?

THE DEFENDANT: I thought he had to offer people for rebuttal.

MR. PAULSEN: So there was an issue raised by Mr. Andrews with Sgt. O'Rourke about whether the original shooting happened at 23rd and Fremont, or I think it maybe was 25th and Girard, and he tried to impeach him with someone else's statement.

This is the incident detail report from that night, the computer-generated summary of the call, and I'd offer it because it shows that the location of the shooting, according to this, is 23rd and Fremont Avenue North. That

would be Government Exhibit 10. Offer 10.

THE COURT: Any objection?

THE DEFENDANT: Hell, yeah. I got a rebuttal to that. I got the public document record of that. Hell, yeah. And this one says 25th and Girard.

THE COURT: Okay, but is there an objection to this document?

THE DEFENDANT: I object to his, yes, because his is false. I object on the grounds that, one, it's an officer who was actually on the scene. He put it in his report and it's up there, and then I'm going to give you the public record of it that we got from public records, the real documents.

THE COURT: Government Exhibit Number 10 will be received. You can put into evidence whatever document you're referring to.

MR. PAULSEN: Okay. And I will note that this document also references 25th and Girard. That's where some casings were recovered.

THE DEFENDANT: If I may ask, could you please just have him read that document into the record, please.

THE COURT: I'll read the document. Trust me on that, okay?

THE DEFENDANT: Because this is just -- this is outrageous, man.

THE COURT: No, he's merely establishing the relevance for the admission of the document.

MR. PAULSEN: And then the other issue that was raised with Sgt. O'Rourke was kind of two issues. One was this blue Tahoe. What was your basis for --

THE DEFENDANT: I object to this on the grounds that he got -- he got to start making this -- he got the chance to start making this stuff up like he informed all them officers to say that about that ping. He went and picked up this little made-up information again that he's going to try to enter. Because if we'd have finished our hearing that day like we were supposed to, he wouldn't have had a chance to offer this into evidence.

So I object on the grounds that it's just unfair to the defendant, period, all around. Their testimony was unfair, even though they was still impeaching, call them lies, and the documents he's using now, I feel like they're unfair, because, one, he didn't offer them in a timely manner and this would have been exculpatory evidence, because I could challenge it and get it suppressed, and now the Court's going to have to waste time on a whole nother hearing and matter with these simple issues when he could have simply followed the law, and he knows the law. Under Discovery Rule 16, he was supposed to give me all of that.

THE COURT: Your objection is noted.

Mr. Paulsen, please finish your --

MR. PAULSEN: So in the search warrant application for that blue Tahoe, Officer O'Rourke wrote that:

"I learned that Andrews' child's mother, Shenita Esaw, is the owner of a 2002 blue Tahoe with a 21-day temporary sticker according to" --

THE DEFENDANT: Objection.

THE COURT: Hold on. Let him finish, please.

THE DEFENDANT: I thought you wasn't going to let this be read in.

THE COURT: Just let him finish. I have to hear the context for this.

MR. PAULSEN: -- "according to Minneapolis Police Report No. 18-045880."

The accuracy of that statement was challenged by Mr. Andrews even though he hadn't followed the rules for a ***Franks*** hearing. And so to rebut his arguments that that's an incorrect statement, we went and got that police report --

THE DEFENDANT: The only reason --

MR. PAULSEN: -- the same one that is referenced in the search warrant, 18-045880, and I offer that as Exhibit 11 to rebut his --

THE DEFENDANT: Objection.

MR. PAULSEN: -- accusation that there was a false

statement in the search warrant application.

THE COURT: Okay. What is your objection, Mr. Andrews?

THE DEFENDANT: Once again, he didn't have this stuff, it wasn't offered in the beginning. Once again, this is -- on the discovery, the only reason we wasn't able to make a ***Franks*** motion about it is because he never turned over the search warrant itself. They never told us -- they never gave us the pictures to the truck till September 7th. The hearing was on the 10th. That's the first time we heard about the search warrant. We had to take a break, a continuance so we can file motions, and I believe we did get in a motion until we heard the search warrant itself. Then it was another motion that I'm putting in today to challenge the motion itself under the grounds that they searched the wrong damn vehicle. It's the wrong car, it wasn't in the correct name, he lied in the search warrant, and it was all bogus. So that shouldn't be entered into evidence, period. He shouldn't be allowed to put it in. It was in an untimely manner. He didn't have it, it wasn't readily available, and it's breaking all type of rules of the Court.

THE COURT: All right. The objection is noted, the issue is preserved, the objection is overruled, and the document will be received. That's Government Exhibit 11.

MR. PAULSEN: And I should not that it's attached

to the email chain that Mr. Andrews put in earlier to show that the officer had this report available to him on the night in question.

And with that, that's all I have, Your Honor.

THE COURT: Okay. Mr. Andrews and Mr. Aligada as appropriate, are there any witnesses that you wish to call now? Obviously they're not here.

THE DEFENDANT: Could I get some rebuttal to what he's doing?

THE COURT: Do you have documents you wish to enter into evidence?

THE DEFENDANT: I damn sure do.

THE COURT: Okay. Have them marked and offer them into evidence.

THE DEFENDANT: Well, here's -- this is coming from the Minneapolis Police Department, General Offense Public Information Report. And in this report it says:

"Officers were dispatched to the above area on shots fired. There were no shot spotters activation. I located approximately 13 DCCs at the above location, the area one" -- "in the area of one neighborhood, believed a blue 2000 Chevrolet Tahoe fired rounds at a clear" -- "a purple Chevy Impala. There was a gray van also roaming the area. Cleared the scene and found several" -- "I mean, found a vehicle with the matching license plate of AGV 69 in

the area."

THE COURT: I need you to identify what the document is.

THE DEFENDANT: Oh. This is the Minneapolis Police -- this is the document that he's referencing.

THE COURT: The police report.

THE DEFENDANT: The police report.

THE COURT: Is it in evidence?

THE DEFENDANT: No, not this one. And I want to enter this and I want to enter an officer's supplement.

THE COURT: Okay. Let's mark the first one first.

THE DEFENDANT: Oh. Also I want to -- it's two pieces in here that need to be entered, because it's another rebuttal to the same thing.

THE COURT: Is it all stapled together?

THE DEFENDANT: Yeah.

THE COURT: It's all one document. Mark it, offer it into evidence.

THE DEFENDANT: Okay. Well, I want to tell you what the evidence is first.

This is going to be rebuttal to both of his claims, one, that report out of St. Paul. It's case-referenced in here and it states a 60-year-old lady was assaulted by her boyfriend of however many years and she was too blind to make a report.

And the other one in here, that's the one he's going to try to make reference saying that the car was in my kid's mother's -- Shenita Esaw -- name.

The other one here is going to contradict Sgt. O'Rourke saying that the shot spotter told him that the shots was fired at 23rd and Fremont when it was 25th and Girard and there was no mention of a suspect, and then the description of the suspect itself was a large, dark-skinned male with braids in his hair. Clearly the suspect's light-skinned or more lighter-skinned with long dreads, very long dreads on his head.

So this will contradict both of them. That's going to be 13.

THE COURT: Let me stop you for a second.

Mr. Paulsen, any objection to Defendant's Exhibit 13?

THE DEFENDANT: Also in there is every case reference that they made in this case, like the other shooting that they're trying to say the gun was registered to which happened in the Boston Terrace that has nothing to do with the suspect. That's also in there. Nothing to do with the suspect, not a shred of evidence.

MR. PAULSEN: I'm looking at Number 11. Relevance is not apparent to me, doesn't have anything to do with the ones I introduced, but if he wants it in for whatever value

it has, I won't object.

THE COURT: All right. Defendant's -- is it 13? --

MR. PAULSEN: 13.

THE COURT: -- will be received.

What is the next document you wish to enter?

THE DEFENDANT: Also, Scott Creighton. I'm going to enter his supplement in. It referenced in here:

"I was on an earlier call in regards to shots fired at 25th and Girard. At approximately 15:20 hours the caller-witness later told us that the description of the shooting vehicle was a dark Chevrolet Tahoe without any plates. The caller-witness told us that the driver/shooter was a large black male, dark-skinned, with braided hair. He stated that the passenger was a shorter male with a goatee and shorter dreads. Officer aired the information and recovered several shell casings at this location."

And that case is 15-6610, which is the one he's going to offer and answer in saying that the thing was on 23rd and Fremont.

THE COURT: Marked Exhibit 14?

MR. ALIGADA: 14.

THE COURT: Mr. Paulsen, any objection to 14?

MR. PAULSEN: No objection. It's the report of Officer Scott Creighton, C-R-E-I-G-H-T-O-N for the record.

THE COURT: Defendant's Exhibit 14 is received.

Any other documents, Mr. Andrews?

THE DEFENDANT: Did we get this in, the impeaching document of Joel Pucely to show that -- this made up email that they sent? I want this entered to show that -- this says the shooting on the night and that he was in contact with Sgt. O'Rourke reportedly from this from 7:51:04, so obviously this is a forged document again. I want to enter that as evidence.

THE COURT: Mark it as Exhibit 15.

MR. PAULSEN: That's already in.

THE DEFENDANT: Huh?

THE COURT: Is it in?

MR. PAULSEN: That's part of our Number 11 I just put in.

THE COURT: Okay.

THE DEFENDANT: Where? Oh, yeah, you did put it in.

MR. PAULSEN: Are you good with that?

THE DEFENDANT: If the record is going to reflect that -- yeah.

THE COURT: It's in evidence as part of Government Exhibit 11.

THE DEFENDANT: Now, is this all the evidence that I'm going to enter in to show for the topic of the

suppression?

THE COURT: That's a decision for you.

THE DEFENDANT: I'm asking you, can I just -- I don't have to just do rebuttal. I can just enter evidence myself now, right?

THE COURT: If you have evidence that goes to the suppression motions that is --

THE DEFENDANT: Oh, yeah. Yeah. Hell, yeah.

THE COURT: Mr. Andrews, why don't you go through that, what you have --

THE DEFENDANT: I got it ready now.

THE COURT: -- figure out what you want to put in. The court reporter needs a break. He's been going for, again, another hour and 45 minutes or so. So we'll take a recess.

Marshals, can he remain in the courtroom and review his documents?

DEPUTY MARSHAL: Yes, Your Honor.

THE COURT: Okay. We'll come back on the record at 20 minutes to 4:00, okay? Thank you.

(Recess taken at 3:22 p.m.)

* * * *

(3:40 p.m.)

IN OPEN COURT

(Defendant present)

THE COURT: All right. We're back on the record in the United States vs. Norris Deshon Andrews, Criminal Number 18-149.

Mr. Andrews, have you had an opportunity to go through the documents you have and identify what you'd like to admit?

THE DEFENDANT: Yes.

THE COURT: Okay. Mr. Aligada, have you had a chance to mark those yet?

MR. ALIGADA: Yes, Your Honor.

THE DEFENDANT: Are you -- what exhibit are you up -- the Court's up to?

THE COURT: I think we're on Defendant -- you've admitted 14, so the next number is 15.

THE DEFENDANT: Okay. Well, the next one would go as to probable cause, the identification of his suspect shooter, on the grounds that, one, the officer illegally cut his body cam off and took a statement.

Two, this female is not identified because of this, so the defendant doesn't get to challenge her in court.

And three is the main important one and I want to

put this into the record.

She stated:

"The female said" -- "The female told me he was driving a blue SUV today. She stated that she heard the shots, ran inside, so she did not see which way the SUV drove. The female told me the defendant's name was N.O. His real name was Norris Andrews. She then showed me a photo of Norris Andrews. I went back to my car, looked up Norris Andrews' NCIC and found Andrews' full name is Andrews, Deshon Norris, 12-8-84. This information was passed along to Sgt." -- I don't even know his name.

But this is their way that they say they got my government name and their eyewitness to the shooting. And as you can see from this officer's statement, she stated that she merely heard the shots, so this is not identification, so this goes to another kick at their probable cause *per se*.

THE COURT: Okay. Just so I know, what is the exhibit?

THE DEFENDANT: Oh. It's a supplement from the case itself, a female who says she was at the scene. It's Supplement Number 9 by Officer Benjamin Brewer (sic). I had asked to have him here, but he's not, but I feel like his name is certified, so I don't even need him to come. I'm just going to put his supplement in. It tells the story.

And once again, this goes -- also I want this to go to show the Government misconduct and the outrageous Government conduct, because surely Jeffrey Paulsen knew this and he still chose to take this to the grand jury. Him and David Voth over there promised that this right here was a positive identification from an eyewitness to the shooting.

THE COURT: Any objection, Mr. Paulsen, to Exhibit --

MR. PAULSEN: There's no objection, but it's actually Officer Benjamin Bauer, B-A-U-E-R, not Brewer.

THE DEFENDANT: It's Supplement 15 -- I mean, it's Defendant Exhibit 15, Supplement Number 9, off of the State's case.

THE COURT: It's received, Defendant's Exhibit 15.

THE DEFENDANT: Also I want to enter Exhibit 16. This is Supplement Number 8 and it's by John Bunnell, Supplement Number 8 in the same case.

This goes to show the credibility, one -- because I had an objection to this too -- the Government offered a photo lineup. One, I object on the grounds that it was given to us on the 7th of September, which is well past the timeline. We put a motion in asking for all identification of the suspect well before this in July. The courts told them to give it to us in June. In an order from the arraignment hearing, they was ordered to turn it over under

the discovery rules 12, 16 and 26.2.

But in this statement here -- well, first issue is the thing itself, the exhibit, is clearly suggestive. The suspect's picture is whited out. It's -- everybody else is dark. Number 6, it looks like a computer spoof, like it's just completely darkened out. And the suspect, he's way taller in the picture, his head's enlarged, and he's brighted (sic) up. Everybody else, like, you can clearly see was darkened out.

Sixteen goes to show -- Defendant Exhibit 16 goes to show the witness' that actually circled that picture credibility, because he needed to be able to identify this suspect. And his statement here, he said that the suspect, a black male, got out of a 2004-2005 Chevrolet Blazer, started walking towards him and began shooting at him.

I'm going to also enter in an exhibit of a video of the shooting itself which contradicts this and that this victim it looks like was with the other victims, and he was -- he got another statement in here where he's going to say that he was just out here with his aunty and was randomly shot or whatever. So Number 8 is going towards the credibility of their witness. This witness did not know who the shooter was, did not see the shooter, and the pictures would clearly show that Sgt. O'Rourke made it very easy for him to identify the suspect by making an overly suggestive

picture.

Also, Number 17 --

THE COURT: Hang on.

Any objection to 16, Mr. Paulsen?

MR. PAULSEN: No. Sixteen is the report of Officer John Bunnell, B-U-N-N-E-L-L, and I have no objection.

THE COURT: It's received.

THE DEFENDANT: Next would be 17. This is a Supplement 46 by Kelly O'Rourke. It's a question-answer supplement by the same victim, Blanton, and in this one it goes to tell a whole nother story of how he was shot and the manner he was shot and what he was doing there.

THE COURT: Okay.

THE DEFENDANT: Which is just all off. He's going to state in here it was two shooters and he was talking to his aunty and was shot. The video of the shooting itself will clearly show that him and the other victim approached these suspects and engaged them into an argument, and he actually was going towards this argument to engage and join in on this fight once the shots was fired. And it's not the same as what Supplement 16 says, so it goes to show again his credibility of identifying the suspect with that picture, because I'm challenging that picture identification also.

THE COURT: Understood.

Any objection to Exhibit 17, Mr. Paulsen?

MR. PAULSEN: No objection. I just want to point out, though, that this is a statement that was given on May 30th, 2018, so long after the arrest, and the Government's position will be that something that occurs and is known only after the arrest cannot factor into probable cause for the arrest.

THE DEFENDANT: That's not when this statement was given. This statement was given May 18th. He entered it May 30th.

MR. PAULSEN: Okay.

THE DEFENDANT: This statement was tooken at Hennepin County Hospital May 18th at 12:30.

MR. PAULSEN: It still is after the arrest.

THE COURT: Okay. Well, I'll sort that out. It's admitted.

THE DEFENDANT: Yes. Like I say, I would like to note that it is the 18th, two days after.

THE COURT: Okay.

THE DEFENDANT: The next exhibit that I want to enter as 18, we got to burn a copy of it, but it's the footage of the shooting itself, the unreindacted (sic) version with all of the cameras. Because he put in a cropped-out version of it where you couldn't see this

witness -- I mean, this victim. This 18 is going to go to show multiple different things. One, the two females. One, which is the one that gave the Government name. It shows her apartment in and out. No female any shape, form or size was in or out of that apartment at the time of shooting, which goes to show once again that she didn't see the shooting and it was secondhand knowledge.

The other female's apartment, which is right next door to her, that gave another statement is going to show that she wasn't out there and she gave a statement saying and no one gave a name, which means she's using third-hand knowledge.

And also it's going to go to show that this same victim, victim Blayton, or Blanton, also -- he lied. Once again, this video is going to show him approach with the other victim and approach the suspects in a hostile manner and engage in a fight, where in his second statement he's going to say that he was just merely out there talking to his poor old aunty and he turned around and he was shot, and then the person got out of the car and tried to shoot him again. And then when the suspect got in the car, he hung out the passenger window and tried to finish him off while someone else drove. The video will go to show that the shooter shot him, got into a vehicle and drove off. No more shots was fired. He didn't get in or out this vehicle,

which makes both of these victim statements that circled this picture false.

Which goes to show once again that the Government knew this, because these are the videos that we was telling them to give us, and once again, we couldn't put no motions in to suppress these because he kept them till September 7th also, which was the Friday before the Monday that we went into the hearing.

So the videos themselves I would have put in for suppression just on the grounds that this is exculpatory evidence, because it goes to show that, one, like I just said, the victims is lying. The witnesses that they're alleging to have don't exist. These officers are just putting stuff in their reports. You just seen impeachments. The Minneapolis police officers write anything.

And this Officer -- what is it -- Supplement Number 15 -- Supplement 9, Exhibit 15, is no better. He just made up this story. There's not a shred of proof that this female exists. She didn't see the shooting. Nothing's there that supports that she gave him a government name and a readily available picture on her phone.

THE COURT: Okay. Let me stop you then. I believe we're on 18. Eighteen is a --

THE DEFENDANT: Is going to be the unreindacted --

THE COURT: -- unedited version of the shooting

video. First of all --

MR. PAULSEN: I assume it's the copy I gave them, and if so, I have no objection.

THE DEFENDANT: It's multiple videos on there, different angles.

THE COURT: Okay. It's received. Eighteen is received.

THE DEFENDANT: For that purpose, another video is going to go to show for probable cause. As a matter of fact, can't I just call myself as a witness?

THE COURT: You can.

THE DEFENDANT: I would like to do that.

THE COURT: I'll tell you what.

THE DEFENDANT: Just swear me in. It's not going to take long. It's not going to take long. What I need to testify to will take roughly about five, maybe ten minutes, depending camera time, for him to play the little video or whatever. Other than that --

THE COURT: Okay. Before we get to that, any other documents or tangible exhibits you want to put in?

THE DEFENDANT: Yeah. Once I get on the stand, I'm going to be putting another video in.

THE COURT: Okay. Anything else?

THE DEFENDANT: Yeah. That video's going to be 18 -- 19.

THE COURT: 19. All right. Well, we'll cross that bridge when we get to it. Other than 19 and whether you testify, anything else?

THE DEFENDANT: Yes. Another video which is going to be a post-arrest interview which the Government also has, I'm going to be entering that as Exhibit 20.

THE COURT: And what is it, a post-arrest interview of you?

THE DEFENDANT: Of me, yes, giving a statement.

THE COURT: Okay. Any objection to 20 at this point, Mr. Paulsen?

MR. PAULSEN: It obviously doesn't go to probable cause for the arrest because it's after the fact, but I won't object and deal with it in the briefing.

THE COURT: Okay. 20 is received then. It'll be marked and received, whatever the post-arrest statement video is.

THE DEFENDANT: This is already in. Stuff that I got that's in as early exhibits, can they still be used for different purposes?

THE COURT: Meaning what? You want to use it for a different motion?

THE DEFENDANT: No, a different meaning in the same motion.

THE COURT: You can argue whatever you like to

about whatever is in evidence.

THE DEFENDANT: Yeah. I want to ask you so you understand what I'm saying just so there won't be any misunderstanding.

The Officer David Voth -- I think I answered this already. I think I impeached Sgt. O'Rourke with this earlier in the thing.

MR. PAULSEN: I can tell you. Is it the June 6th report?

THE DEFENDANT: It's his narration, his first report.

MR. PAULSEN: I'm not sure that one's in.

THE DEFENDANT: Yeah, it's this one along with the attachments. It's this one. Is it in?

THE COURT: If we don't know, mark it, offer it.

Mr. Paulsen, objection to what will be marked as 21?

MR. PAULSEN: No objection.

THE DEFENDANT: Aside from that was another one that was going to be used for multiple purposes. I believe it's also by David Voth. I think it's his Report Number 5 where he called Sgt. O'Rourke and the attachments about how they located the suspect.

THE COURT: Okay. Here's what we'll do.

THE DEFENDANT: Those is in, right?

THE COURT: I believe so, but I can't swear to it. Here's what we'll do.

Anything that you discover after today that you wish to be entered that's a document, have Mr. Aligada talk to Mr. Paulsen, I suspect there won't be any objection, and it'll be received, okay?

Let's turn to the issue of your testifying.

Mr. Aligada, do you need a little time to consult with Mr. Andrews on that question?

MR. ALIGADA: Your Honor, I certainly can take a couple minutes to talk with him about it. But I mean, what I anticipate it would be is him testifying in the narrative without my involvement, but I'm happy to talk with him about legal issues that could arise.

THE COURT: I think that would be prudent. Can you do it here?

MR. ALIGADA: Yeah.

THE COURT: Okay. Do you need us to exit the courtroom?

MR. ALIGADA: That would probably be the best practice.

THE COURT: Okay. One last recess then. We'll recess for about five minutes.

And then if you testify, Mr. Andrews, it's -- you're telling it's not too long, correct?

THE DEFENDANT: No.

THE COURT: Not correct or not too long?

THE DEFENDANT: It's not going to be too long.

THE COURT: Okay. All right. We're in recess for five minutes.

(Recess taken at 3:57 p.m.)

* * * *

(4:02 p.m.)

IN OPEN COURT

(Defendant present)

THE COURT: All right. Back on the record in United States vs. Norris Deshon Andrews, Criminal Number 18-149.

Mr. Andrews, during the break you've had an opportunity to speak with standby counsel, correct?

THE DEFENDANT: Yes.

THE COURT: All right. And, Mr. Aligada, I'm going to direct these questions to you.

Have you had an opportunity to apprise Mr. Andrews of any legal issues and ramifications of testifying here today?

MR. ALIGADA: I have, Your Honor.

THE COURT: All right. And are you satisfied that he has understood whatever advice and counsel you may have given him?

MR. ALIGADA: Yes, Your Honor.

THE COURT: All right. Thank you.

Mr. Andrews, is it still your intention to testify?

THE DEFENDANT: Yes, but we figured out a couple more exhibits that need to be entered real quick.

THE COURT: Okay. Let's do that.

THE DEFENDANT: Okay. We got one of -- Exhibit 22 is going to be a T-Mobile record that the Government had that once again they didn't give to us till September 6th, but he has it. That's that one from May 16th. This is the response to Sgt. O'Rourke's extinguishing ping that he did. That's that one.

THE COURT: That's Number 22, correct?

THE DEFENDANT: Correct.

THE COURT: Number 23 is going to be the one that -- is going to be the first and last page, because I'm not going to enter all that, the first and last page of the one we subpoenaed just to show a time frame --

THE COURT: Understood.

THE DEFENDANT: -- of the one we got. But the whole one that they got I'm going to enter, but it's pretty much a duplicate of the one we got, plus something.

THE COURT: Okay.

THE DEFENDANT: So that's going to be 23.

Also, I want to ask the Court, that motion that I gave you when we left last time, was it docketed?

THE COURT: You know what? As I'm sitting here, I simply don't know.

THE DEFENDANT: Well, he had it and he had time to read it.

THE COURT: It will be docketed. It will be addressed.

THE DEFENDANT: Yes, because I can -- we can very well -- it can be argued after this in my motion if he's willing to let it go on the record.

THE COURT: It'll be docketed and you can submit further briefing and other material on it.

THE DEFENDANT: One, I would like to enter e-mails. The next one would be e-mails back and forth from Reggie Aligada to my state attorney, Laura Prahl. This is going to be Exhibit 24.

THE COURT: What is the purpose of Exhibit 24?

THE DEFENDANT: Huh?

THE COURT: What's the purpose?

THE DEFENDANT: Oh. It's going to be about his (indicating) conduct.

THE COURT: Okay.

THE DEFENDANT: Exhibit 25 is going to be e-mails back and forth from the Government to my counsel which shows

the times and dates that we get these exhibits. It's going to go more towards his conduct and outrageousness that he's displaying.

And the last one is going to be -- hold on.

(Discussion off the record between the defendant and Mr. Aligada)

THE DEFENDANT: Also, I would like to enter two sets of forged documents, laboratory reports that the Government turned in. One is from June 4th. This is a forgery. I will enter with it Supplement 44, which is the original document to this supplement -- I mean, this piece of evidence that I'm going to enter.

The Government has both of these. Supplement 44 was received in mid-January from the Government. Supplement -- I mean, the attachment is going to be just given to us on the 7th of September, and this is a forgery of this (indicating) one.

THE COURT: So they need to be marked.

THE DEFENDANT: And the reasoning for that is because it goes to show that once again the Government took false information to the grand jury when it said that the gun recovered from the vehicle matched the shell casings that was recovered from the shooting scene, because they're making their case by way of constructive possession. So this goes to show that they didn't have a match, Supplement

44, which was done May 29th, verified May 30th, and was given to us in July, well before our motions went in asking for all other evidence.

And the other one that I'm attaching with it is the false one. It's an approved medical examiner report. They have an extra line on here where it's going to show that the gun matched the shooting now, because I was making an issue about it, so he brought it up and that's going to show more of his conduct when I get around to that.

THE COURT: Number, Mr. Aligada?

MR. ALIGADA: 26, Your Honor.

THE DEFENDANT: 26, those two documents.

THE COURT: Thank you.

THE DEFENDANT: And mind you, I'm pushing for suppression of that other one.

THE COURT: Understood.

THE DEFENDANT: 27 is going to be a fingerprint ridge detail that was also just turned over to the defendant on September 7th. And in this supplement it's saying that a right thumbprint was found on the gun and this was verified May 18th. Two days after the shooting they had this fingerprint. So if they surely had this fingerprint, they wouldn't be trying to prove constructive possession, because this is direct possession of the gun that would have been alleged to be in that vehicle that we're going for

suppression, as you can see, tampering with evidence. But that's this exhibit.

THE COURT: That's 27?

MR. ALIGADA: 27.

THE DEFENDANT: Also, I'm going to enter in under more loss of exculpatory evidence. We can telling this fine officer here to give us all of the car video footage of not only the shooting situation, but of when the defendant was arrested. He stated it was only them two cars footage. Well, I have a document to show that it was five different cars footage. It was five cars seen on video on Joel Pucely's body cam, which we're also going to be entering into evidence somewhere within these exhibits. But yeah, this shows there's way more body cam footage and car cam footage.

And I also would to suppress this footage if they try to get it in later on the grounds that it's loss of exculpatory evidence and it's untimely, we can't make a motion to get it out of there, so I would just have it excluded.

THE COURT: Mark it, Mr. Aligada?

MR. ALIGADA: 28, Your Honor.

THE COURT: Thank you.

THE DEFENDANT: Also, I would like to enter as showing -- this is from the investigator on my state case,

Darcy -- what's her last name -- Darcy Goolich (ph).

This is her handwritten note from June before I was indicted on this case. It's going to show that I told them to go get alibi camera footage. This is going to go to show loss of exculpatory evidence by the Government. They knew well in advance they didn't go get this footage that I'm also going to be entering in evidence in one moment when I testify.

MR. ALIGADA: This is 29, Your Honor.

THE COURT: Thank you.

THE DEFENDANT: But that's the document from the county before I was indicted, which is going to go to show consistently that I've been telling the truth. And I believe -- I believe that -- I believe that just about does it, and then we can get the rest on the road so we can wrap this hearing up.

THE COURT: Okay. So, Mr. Prahlsen, any objections to Exhibits I believe it's 22 through 29?

THE DEFENDANT: Also, I'm going to have him print up over 200-and-something pictures -- I'll just name some of them -- as far as exculpatory evidence:

The fingerprint, the gun itself. We didn't have that until -- all of these was turned over on May 6th and May -- I mean, September 6th and September 7. This is all exculpatory evidence that we put in motions they was ordered

to give us in arraignment hearings. They didn't. They dumped on us three days before the motions hearing.

Over 200 photos. These photos consisted of the search warrant that he just entered in on the 10th which we had to take a break for, the filings of that search warrant, the pictures of the truck conducted during that search warrant, the fingerprint, the gun, the crime scene, the shell casings, the identification of photo lineups. Like, we had none of this. All of this was dumped on us three days prior to the motions hearing, so we didn't have a chance to get --

THE COURT: Okay.

THE DEFENDANT: So I'm going to have him enter all of those pictures as Exhibit --

MR. ALIGADA: 30.

THE DEFENDANT: -- 30, the pictures and stuff that we got from September 7th -- 6th, 7th, and the 12th.

THE COURT: Okay. Anything that is not here today that you need to do that on will be handled in the manner we talked about. Mr. Aligada will provide it to Mr. Paulsen and the Court will hear from them as to whether there's an objection, and if there is, I'll rule on it at that time, okay?

THE DEFENDANT: Yeah. They need to be suppressed.

THE COURT: I understand that's your purpose in

admitting them.

THE DEFENDANT: Okay.

THE COURT: Is that it?

THE DEFENDANT: Yeah, that does it.

THE COURT: Okay. As to the exhibits you have, Mr. Paulsen, 22 through 29, any objections?

THE DEFENDANT: 22 is going to be a full phone documentation and 23 is just going to be our portion of the same phone document, but two pages, just the beginning and the end.

THE COURT: Understood.

MR. PAULSEN: No objection to 22 and 23.

I really haven't had a chance to review these emails between Mr. Aligada and the state lawyer, but I'll do it later. I have no objection.

And then the emails between myself and Mr. Aligada, no objection.

26, I believe, was reports regarding the examination of the gun, two pages. No objection.

27, I guess, is the fingerprint report. No objection.

28, I guess it's a chain-of-custody report on some videos. No objection.

29, handwritten notes by his state investigator.

THE DEFENDANT: They attached this to the email.

I just had them printed out, because the emails themselves, they can't let the attachment come out, but they was attached to the emails.

MR. PAULSEN: So it looks like the investigator is taking notes of things Mr. Andrews is telling him or her. It looks like it may be a summary of his alibi. I question the relevance for probable cause, but we might as well put it in the record if he wants it, so no objection. The last one, 30, I guess is going to be photos of the crime scene.

THE COURT: Thirty we'll find out about.

MR. PAULSEN: Presumably no objection to that.

THE COURT: Okay. So Exhibits 22 through 29 are received.

Mr. Andrews, do you wish to testify?

THE DEFENDANT: Yeah.

THE COURT: All right. I assume he goes up here, correct?

DEPUTY MARSHAL: Wherever you'd like him, Your Honor.

THE COURT: Come on up, Mr. Andrews. Yeah, Mr. Aligada will take care of that. You need to stop and raise your right hand, please.

**NORRIS DESHON ANDREWS, DEFENDANT, SWORN**

THE COURT: State your full name for the record and spell your last name, please.

THE DEFENDANT: Norris Deshon Andrews, A-N-D-R-E-W-S.

THE COURT: Now, Mr. Andrews, you are going to testify about whatever it is you wish to testify about. Go ahead. You don't have to go through this questioning yourself and then answer it. Go ahead and testify in a narrative fashion, whatever it is you need the Court to know.

**DIRECT EXAMINATION**

THE DEFENDANT: Okay. Well, first off, I would like to play -- play my post-interview. This is a statement that was given to Sgt. Kelly O'Rourke on June 6th, roughly an hour after I was taken into custody.

Go to the third before the last one. That one. I can't see it. All right. Scroll over. Keep going until you see him come in the room.

(Videotape played)

Start the next one.

(Videotape played)

Stop. I would like the record to reflect and show impeachment of Officer Joel Pucely's testimony again. It goes to show that I was not under arrest, that I was merely being detained again and I'm going to be read my rights now, which is the officer right here, the investigator that told them bring me down that's testifying, his statement right in

my post-interview that I was not under arrest. This is going to show probable cause -- that they didn't have probable cause to search that vehicle that night, because you said you searched it incident to arrest.

You can continue.

(Videotape continues)

In that statement he just asked me where was I at at 4:30, which is before the time of the shooting, which was first called in and logged in at 4:42, and I told him I was in Loring Tower.

Could you please finish playing it.

(Videotape continues)

Stop it again. He just asked me where I was at at 5:00 o'clock, which is after the shooting, and I told him I would have still been down there picking Dearra up, which is the girl I deal with, but I was late to get her at 4:30 to get her son. So me and my brother was down there riding around the building waiting on her because she told them that -- I mean, she told us that she was going to push the time back to 5:00, so we left, went to the gas station a block away and came back, and that's why I was telling him we're going to be down there on camera.

Continue to play it.

(Videotape continues)

Stop it. That's the end of the value of that

footage. I just wanted that down to show that this is the night of May 16th at roughly 2:00 in the morning. I was arrested at 12:07 on the 16th, so this is like an hour and some change later. I just gave an alibi statement to the lead investigator in this case, Sgt. Kelly O'Rourke.

Could you go to the -- you can take this down. Go to the Loring Tower videos.

MR. PAULSEN: Well, if we're going to play something that's not in evidence, I think I need to look at it first.

THE DEFENDANT: No. I told you this was getting put in evidence. I already marked it as an exhibit.

MR. PAULSEN: What number is this?

MR. ALIGADA: I don't think we have it.

THE DEFENDANT: No, we said we were going to burn it. Remember I told him I was going to put this in?

MR. ALIGADA: Exhibit 19.

THE DEFENDANT: Y'all had a chance to go get it. I told your sergeant, which is the Government. You had this video too, because you turned this video of my post-statement over to us. We didn't have this, y'all had it. Y'all gave it to us late again. And as you can see, the statement was on there, so y'all had the chance to go get this footage just like we did.

MR. PAULSEN: Your Honor, if I may, unless I'm

mistaken, this is not something we've turned over. It's something that purportedly --

THE DEFENDANT: I'm talking about the statement.

THE COURT: Hold on. You got to let him finish.

I'm sorry, Mr. Paulsen. Go on.

MR. PAULSEN: So my problem with this proposed video, it's not something I've ever seen, and without having seen it, I have no idea where it come from, whether it's authentic, whether it's from the day in question, so without a foundation -- and I haven't heard any -- I'm going to object to this one.

THE DEFENDANT: The time, date and everything is stamped on there. If you need more further ground, the investigator for the Federal Defender's Office is who went and got this footage, but the video itself has got the time and date stamped on it, so there's going to be no ifs, ands, or whats about it being authentic and what time it's from, the date it's from.

And once again, like I said, y'all -- the state government and all the officers involved have my post-interview to my arrest and they had it all this time, so you had the chance to go get it.

MR. PAULSEN: That's fine. I've consulted with Mr. Aligada. I'm not going to object.

THE COURT: Go ahead, Mr. Aligada.

THE DEFENDANT: Play video two. Stop video two.

Now, mind you, before this video starts, I want to put on the record that this is loss of exculpatory evidence that I'm just going to put down. This video is still going to show that I was where I said I was at, but I want to put on the record before that that this is loss of exculpatory evidence.

I, Norris Andrews, defendant in this case, was arrested May 16th.

Before May 20th, I told my attorney down in the state, Laura Prahl, to have her investigators go get footage from this building, a gas station and two other stores within a week or so after I was arrested, well within the time frame to get my alibi footage. No one did it.

A month and a half later I was indicted. Mid-July, Mr. Aligada took over my case. He had his investigator go. His investigator was able to go down and -- all other footage was gone except for this building, which was the criticalist footage. Two months later, the Loring Towers still had the whole day of May 15th. I told them to go get the whole day.

And the value of the whole day would be, at 4:00 in the morning on May 15th, I would arrive at the Loring Tower. There's cameras inside, there's cameras outside. The cameras inside will show what I was wearing

when I arrived at 4:00 in the morning.

The cameras inside also will show 2:00 p.m. when I left the Loring Tower. This stuff can be verified, because I told my lawyer and them the same thing down in the state to go get the footage.

So the afternoon hour between 2:00 when I left, it would have showed what I had on, which was different than what I had on last night, and 2:00 o'clock is roughly two hours before the shooting happened, so that would go to show relevance to what I had on. Because if I arrived in one outfit and I left at 2:00 o'clock in the afternoon and there's then another outfit, the outfit I was wearing would more than likely predict what I had on at your shooting, which was different. And I told them on this -- my post-interview that I had on red too. You're going to hear that more. But after that the video still would have showed me come back into the building, go up, tell up Dearra I was there or whatever. She gets mad, she don't let me in, so I get back in the car. And my brother gets out the car. He goes in.

Now, mind you, I just said I was late. She was supposed to pick her son up at 4:30. By me being late she pushed it back to 5:00 o'clock, so now she's texting me while I'm sitting in this vehicle here.

But the last time before you see my likeliness,

somehow, some way, two months later the video got -- after my lawyer and the investigator got the subpoena for it -- I'm going to go more into that later, but it's a loss of exculpatory evidence is what I'm going to tell you. Two months later they told me that the video was there. We put in a request for the full day's worth of the video.

What I was brought back as a defendant was only the hours between 4:30 and 6:30 and none of the inside cameras. So throughout the whole May 15th day, I was only given 4:30 to 6:30, and I was told by my attorney and his investigator that the footage was just gone now. Two months after they said they had it, when we asked for it, we got a subpoena, we went and got it, and when we went and got it -- I'm going to bring up that more of a issue later as far as the loss of exculpatory evidence, but it's still enough here that verifies everything that I said in that interview about where I was going to be at, at what times I said I was going to be there.

And I'm going to have the investigator over there, he's going to testify that I told him to go down there and get the other footage, the exhibit I entered by Darcy Goolich. Her written notes from June is going to also show that I told them to go get this footage and why I told them go get this footage so it can show my alibi, and once again they ignored it and it's gone, and this is going to point

more to Government corruption as we go along.

But as you can see from this, it's May 15th, 4:30 p.m. I'm already in the vehicle. Like I said, somehow miraculously the video only starts after I'm already in the vehicle, but it's the same vehicle I told you in the post-interview and that my attorney notes going to tell you, the white Nissan Maxima right here.

And you're going to see my brother come out, he's going to make a face at me, then this vehicle's going to make a U-turn, and then I'm going to put it to the other videos so you can see what the rest of it was, which is what I stated in my post-interview where I was going to be at the time of their shooting.

Start the video, please.

(Videotape played)

As you see, it's 4:30. There's my brother. He's talking to his kid's mother. He's telling her to come down in the back. We're going to go around the back and get something out of his kid's mother's car. She's going to pass me some money through the passenger window and I'm going to give it to my brother. She's going to talk to us for a few minutes, then we're going to come back around the front and attempt to get my girlfriend, but she's still not going to be ready, so we're going to leave and go to the gas station and come right back. You're going to see all that

on footage. He made the face. He got in now.

Now, once again, I tell you this, to say that there's over 20 videos of inside this building footage and somehow, some way, the defendant didn't get it when I asked for it and they requested it, and then miraculously it got deleted. That's another reason why I'm going *pro se* right now with standby counsel.

Stop that one. Go to video one and go to 32, 4:32. Go back, back, back. Right there. Just stop right there.

You're going to see the vehicle come into the picture.

You still got it going?

The SUV is going to enter this picture, go down to the corner, make a left, and then it's going to turn into the back of this building. You see it? There it is. It just made a U-turn, it's going to the corner, it's making a left.

Stop it. Go to video four.

(Videotape played)

Stop it. As you can see in the crack of the left-hand corner, there's the SUV. It's going to turn into the parking lot.

Start it. And if you notice the time, it's still lining up. It's 4:32.

Stop it. Go to video three.

These are only the outside cameras, as I said.

Go to 4:32. The red car that you will notice on the right side of your picture, we're going to come park on the driver's side of this car. That's my brother's kid's mother. You see her doing some stuff, her little friend or whatever. We're going to come in, then she's going to come walking out.

Is it freezing? No, it's still going. As you see, the time is 4:32 still. Here's the SUV turning into the lot. We're parked right there. In roughly another minute or two -- well, go to 36, because it's going to be a few minutes of just sitting there until she comes out.

37. Go back. She's there already. Go forward. Just let it play from there.

There she is entering the screen. She's going to go to the passenger side, get something out the car, put it back, come around, come to the passenger side. She's going to pass me something through the window to give to my brother. Now she's just standing there just talking to us smoking a cigarette. Well, I'm smoking a cigarette and I passed it to her.

As you can see, this is roughly when his shooting starts. It's 4:40, or just about.

We're going to pull off, because I don't want to

be late taking her to get her son from Franklin at 5:00. So we're going to go back around the front and we're going to park in front of this building and attempt to wait on her to come out. I'm going to start texting her, tell her to come down. She's going to tell me she's not coming down till 55 after, so -- because its only roughly seven, eight blocks to Franklin from here. This is Nicollet, Nicollet Avenue. Coming out of downtown going to Franklin, it's roughly about seven, eight blocks there. And she's saying she's only going to come down -- my phone records will show the texts and calls back and forth between me and her to, and it's going to put me down here at this time.

So we're going to go out. And if you trust us, we can skip the camera on the side of the building that's only going to show us -- go out here, make the turn and then come around the front. If y'all willing, the Court's willing, to spare for time, we can just go up to video number one.

Go to 4:40. There we are pulling up. We just came out the back --

(Videotape changed and played)

THE COURT: Can you stop for a second? Mr. Aligada, can you back it up a couple of frames?

THE DEFENDANT: Oh. You want to see it pull around the corner?

THE COURT: Go ahead now.

MR. ALIGADA: (Complies).

THE COURT: Okay.

THE DEFENDANT: As you see, I'm going to sit there. I'm going to text her. She's going to tell me she's not coming down right now.

I'm going to get the text back. We're going to make a U-turn, go one block up, and then we're going to go to the -- we're going to make a left into the SuperAmerica, which is I believe on Grant, one block off of Nicollet. It's the SA right here. We're going to turn into there.

And we lost that footage, because it's going to be on my lawyer and them notes that I told them to go get this footage from SA in June too, but they didn't go get it. Time lapsed. SA got rid of the footage. All the May 15th footage was there two months later, so how -- we only got this little bit of footage there, though.

We make a U-turn. Now we're going back there, whatever.

Okay. Now, you see this is after the shooting. This is at 4:41 and this is in south Minneapolis still, roughly on the other side of town from your shooting, which is where I said I was going to be at.

Could you stop it. Go back to camera three and go to 5:01.

(Video changed and played)

We're late, by the way, because we was trying to get some pizza and some gas, so I was late to get her again.

Now, this is where she's going to get mad.

You see us -- hold on. Go back, because I want you to see the vehicle actually come in. Right there. Stop. Perfect.

We're going to come in, pull into the same spot, come out, go back around the front, because I'm telling her to come down. She's been me like crazy: You're late. You're late. I'm only five, six minutes late, I mean. You wanted to wait till 55 after. We was up at the gas station. There's a little pizzeria right there.

Here we go turning in. There's the same vehicle. We're going to pull in, we're going to back out. We're going to go around the front.

Could you go back to camera one.

(Videotape changed and played)

Go to 4:41. I mean -- oh, no, no, no, no, no, no. You're going to go to 5:02 and nine seconds. We're going to turn the corner.

Yeah, roughly. Just leave it there. That's good.

Now, in this picture, if you close, you're going to see me roll the window up and show that I'm in the vehicle, because like I said, these are some spotty cameras. If they would have just got the inside footage, you would

have seen my likeliness and stuff if they'd got the rest of the day. But like I say, this is -- I believe this was a move for the Government or in the Government's favor. We're going to stop early this time.

Now, you see the window's down? It's going to start to go up. That's me rolling it up. We're going to sit here to 3:02, because she's talking shit now. She's telling me: You bitch. I don't need you no more. She's mad, calling out my name, so I tell her I'm going to go ahead and leave.

Now I'm going to show you the girl come out just so the courts know that I wasn't lying as we pull off. Now, remember the time we pull off, 3:02.

Go to camera three.

(Videotape changed and played)

We leave for good. You're not going to see us no more, but I want to put up my alibi for the girl.

Go to 5:01 and 50 seconds.

Right there. You're going to notice her come walk in the screen with her sister's baby dad. They're going to get in this black SUV right here. Notice that she's not going to have a baby. She's only going to have a bag in her hand. Relevancy.

Now you see us leaving the parking lot. That was the truck just leaving out. We're going back around the

front, which is the last footage we just watched. She was looking out the door. So now she's going to come out. This camera's like it's an elevator inside the building a little further back and she's coming out that way now. You will see her in probably about another roughly 15 seconds.

And there's her baby dad, her sister's baby dad and her. They're going to get in the SUV and go to the left, which is towards Franklin, which is what I told you the daycare's at.

And her name's Dearra Young. The Government can look it up and see that she lived in the building at the time. I would have had her here to testify to this too, but we don't deal with each other no more, so I got to work with what I got.

THE COURT: Just for the record, you can subpoena her if you need her for future court hearings.

THE DEFENDANT: She's a -- it's a long story with her, man.

THE COURT: Is that it?

THE DEFENDANT: No. You can go forward to -- the truck's going to leave. Go forward to 5:26 and 28 seconds. There for the pull out, go to the left. At 5:26 she's going to come back.

Wait. Go back.

There it is. You see the truck coming back in,

parking in the same spot? She's going to get out with the baby, go into the building around the front which I'm going to show you. He's going to get out the truck and leave the parking lot and go somewhere else. He had to run another errand at the Family Dollar over here for his baby mama, so this is going to show that she wasn't with him, but she only got the ride with him because I was late, which is what I told the investigators from the beginning, that I wasn't at their crime scene and didn't do the shooting.

I told them if they'd have went and got this footage, they would have seen me with red on. Then I'm going to play some other footage where I actually tell the officers while I'm being arrested that I had red on and the outfit that they was arresting me in and alleging to be my -- the clothes I had on at the shooting that I just put on that night because it was chilly, and that's why I had the coat on also. Schroeder's going to make a reference to it. But all that's going to be just split-second stuff and then he can get his cross on or whatever.

Do you see that? She has the baby. Closer up picture of her.

Go to camera four. Go to 5:28.

(Videotape changed and played)

Right there. She's going to come walking through the screen with the baby. And if for a time for the courts,

if everyone would just let this be, she's going to turn, walking up the front. I can show you the camera right there. Then I can show you the ramp of her walking in too, but for the argument of saving time, we're all going to be able to see that she has the baby coming back by herself.

There she is. She didn't leave with that baby, which goes to show that once again I told these detectives and stuff.

So I'm going to be entering this whole video. All this documented evidence that -- for the sake of Government misconduct, like lying to the jury, like all type of different stuff that they could have done and investigated and knew that I didn't do this. There was multiple stuff along the way that told them I didn't do it. The gun didn't match, all type of stuff.

Okay. You can stop this one. Go to Joe Pucely, his body cam one. Stop.

Can you pull up -- put this down and pull up on this screen -- pull up on this screen the supplement of, if you remember it -- I believe it's -- go to 30, Supplement 30.

MR. ALIGADA: Mr. Andrews, I don't have --

THE DEFENDANT: Scroll down. I'll tell you. Skip a lot of them. Keep going. Keep going. Keep going.

What I'm going to show here is going to be -- no,

go down. Wait. Go up, up, slowly. Go up. Keep going to the next one. Each one I tell you to skip, skip. Skip that one. Skip, skip, skip this whole one. Skip. Yeah, just keep going. I'll tell you when to stop. No. Keep going. Stop. No, go to the next one. That's not it. No, that's not it. No, that's not it. Go to 30. I thought it was 30.

MR. PAULSEN: 30 is Officer John Owen. Is that what you want?

THE DEFENDANT: No, but it's right there with his. It's the one with the officer who said he found the truck. Keep going. Keep going. Slow down.

MR. PAULSEN: 31.

THE DEFENDANT: Huh?

MR. PAULSEN: Jacob Spees, 31, found the truck.

THE DEFENDANT: Right here.

Now, in this officer's supplement he states that he was sent to this location with information and O'Rourke testified that he sent the officer to 26th and James, but in fact this officer went to 24th and James.

I just said that as a tangent, but what I want you to pay attention to is this officer said he located the vehicle, which is a 2001 Chevrolet Tahoe, parked behind 2412 James. While checking the vehicle for occupants, he observed the ID in the center console in plain view. From his point of view he was able to read the ID number and that

matched the suspect from the shooting. He took photos. The Government never turned those over. He said he didn't enter the vehicle and he notified whoever from the Assault Unit.

Okay. Now, go back to -- now, you see he said my ID was in there in the center console and he never went in this vehicle. He never searched it.

I'm going to enter this as evidence. I forgot to put it in, so that's going to be whatever the next one is. I will get around to it.

But play that video, that body cam that I had you tee up. Skip. Keep skipping till they take me out the vehicle. Right here is good. Stop.

Now, when he takes me out the vehicle -- this is already going to be an exhibit -- he's going to ask me what is my government name. At that time I'm going to tell him my government name, but I'm also going to inform him that I have my ID on me, I have my ID on my person.

Could you play it.

(Videotape played)

Stop one more time. This is Officer Joel Pucely body cam footage number one which was introduced by the -- was given to us by the Government.

Okay. Play it.

(Videotape changed and played)

Also I want to make a record for saving time for

the courts. The item that he just took out of my lap was a cell phone. He just set it on the hood of the truck -- I mean, the top of the truck. The Government made reference to it because he knew I was going to make an issue out of this too, but just take note that he just took that phone and put it on the truck. I'm going to show you something else in this video footage as we go further along, but to save time I'm just going to point you to each issue.

Okay. Go ahead.

(Videotape continues)

But this is about the ID. I just told him I have my ID on me. He's going to frisk me down, take my ID, do whatever, throw it on the hood. He's going to do what he does with it. I seen him with it. He takes my ID.

Go to his second video. Skip ahead. Right here. Perfect. Stop.

(Videotape changed and played)

I just told him again and that was Sgt. Schroeder asking me my name. I told him my name and then I told him that the officer that's searching me, which is Joe Pucely, I told him he took my ID already. This is the second time they searched me after they took me back out of the squad car, which is once again me telling them that, "You have my ID."

Skip ahead. More. More. More. More. Back just

a little bit. A little bit more. Right there. Stop.

Before he gets in -- he's going to get in and he's going to take my information. He's going to ask my name and all this, but I want you to take note of his screen and what he said.

He's going to ask me for my government name, my date of birth and all of that. Then he's going to ask me my address. I'm going to give him my address. He's going to be flicking the screens and he's going to state: "So your ID's correct," which means that he has my ID in his possession in this vehicle.

Could you please go forward and play it again. Stop.

(Videotape played)

As you see, he's flicking through screens. None of that has my information up there, period. He's just doing some stuff. He's obviously looking at something to verify my ID and he's going to say it in one second.

Play the rest of it.

(Videotape continues)

You can see he's not looking at my info.

Now, once again I want the record to reflect that he just said my ID is correct and I told him yes, which once again shows that the State had my ID and it wasn't in fact in that truck that they're going to go to in the next three

hours, because this is 12:07, 12:10-ish. They're going to go to that vehicle at 3:00 in the morning.

And also, when Ms. Darcy Goolich had the records from my state attorney information that she sent in the emails to him, which is why I'm going to state that I told them that they had a phone call of the same morning I went into custody, which is before I knew they found the truck. He's going to tell me over the phone that she woke up, she went outside, seen the officer two-stepping it back to his truck. At that point, the passenger window was jimmied down, the 2001. This officer never went in the truck and that ID was in there. This is going to show that it was record documented that this officer broke into my truck. She's going to send it to her investigator and go get the actual form, because they already heard the phone call. There's emails to him because she sent him the emails. She then sent him emails about other stuff that's pertaining to the case too, because he's going to go back and forth with her.

So skip forward.

(Videotape played)

We're almost out of here. I just want to develop the record.

Keep going. Go all the way until we're getting out the car at the station. A little bit more. We're

downtown now. A little bit more. A little bit more. Right there.

(Videotape continues)

Stop. At this time I'm going to ask him about my cell phone and my ID and stuff that I left, I mean, that was left there. He's going to -- clearly he's going to lie and state that he didn't take no cell phone. I had nothing in my pockets, he didn't take my ID, he didn't take nothing, but clearly the video footage and stuff is going to contradict that.

Could you keep playing it.

(Videotape continues)

Stop. Now, you heard him say he didn't take my cell phone. We all seen him put the cell phone on the roof of the car. And in his report he actually states that he put the cell phone on the roof, but I want to point you to some corruption by him. He's going to think that he cut his body cam off to make a phone call, but he's not.

Go forward. Skip forward. Go back just a little bit. Skip forward just a little bit more. Right there. Play it.

(Videotape continues)

Now, this is where he's covering his body cam thinking he cut it off.

Stop. This is Joe Pucely again, once again,

corruption at its best. He just said he didn't have it, he didn't do it, and once again you see him trying to cut his body cam off and minimize the footage that he left my stuff there. So my ID being in that truck, that's tampering with evidence also, so that tends to evidence not only in the Tahoe that the Government had since May 16th and they didn't search till June and gave the wrong truck numbers and stuff, and he put my kid's mother in this report for whatever reason, telling them it was a 2002.

But as you seen from the Supplement 31 that we're going to enter into evidence, when the officer towed it, he said it was a blue 2001 Chevrolet Tahoe and he actually lists the serial number, all of which before Sgt. O'Rourke wrote this report he could have checked to verify who was the owner of that vehicle. The owner of that vehicle was a Tamika, and I'm going to enter that into evidence, her name, the registration of the vehicle and everything, the 2001. It was never in my kid's mother's name. So them trying to put this -- this is more government corruption with them trying to put this bogus report in saying that it was a domestic and it was wrote it in there, they would have had that at the first hearing. They made that shit up. The number that we had -- excuse my language. But the number that we had and that we looked up for this case registered to, like I said, a 60-year-old woman and I entered that into

evidence. It's going to be in that police thing. And this is a domestic with her husband. The police didn't -- she didn't file charges because she was too blind to sign the papers. That's what it's going to say in there, no reference to a Chevrolet Tahoe, no reference to a Shenita Esaw.

And then if you look in the forged documents that they made, if you look in there, it says that that's from June 4th, and it was a 2002 with a 21-day temporary sticker in the window. That's what he's going to allege that this is, right? Well, how is it May 16th that -- when you towed this vehicle, this one had a 21-day sticker in the window? Now, is it me, or is that the longest 21-day sticker in history?

That goes to further proof that they knew that this wasn't the truck. They made up a truck. Because if the 2002 that you're alleging my kid's mother had in her name with the 21-day sticker was from March 4th, which is when the alleged domestic took place, then there's no way possible that it would have been a valid 21-day sticker in the window, which was valid because this sticker that's in fact in the 2001 that you guys got that they entered into evidence late that I'm putting in the suppression to get marked out, they actually take a up-close picture of the sticker the night before or the night when the vehicle's

being taken. That sticker was issued May 5th, ten days before the arrest of the suspect, which makes that a valid 21-day sticker, and the one from March 4th would have been also unvalid.

So when they go to make their argument about, oh, it was in his kid's mother's name and all that, bull. They had a chance to look up the VIN number. They didn't. They searched the wrong car, they lied to the judge.

Even the vehicle that they searched in their inventory report, it said a blue 2001 Chevrolet Tahoe. They had the vehicle in their custody a month and a half before they did the search. They had the VIN numbers the same night. They had already went in the truck. They had already did stuff to the truck. They clearly were saying that it was a 2001.

They took pictures of the door with the VIN number saying it was a 2001. They took pictures of the VIN number in the window. Everything in this truck -- they went through the owner manual and took pictures of it saying it's a 2001. They even took pictures of the ownership of the truck itself in the impound lot and it said it was in a Tamika -- a Tamika Barnes, when really it's supposed to be in a Linda Bail. It just never crossed over because the truck has still got a lien on it from an Automobile Giants and they didn't transfer it over.

So the vehicle that they did search, yeah, that was my vehicle with my stuff in it. I'm admitting that, everything you found in there. It's false, though. The insurance card, that's mine. All the stuff that was in there legally with my name on it, my tickets, my citations, those are mine. The stuff that you guys are showing is not.

Your witnesses at the scene said that the vehicle that did the shooting had tape repair on it. The vehicle that you towed had tape repair on it. It had a whole light missing.

THE COURT: Mr. Andrews, you got to slow down.

THE DEFENDANT: Oh. The vehicle that -- a witness that was at the scene, another witness that gave the name NO and a cell phone number that wasn't out there -- and the video was showed that I'm going to enter into evidence that she wasn't out there neither. But she's going to say that the vehicle that the suspect is known to drive has some tape repair somewhere on it. They enter into evidence so many pictures of this light hanging out, taped up, and all this stuff that's on this truck.

The vehicle that's in the video of the shooting, there's no tape. There's no light hanging off. They towed that vehicle, the 2001, less than 12 hours after the shooting. Once again, I told them I wasn't the right guy. They had the wrong truck. They had a chance to check that

truck. It wasn't the right truck. The evidence didn't fit.

This is Government corruption at its best. Them two (indicating) knew. It started off with David Voth, because he was the one taking the information from the sergeant. He checked it over. He knew that it didn't match. He knew the gun didn't match the crime scene. Supplement 44 said the gun didn't match the crime scene. They knew this. They turned over Supplement 44 in July, which means that that's the evidence that they took to the grand jury. In Supplement 44, that gun was not a match. The make-up copy that they made to Supplement 44, which is a forgery that they turned over September 7th, says that the gun was a match. That's a forged document.

Also, another thing that we're going to put into evidence. They put the search warrant for the DNA in. The search warrant that they put in was a forgery of the judge's. I have the original copy with the judge's signature on it. It's down there at the table. We're going to enter it into evidence. That one has the date, the judge name and everything on the same page. The one they entered, the judge name is on the second page, no date. It's not even wrote the same. But they stamped the judge's signature onto it, another forged document by the Government. He knew that, they knew that, and I had objected to it, so I'm using it as my argument. I put my motion in for Government

corruption. That's why I'm developing this stuff on the record.

I'm entering my notice for my alibi. My alibi is in. One is going to be a motion for an alibi. The second one is going to be a motion for my alibi, also to dismiss this case for loss of exculpatory evidence by both the Government and my attorney. No one went and got that footage. I don't know what they was thinking, what they was doing, but it's well-documented that I was telling people to get the whole day.

Also, these (indicating) two is more corruption. Once again, in David Voth's report he entered in the way that they develop what you say. You call Sgt. O'Rourke on June 6th and asked him how did he get the location of the suspect.

THE COURT: Mr. Andrews, let me interrupt you for a second, okay?

THE DEFENDANT: I wrapping up.

THE COURT: Okay. You're wrapping up? Because you're well into argument, which is fine. The only reason I care about it is you can make all those arguments later.

The Marshals Service has to transport a lot of people back to Sherburne County. They've been waiting 45 minutes. That's fine. If you're wrapping up, that's fine too, but just recognize that if there's factual information

you want in the record, put it in. If it's argument, you can wait.

THE DEFENDANT: No, it's factual. I want to talk about the evil eye and double-edge sword and about the evidence they entered as an exhibit, but it's David J. Voth, ATF officer in this case.

June 16th he spoke to Sgt. O'Rourke, asked him how he developed the supplement on May 10th. Sgt. O'Rourke on June 8th in response sent him his supplement and roughly eight attachments that show the time reference, date and the paperwork that they used to get the suspect. And that time, date and reference they only gave -- the Government -- the defendant at the 11:00 o'clock hour. Why did they only give it at the 11:00 o'clock hour? Because they wanted to show that that was the hour and the cell site information they used to get the suspect. There's no way in a realtime emergency ping, nowhere. There's many, many perjuries on this stand and impeachment that none of these officers had this until it was turned over May 10th, which is what Kelly O'Rourke testified to and we took a continuance that day. So that's in the evidence.

Also -- I mean, the phone records. This is why they changed their records. If you look at the records which they refused to turn over till September 7th, it shows the full time from the 13th to midnight May 15th. In those

records it got cell site tower information. Now, that's the same cell site tower information they used at the 11 o'clock hour to locate the suspect.

If you go to the 4:00 o'clock hour over south, Loring Tower on Nicollet, which I said from the beginning which gives me an airtight alibi, somehow, some way, the Government was dealing with my attorney, because they wouldn't return multiple emails to them and asking them back and forth, they wouldn't give us the full document of the realtime ping, because David Voth put in -- said they had 48 hours. So September 7th they gave us theirs, but a week or two earlier, maybe three weeks earlier, he was telling me if they don't want to give it to us, put a subpoena in. Well, it was put in and we got our own. We got ours September 6th. They gave it to us on September 6, 7, brought it to me before the motions -- two days before the motions hearings.

Now, in ours, ours went through May 16th. Theirs didn't. The thing that was different from ours from theirs is ours showed the 16th. This goes into the corruption of how all of this is twisted together with the Government's outrageous conduct and what he's willing to do, Jeffrey Paulsen, to get a conviction. He changed his story. In came this realtime ping location, because he was made aware from my attorney that I was going to use their phone records

that they gave us as an airtight alibi, but in doing that I feel like my attorney exposed him and working with the Government. How do I prove that? This is facts.

Their time frame stopped midnight May 15. Ours went through May 16th. On May 16th, 5:00 o'clock, text messages, so we knew that the time frame was off by five hours. The Government didn't know this. Up until this point they was only putting in the 11:00 o'clock hour from T-Mobile. If you go back to 4:40, which is the shooting, I was over south, the other side of town from their shooting.

Now, for the Government to prove my time is, say, this five hours, which they show with his time, they got to put in another way the suspect's location on May 15th going into May 16th. In comes the realtime location.

But here's the fact that the Government had to be working with my attorney. The Government wouldn't have known that it was the five-hour gap unless my attorney had told them May 16th that my phone was still making phone calls till roughly 5:00 o'clock in the morning, so that goes to show there was a 5:00 o'clock gap. Even with that 5:00 o'clock gap, it still put me downtown south closer to -- the phone is bouncing around, but it's an airtight alibi where I was from the cameras and the T-Mobile records.

But they changed their time frame now and they put the realtime in because they need to push my time back,

which I knew, but that's why we get to the T-Mobile records, which show the beginning of our time and the end of our time to show where ours went. They changed their story three days after we got our records, which goes to show someone gave them that information that the five hours was off. Surely they had four or five months before September 10th to put their realtime location in, which is why I impeached Kelly O'Rourke and the other officer, pressed them so hard about why that email didn't exist and why it was so important. It goes to show that they changed the story line, they changed their evidence, because they received evidence I believe from my attorney just like my attorney and them got rid of the footage two months later.

And if we put a subpoena in, the investigator is going to testify when we put him up here that they told him that they saved the footage, but they just needed -- the footage was there. If the whole day was saved, why when you went back to get it a week or so later only two hours was saved after I was outside after? This shows nothing of my life from the morning time, to the afternoon, to when I came back.

THE COURT: Mr. Andrews, let me stop you.

THE DEFENDANT: That's the loss of exculpatory evidence.

THE COURT: I understand your argument.

Let me ask Mr. Paulsen: Is it your intention to cross-examine Mr. Andrews?

MR. PAULSEN: I have to on a couple points.

THE DEFENDANT: I stopped there.

THE COURT: I got to ask the marshals: Are we holding it up for an hour?

DEPUTY MARSHAL: Yes, Your Honor. It's been held up. They have other drops they have to do with other agencies as well, but if we had a sense -- I was trying to find that out earlier -- it doesn't seem like there's a timeline here, so they're still waiting downstairs.

THE DEFENDANT: I don't feel that I -- that this should be another continuance if they got to leave and come back and get me, because he said they'd be able to do that. If there's going to be another continuance like that again where I can't put my argument in, try to scramble and get evidence and get it into the record and stuff like that, then I object, because I feel like it was some type of violation with this time. I'm already putting in false documents that I got to keep proving left and right that are forged.

THE COURT: Very short answers. How long are you going to go?

THE DEFENDANT: Man, I'm done now. He can cross me.

THE COURT: How long are you going to go?

MR. PAULSEN: Hopefully just a few minutes.

THE COURT: What does that mean?

MR. PAULSEN: I have two areas I want to go into.

THE COURT: So are we talking ten minutes or half an hour? I know you don't --

MR. PAULSEN: Five minutes.

THE COURT: Are you done? I don't want to put you off. We've got other things we have to manage here, so I don't want you to say you're done if you're not done, but same thing I told you before. Argument you don't have to make today, and frankly, the more you argue, the more you're letting him (indicating) know, okay?

THE DEFENDANT: If this wraps up the motions hearing today and we can get our transcript and put our arguments in. I don't want to do another continuance where he's going to call other witnesses and all this other stuff.

THE COURT: I don't want to either, I don't want to either, but I can't and I will not keep everybody here until 6:00, 6:30, 7:00 o'clock. I've got to wrap this up and I got to either put a time limit on you or talk to the marshals about what they can do.

THE DEFENDANT: He said they can come back and get me.

DEPUTY MARSHAL: That was at 4:00 o'clock, Your

Honor.

THE COURT: All right. Look, 15 minutes. I don't want to continue it either, Mr. Andrews, but at quarter to 6:00 we're done, okay? Do you want to keep talking or do you want Mr. Paulsen to cross-examine you?

THE DEFENDANT: I guess he can cross.

**CROSS-EXAMINATION**

BY MR. PAULSEN:

Q. The cell phone, you're saying you did have a cell phone with you when the police stopped you?

A. Correct.

Q. Is that the phone that has the number 651-502-5142?

A. I had two cells.

Q. The telephone number 651-502-5142, that's the one they pinged.

A. Yes.

Q. Did you have that one with you when you were stopped?

A. Yes.

Q. Did you have it with you all day long?

A. Yes.

Q. Didn't loan it to anybody?

A. No.

Q. Is that the one you claim you were texting to a female during the time of your alibi, which is the time I have the shooting?

A. No, that's not what I'm testifying to.
Q. You showed some videos of a car, white car, with a time stamp between 4:00 and 5:00 p.m. You're saying you were in that car?
A. That's what I said in my post-statement.
Q. Can you tell us who these people were that were supposedly with you?
A. No. If -- y'all had a chance to go check in on that stuff, so I'm not dragging no one else into this.
THE COURT: I'm sorry. If you know the answer to his question, you're going to have to answer it. The question is: Who was with you? Do you know their identity?
THE DEFENDANT: Yes, I know their identity.
THE COURT: So what's the answer?
A. Yes, I know their identity.
BY MR. PAULSEN:
Q. Well, you said you were in that white vehicle.
A. Yes.
Q. Who else was?
A. Brother.
Q. What is his name?
A. Mike Jones.
Q. Mike Jones. And you said there was a female that came up to that white car?
A. Mm-hm.

Q. Who was she?
A. That's my brother's baby mother.
Q. What's her name?
A. I don't have her government name. She go by DeeDee.
Q. And I thought you said -- wasn't there a Dearra Young?
A. Yes.
Q. She lived at that Loring Tower?
A. Yes.
Q. Somebody that you interacted with or claimed to during the 4:00 o'clock to 5:00 o'clock hour time period?
A. Yeah.
Q. Anybody else?
A. Yeah. People at the SuperAmerica and the pizza shop.
Q. Would they know you by name?
A. Probably not.
Q. One other thing I want to clear up. You did use a blue Tahoe that day?
A. No.
Q. Well, let me be clear, because I thought I heard you say that the stuff in the blue Tahoe was yours.
A. It is.
Q. And is that a vehicle --
A. Broke down.
Q. Let me finish my question. Is that a vehicle you've driven in the past?

A. In the past?

Q. Yes.

A. In reference -- what do mean in the past?

Q. Is that a vehicle Shenita Esaw used?

A. No.

Q. All right. So who used it? Who had it?

A. Me until it broke down.

Q. When did it break down?

A. Sometime like April.

Q. So are you saying it's been sitting in the location that it was found since April?

A. Roughly just about like beginning of May into April, somewhere in there.

Q. All right.

A. Broke down for a few weeks prior. That's why I was getting a ride from my brother. And if you looked at the pictures and stuff, you would see that it was dusty and beat up, and even your officer said that the vehicle wasn't working. That's why they didn't give our investigator the keys when he went to go to try to check that you all broke the window and jimmied the windows down.

Q. The second cell phone, did you have that with you in the car when you were stopped?

A. Yes.

Q. So there should be cell phones from you in evidence?

A. Yeah, but y'all lost one and I told your officer. If you listened to my post-interview, I told him that I had a phone, 502-4191.
Q. 502-4191?
A. Correct.
Q. What's the area code?
A. 651.
Q. Would that be in your name?
A. What?
Q. The second cell phone?
A. I doubt it. It was a Wi-Fi phone that I just made Wi-Fi calls and stuff on it and text messages.
MR. PAULSEN: That's all I have, Your Honor.
THE COURT: Thank you.
THE DEFENDANT: I got a rebuttal.
THE COURT: You have 11 minutes.

**REDIRECT EXAMINATION**

THE DEFENDANT: How should I put this?
I was asked about my cell phones and I told the officers, and they said in their paperwork at the beginning of y'all's supplement -- I'm going to enter that into evidence too because of the fact of ownership of the vehicles. That's why I want the rebuttal.
You were asking whose vehicle was it. That vehicle in question is mine. It's not in my government

name. It's in someone else's that's got better credit than me, but it's my vehicle, insurance and everything. It was mine.

But in your consolidated response to our motions, you're going to state -- and this is another reason I put in the beginning of that supplement, which is going to be like the witnesses, the victims, the others, you know, the portion of the State case, you have it. It's the beginning before the statement started with the evidence and all that, videos and stuff that y'all refusing to give us that didn't exist, body cams, the bullets, the gun, that type of stuff. But in there your officers checked the ownership of another vehicle. That's the GMC Yukon.

Now, at the time that vehicle was in my name, so when you go to try to say I had no standing when y'all violated our constitutional rights and searched that vehicle without proper grounds to even pull it over, let alone search and seizure, you're false. That's a false statement. If you look at the beginning of that supplement -- could you pull up the beginning of the state case -- it's going to list the ownership in this whole case as mine.

Go all the way to the top. And yes, I'm entering this into evidence. Go down. Go down after the victims and stuff until you get to the vehicles. Keep going, keep going, keep going.

In your supplement your ground is going to be that I had no standing. Well, I did.

Keep going.

And this is your evidence that you turned in. This is your reindacted statement to the Government's case.

Keep going. It's coming up very, very quickly. Stop. Go up. Go up. No, no, down, the same way you was going. It's page 10.

Stop right there. Can you zoom in on the section that has vehicle one. Enlarging a little bit more. A little bit more.

Stop. That's the vehicle that we was pulled over in, which is a 2012 GMC Yukon with the dealership tag 17712 D, GMC Yukon. Owner name, Norris Andrews. This vehicle was verified, it was checked into. You want to know by whom?

Would you go to the thing again. We're running out of time. Go to the squad cams.

This is another purpose that I'm going to be entering this video into evidence.

(Pause)

Go to three -- or four, four, four. I believe it's four. No, it's three. We only need the very beginning of this. Is that the truck being towed?

MR. ALIGADA: Yes.

THE COURT: Play it.

MR. ALIGADA: It's playing.

(Videotape played)

THE DEFENDANT: What you're going to hear when his microphone is on is Officer Schroeder talking to his partner, and his partner is going to tell him that he ran the VIN number. He's the one putting the -- filling out the tow sheet, the registration and owner of this vehicle and -- but he's going to say and testify that he ran a VIN number and the VIN number to the dealership plates doesn't match, is that the plates that it does go on there which registers it to the owner is in fact another plate, and the plate that's on there is the dealership so the car can have a plate on it. But this is going to show that he looked into this and he verified whose vehicle it was.

Could you please start that footage.

(Videotape played)

Stop. Need I say more? So when you put your argument in -- yeah.

With that, how much more time we got?

THE COURT: You have three minutes.

THE DEFENDANT: Three minutes.

Last but not least, I would also like to put it on the record that the Government also gave my vehicle to an unknown male. They gave it to a Larry Smith that said he was Domonique's father. Domonique is a fictitious name.

The Government knew this. They found meth and that dope on that girl. They promised her they would let her go if she was going to come and testify that I was the one that put that gun in that car.

Well, lo and behold to them, the one that they thought was 16 years old, she's actually 21. Her name is Rachelle Hawkins. Y'all released her to a man named Larry Smith and you need Larry Smith's report. That's in the last one. I'm going to enter that too. He actually states in there that the girl's his stepdaughter, and then when she asked him what's her mother's name, he says Danielle, and the investigator says, "Danielle who?" and he says, "Danielle Hall." So if this is his stepdaughter, how is it Domonique Smith and how is it Larry Smith? He didn't adopt the daughter. This is his stepdaughter. You made some terrible mistakes, a lot of Government misconduct, outrageous Government conduct.

And with that I have nothing further for the record, but I do reserve the right to enter those other items. I would ask to bring Sgt. O'Rourke back to impeach him some more, but I think the record clearly shows that these detectives, the Government, the lengths that they're willing to go to to frame an innocent man and things that they're willing to put in emails that it's not even remotely right.

You got emails saying the shooting was at night, but the detective just testified that he didn't talk to Sgt. O'Rourke, emails or nothing. If he sent Sgt. O'Rourke all this information about the suspect, which is the forged documents that you sent to my lawyer since the last meeting, well, you just turned it over in the last 48 hours and he had his investigator bring it to me. Well, I read pretty fast, real fast, and --

THE COURT: Mr. Andrews, we are at 5:45, okay? You have reserved your right to put in any further documents per the procedure we've talked about.

THE DEFENDANT: How do I --

THE COURT: Mr. Aligada will take care of those kinds of details.

MR. ALIGADA: I'll order transcripts and I'll mail them or deliver them as fast as possible.

THE COURT: And all the exhibits, so we'll make sure that that's all taken care of.

THE DEFENDANT: So I just call him and tell him the extra exhibits to add in?

THE COURT: You do that, yes.

MR. ALIGADA: One administrative thought. Perhaps we should introduce -- maybe I'll talk to Mr. Paulsen about that.

THE COURT: That's fine.

All right. I'm going to stay out here. You gentlemen need to get on the road, okay? So we're in recess.

Go ahead. Don't stand up on my account. Can I speak with the CSO when we're done?

THE DEFENDANT: Do I need to give you the other motions?

THE COURT: Mr. Aligada will take care of that as well. All of that stuff will be filed, taken care of, it will be heard and it will be ruled on.

THE DEFENDANT: And we can argue on it?

THE COURT: Yes.

THE DEFENDANT: All right.

THE COURT: You have to leave any exhibits that have been marked up there. You have to leave them there. You will get copies of everything that's been marked.

THE DEFENDANT: Just for the record, I want to give this to the Government. Y'all can introduce it. This is the 16-year-old Domonique Smith, a/k/a Rachelle Hawkins, that my truck -- here. I want to introduce --

THE COURT: Leave it there. We'll mark it. We'll get it introduced.

THE DEFENDANT: That's her picture, photo, and her Government information is behind it.

THE COURT: Thank you.

THE DEFENDANT: Are we going to be need to have any more hearings?

THE COURT: Not for a while.

THE DEFENDANT: What would cause us to have another hearing?

THE COURT: Another motion perhaps, but that's for a later date. Rest assured, Mr. Andrews, we do not discuss your case out of your presence.

THE DEFENDANT: So if I decide not to put these other motions in, we don't have to have another date?

THE COURT: Correct.

THE DEFENDANT: Because I want to wrap this up. I want to get the argument in.

THE COURT: Even if you put these motions in, they can go in without another hearing and without in-court presence.

All right.

(Proceedings concluded at 5:50 p.m.)

* * * *

# I N D E X


| W I T N E S S E S: | PAGE |
|---|---|
| **JOEL E. PUCELY** | |
| Direct Examination by Mr. Paulsen | 12 |
| Cross-Examination by the Defendant | 22 |
| **ANDREW W. SCHROEDER** | |
| Direct Examination by Mr. Paulsen | 156 |
| Cross-Examination by the Defendant | 162 |
| **NORRIS DESHON ANDREWS** | |
| Direct Examination by the Defendant | 250 |
| Cross-Examination by Mr. Paulsen | 264 |
| Redirect Examination by the Defendant | 269 |

* * * * *

# E X H I B I T S

| NUMBER | FOR ID | IN EVIDENCE |
|---|---|---|
| Defendant 5 (Government 5) | | 32 |
| Defendant 6 | 47 | |
| Defendant 7 | 48 | 58 |
| Defendant 8 | | 58 |
| Defendant 9, 10 | | 58 |
| Defendant 11 | | 126 |
| Defendant 12 | | 137 |
| Government 10 | | 218 |
| Government 11 | | 221 |
| Defendant 13 | | 225 |
| Defendant 14 | | 226 |

**E X H I B I T S (CONTINUED)**

| NUMBER | FOR ID | IN EVIDENCE |
|---|---|---|
| Defendant 15 | | 230 |
| Defendant 16 | | 232 |
| Defendant 17 | | 233 |
| Defendant 18 | | 236 |
| Defendant 19 | (236) | |
| Defendant 20 | | 237 |
| Defendant 21 | | 238 |
| Defendant 22 through 29 | | 249 |

* * * *

**C E R T I F I C A T E**

I, **TIMOTHY J. WILLETTE**, Official Court Reporter for the United States District Court, do hereby certify that the foregoing pages are a true and accurate transcription of my shorthand notes, taken in the aforementioned matter, to the best of my skill and ability.

***/s/ Timothy J. Willette***

**TIMOTHY J. WILLETTE, RDR, CRR, CRC**
Official Court Reporter - U.S. District Court
Warren E. Burger Federal Building & U.S. Courthouse
316 North Robert Street - Suite 146
St. Paul, Minnesota 55101
651.848.1224